# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLENN BURTON, JR.,**
            **Plaintiff,**

                                        v.      **Case No. 07-CV-0303**

**AMERICAN CYANAMID et al.,**
            **Defendants;**

**RAVON OWENS,**
            **Plaintiff,**

                                        v.      **Case No. 07-CV-0441**

**AMERICAN CYANAMID et al.,**
            **Defendants;**

**CESAR SIFUENTES,**
            **Plaintiff,**

                                        v.      **Case No. 10-CV-0075**

**AMERICAN CYANAMID et al.,**
            **Defendants.**

---

## DECISION AND ORDER

Plaintiffs bring these negligence and strict products liability claims against various manufacturers and alleged successors-in-interest to manufacturers of white lead carbonate pigment (WLC). Plaintiffs allege that they were harmed by ingesting paint containing WLC when they were children. Each plaintiff further alleges that he or she is unable to identify the manufacturer of the WLC that harmed him or her; in consequence, plaintiffs' substantive claims rely on Wisconsin's risk contribution theory of liability which relaxes the traditional causation standard and requires a plaintiff to prove only that

defendants "contributed to the risk of injury to the public, and, consequently, . . . to the individual plaintiffs." *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129 ¶¶103-104, 285 Wis. 2d 236, 701 N.W. 2d 523. Before me now are several defendants' motions for summary judgment.

## I.    RISK CONTRIBUTION THEORY

Many of the motions before me require me to resolve questions of law with respect to risk contribution. In order to provide context for these issues, I begin with an overview of the development of risk contribution law.

The Wisconsin Supreme Court created its risk contribution theory of liability in order to address a problem of proof that might otherwise have functioned as an effective barrier to remedy in certain products liability cases. *Collins v. Eli Liilly Co.*, 116 Wis.2d 166 (Wis. 1984). In *Collins,* the seminal Wisconsin risk contribution case, the mother of the plaintiff had been prescribed the drug diethylstilbestrol ("DES") during her pregnancy in order to prevent miscarriage. Seventeen years later, the plaintiff was diagnosed with vaginal cancer, thought to be caused by her *in utero* exposure to DES. The plaintiff filed suit against twelve drug companies that produced or marketed DES, but was "unable to identify the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time." *Id.* at 177.

Recognizing that the plaintiff could not satisfy the common law requirement that she prove legal causation between the defendant's conduct and her injury in order to recover on her negligence and strict liability claims, the *Collins* court crafted a novel method of recovery for the DES case which relaxed the plaintiff's burden of proof in

establishing causation. Under the risk contribution doctrine, instead of having to prove that a particular defendant produced the DES that harmed her, a plaintiff might establish a prima facie case by showing that the defendant produced or marketed the type of DES taken by the plaintiff's mother. *Id.* at 193. In the case where the plaintiff could not allege and prove what type of DES the mother took, the plaintiff needed only to allege and prove that the defendant drug company produced or marketed DES for use in preventing miscarriages during pregnancy. *Id.* at 193-4. Once the plaintiff had proven the *prima facie* case (including other elements of strict liability or negligence), the burden of proof shifted to the defendant that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographic market area in which the plaintiff's mother acquired the DES. *Id.* at 197-198. The court "believe[d] that this procedure [would] result in a pool of defendants which it can be reasonably assumed could have caused the plaintiff's injuries." *Id.* at 198.

The *Collins* court discussed a number of factual circumstances that justified the application of risk contribution theory in DES cases. These fall into three general areas. First is the problem of proof faced by the plaintiff. The court noted that the passage of time, the lack of records and other factors created an "insurmountable obstacle" to the plaintiff's identification of the manufacturer of the product that actually caused her injury. Second, the court considered public policy matters, including the number of manufacturers of DES, the number of possible plaintiffs who had been exposed to DES, and the fungibility of DES itself. *Id.* at 180; *also see id.* at 181 ("It is probable, given the sheer number of potential victims, that many more [DES] suits will arise. Thus it is quite clear that in this case we are not dealing with an isolated, unique set of circumstances

which will never occur again."). These circumstances warranted the court's reliance on a modified version of market share theory to justify the likelihood that under risk contribution theory individual defendants would be held liable for injuries that their products did not actually cause. The nature of the product and the market was such that by producing and marketing DES, each manufacturer contributed to the risk to the public and by extension to the individual plaintiffs. *Id.* at 191. Finally, the court considered the balance of equities between the plaintiff and defendant. The court noted that because the plaintiff was a child in utero when she was exposed to DES, the plaintiff was entirely innocent, while evidence in the record support a conclusion that defendants had acted culpably by producing and marketing DES without adequately researching the risks associated with DES. *Id.* at 191-192. The court also considered that the defendants were better positioned to absorb the costs of the injuries caused by DES than were the plaintiffs. *Id.* In light of these imbalances, the court found that the equities supported a shifting of the burden of proof to the defendants.

In crafting risk contribution theory, the *Collins* court paid considerable attention to the practical mechanics of litigation, as especially evidenced in the court's discussion and ultimate rejection of the "market share" theory of recovery that had been adopted by the California Supreme Court in *Sindell.* Under *Sindell,*

> "once a plaintiff joins manufacturers of a substantial share of the DES produced and marketed in the relevant area and proves a prima facie case on every element except identification of the direct tortfeasor, the burden of proof shifts to the defendants to prove that they did not cause the plaintiff's injuries. This can be done by each defendant demonstrating that it could not have made the DES which caused the plaintiff's injuries. Those defendants failing in

> this proof are held liable for the percentage of damages approximating their share of the market.

*Collins*, 116 Wis.2d at 188-89, *citing Sindell*, 26 Cal.3d at 612. While the *Collins* court the viewed the *Sindell* approach as both "fundamental[ly] fair[]" and "conceptually attractive," the court had misgivings about the practicability of defining and proving market share, in light of the fluidity and scale of the drug market and the likely destruction of relevant records in the time since the plaintiff's exposure to DES. Further, the court observed that the "waste of judicial resources which would be inherent in a "second mini-trial to determine market share militates against its adoption by this court." To avoid these practical impediments, the court elected to permit a plaintiff to bring suit against just a single manufacturer, provided the plaintiff could allege and prove that the defendant produced the type of DES that caused the injury.

   *Collins* expressly allowed for the recognition of risk contribution theory in factually similar cases, and the *Thomas* court made risk contribution theory available to the WLC plaintiff in that case on the basis of the same general factual considerations as *Collins.* Reviewing a grant of summary judgment to the defendants and thus reading the facts in the plaintiff's favor, the court determined that, "due to the number of manufacturers, the loss of records and passage of time," the plaintiff could not identify the manufacturer of the WLC that harmed him and thus faced a problem of proof similar to that in *Collins. Thomas,* 285 Wis.2d at 309. The court considered the nature of WLC and of the WLC market, concluding (on the summary judgment record) that WLC is fungible such that application of risk contribution theory would result in a pool of defendants which can be reasonably assumed have caused the plaintiff's injuries. *Id.* at 312-316, 321. And the

court considered the equities, finding that the record established that defendants were culpable for contributing to the risk of harm to the public, and that the defendants were also better positioned to absorb the cost of injury than was the innocent plaintiff. *Id.* at 308.

Adapting the framework from *Collins, Thomas* described the procedure to be followed in a WLC case under the risk contribution theory as follows.

> "Thomas has brought claims for both negligence and strict liability. Applying the risk-contribution theory to Thomas' negligence claim, he will have to prove the following elements to the satisfaction of the trier of fact:
>> (1) That he ingested white lead carbonate;
>> (2) That the white lead carbonate caused his injuries;
>> (3) That the [defendants] produced or marketed the type of WLC he ingested; and
>> (4) That the [defendants'] conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty to Thomas.
>
> Because Thomas cannot prove the specific type of white lead carbonate he ingested, he need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the house's existence.
>
> Applying risk contribution theory to Thomas' strict products liability claim, Thomas will have to prove the following elements to the satisfaction of the trier of fact:
>> (1) That the white lead carbonate was defective when it left the possession or control of the pigment manufacturers;
>> (2) That it was unreasonably dangerous to the user or consumer;
>> (3) That the defect was a cause of [the plaintiff's] injuries or damages;
>> (4) That the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer; and,

> (5) That the product was one which the company expected to reach the user or consumer without substantial change in the condition when it was sold.
>
> Once Thomas makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographic market where the house is located.

*Thomas*, 285 Wis.2d at 320-321.

Once the plaintiff makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or marked white WLC either during the relevant time period or in the geographical market where the house is located. *Thomas* ¶ 163.

## II.    FAILURE-TO-WARN IN THE RISK CONTRIBUTION CONTEXT

The duty to warn is implicated in both the plaintiffs' negligence and their strict liability claims. Among the elements required to prevail on the strict liability claim, plaintiffs must prove that the WLC they ingested "was defective when it left the possession or control of the manufacturers." *Thomas,* 285 Wis. 2d 236, ¶ 162. Plaintiffs rely on the failure-to-warn theory of product defect recognized by Wisconsin law: "a product is defective based on a failure to adequately warn when an intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction." *Godoy,* 319 Wis.2d 91, ¶29. Separately, plaintiffs' negligence claims require proof "that the pigment manufacturers conduct in producing the white lead carbonate constituted a breach of a legally recognized duty to [the plaintiff]." *Thomas,* 285 Wis. 2d 236, ¶ 161. Plaintiffs proffer the duty to warn as one such legally recognized duty, while

reserving the possibility that parallel negligence claims might be pursued on the basis of other sorts of duty.

Defendants Sherwin-Williams, Armstrong Containers and American Cyanamid have each moved for summary judgment on plaintiffs' failure to warn claims, arguing that they had no duty to warn about the hazards associated with WLC when used in paint, and that plaintiffs cannot prove that a failure to warn by defendants caused their injuries.

Courts applying Wisconsin law have often stated that, though failure-to-warn claims may sound in negligence or in strict liability, the proof requirements of the claims are essentially the same. See, e.g., *Lemmerman v. Blue Cross Blue Shield of Wis.,* 713 F.Supp.2d 791, 811 (E.D. Wis., 2010)(failure to warn claim under strict liability is substantially indistinguishable from a claim of negligent failure to warn). While this is no doubt accurate in most cases, the risk contribution theory's unique approach to causation reveals a salient difference between the duty element of strict liability and that of negligence such that the two failure to warn claims are best analyzed separately.

Specifically, the negligence claim outlined in *Thomas* required proof that "the Pigment Manufacturer's conduct in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty **to Thomas**." *Thomas*, 285 Wis.2d 236, ¶ 161 (emphasis supplied). Thus the duty that must be established is necessarily a duty to the plaintiff. However, once this duty has been established, the *Thomas* negligence elements do not include a requirement that the plaintiff establish a causal relationship between the defendant's specific breach of a duty and the plaintiff's injuries. *Id.*

On the other hand, the strict liability failure to warn claim under *Thomas* does **not** require proof that the defendant owed and breached a duty **to the plaintiff.** The emphasis in strict liability is rather on the condition of the product at the time the manufacturers released it into the market. Again, under *Thomas*, the first required element of the plaintiff's proof on strict liability claims based on risk contribution is "that the white lead carbonate was defective when it left the possession or control of the pigment manufacturers." *Id.*, ¶162. Under Wisconsin strict liability law, "if a manufacturer has reason to anticipate that danger may result from a particular use . . . [the manufacturer] may be required to give adequate warning of the danger, and a product sold without such warning is in defective condition." *Godoy,* 319 Wis.2s 91, ¶33, citing Restatement (Second) of Torts § 402A, cmt. h. However, a manufacturer does not have a duty to warn about dangers that are obvious to or readily known by potential users, or so commonly known that it can reasonably be assumed that users will be familiar with them. *Godoy,* 319 Wis.2s 91, ¶32 ("If [the product] posed a hidden danger that the ultimate consumer would not contemplate, a manufacturer might be liable based on the failure to adequately warn or other claims."); Restatement (Second) of Torts, § 402A, cmt. g. Thus, establishing the existence of a product defect based on failure to warn in the strict liability context requires analysis of what the manufacturer knew and what potential consumers or users knew about the hazards of the product at the time that the product left the manufacturer's control. The duty, in other words, is **not to the plaintiff**; it is a general duty owed at the moment of sale to potential users of the products, such that the breach of the duty becomes a characteristic of the product itself—a defect, a quality of unreasonable dangerousness. On the other hand, in further contrast to the

negligence framework, the plaintiff seeking to recover on a strict liability claim using risk contribution theory must demonstrate that the defect in the product (i.e., the manufacturer's failure to adequately warn about a known danger at the time the product was transferred or sold) was a cause of the plaintiff's injuries or damages. *Thomas,* 285 Wis.2d 236, ¶ 162.

To summarize: a plaintiff claiming failure to warn in the context of a *Thomas* negligence claim must establish that the defendant owed the plaintiff a duty to warn and breached that duty, but need not establish a direct line of causation between that breach and the plaintiff's injuries. On the other hand, a plaintiff claiming failure to warn in the context of a *Thomas* strict liability claim need not establish that the defendant owed any duty to the individual plaintiff; rather, the plaintiff need only establish a duty owed to potential customers or users at the time the product was sold. However, once that duty and its breach have been established, the plaintiff also must prove that the breach was a substantial factor in causing the plaintiff's eventual injuries.

### III.    SUMMARY JUDGMENT STANDARD

When I consider a motion for summary judgment, I am to treat the evidence of the non-movant as true and draw all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). I am to grant summary judgment if the movant shows that there are no genuine issues of material fact such that the movant is entitled to judgment as a matter of law. *Blasius v. Angel Automotive, Inc.,* 839 F. 3d 639, 644 (7th Cir. 2016).

IV.    **FACTS**

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

A.  *Sherwin Williams*

Sherwin-Williams made WLC pigments at most times from May 1910 to June 1947, and used some of the WLC it produced in its own ready-mixed paints. From the early 1900s onwards, Sherwin-Williams' product labels listed lead or WLC pigments as an ingredient whenever it was present. In 1940, Sherwin-Williams added a product label warning, stating "Keep away from fire. Use in a well-ventilated place. Observe cleanliness and sanitary precautions." In 1955, Sherwin-Williams and other paint manufacturers began voluntary participation in a national standard to limit the lead content of interior residential paints to 1% or less of the total weight of the contained solids. Also in 1955, Sherwin-Williams and other manufacturers placed a warning on other paints with lead exceeding the 1% by weight restriction. That warning said, in part: "CONTIANS LEAD OR OTHER COMPOUNDS. HARMFUL IF EATEN. Do not apply on toys, furniture or interior surfaces which may be chewed by children."

Federal, state and local governments have warned of the risks of lead in the home since the 1970s. The plaintiffs' claimed exposure to WLC pigments occurred in 1993 and 2001-02. Parents and caregivers of each plaintiff have acknowledged that they were aware of the risk of lead exposure from paint at or before the time that the plaintiff was exposed.

Internal Sherwin-Williams publications from the early 20th century discuss risks associated with the use of lead in paint. An article from the January, 1900 edition of the Sherwin-Williams publication <u>The Chameleon</u> stated:

> It is also familiarly known that white lead is a deadly cumulative neurotoxin, while zinc is innocuous. It is true, therefore, that any paint is poisonous in proportion to the percentage of lead contained in it.  This noxious quality becomes serious in a paint which disintegrates and is blown about by the wind; but if a paint containing lead (such as the better class of combinations) is not subject to chalking, the danger is minimized.

A July,1904 article in the Sherwin-Williams publication <u>The SWP</u> described a European conference at which an expert stated that he "condemn[ed] the addition of white lead to paints and all colors containing it, declaring them to be poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors."

B. *American Cyanamid*

Cyanamid first manufactured WLC in June, 1971, when it purchased the assets of a WLC manufacturing operation in a transaction involving the MacGregor Lead Company and its parent Armstrong Chemcon, Inc. The only location where MacGregor manufactured WLC was in Chicago, Illinois. As of 1971, one of Cyanamid's business lines involved manufacturing additives used in making plastics and selling those additives to plastics manufacturers. Cyanamid asserts that its primary purpose in purchasing the Chicago lead processing facility was to manufacture lead stabilizers for sale to the plastics industry.

Part of Cyanamid's June, 1971, asset transaction included a contract under which it agreed to sell WLC to Armstrong Chemcon, the maker of Scotch Laddie paint. The parties dispute whether Armstrong manufactured other residential paints besides Scotch Laddie. Cyanamid did not sell WLC to general customers. There are no documents evidencing any sales of WLC to Armstrong or its subsidiaries pursuant to the contract. Any sales pursuant to the contract would have happened in Chicago, between June 1971 and December 1972. Cyanamid never made paint.

C. *Armstrong Containers*

Plaintiffs sue Armstrong Containers as an alleged successor to the interest of the John R. MacGregor Lead Company. Armstrong disputes that it is successor-in-interest to MacGregor, but that dispute is not material to the present motion before the court.

The John R. MacGregor Lead Company was formed in 1937 in Illinois. It manufactured WLC at a single plant in Chicago from 1938 to 1971, when it sold the plant to Cyanamid. MacGregor manufactured the Scotch Laddie line of paint using its own WLC. The parties dispute whether MacGregor also sold WLC to other manufacturers for use in paint.

MacGregor was a member of the Lead Industries Association. Publications and internal papers of the LIA indicate awareness, dating to at least 1959 and perhaps earlier, of the risk that children might ingest chips or peelings of deteriorated lead paint, leading to cumulative lead poisoning. No. 07-C-0303, ECF No. 893-9 at 17.

MacGregor had no known presence in the Milwaukee area until 1949, when ads for Scotch Laddie paint issued by a local paint supplier first appeared in the Milwaukee

Journal. Ads for Scotch Laddie appeared intermittently in the Milwaukee Journal and Milwaukee Sentinel until 1966.

Plaintiffs have presented evidence of two labels for Scotch Laddie brand paint. The label for Scotch Laddie Pure White Lead Paint No. 22—Ready to Use states:

> CAUTION! COMBUSTIBLE
>
> Keep away from Heat, Sparks, and Open Flame. CONTAINS LEAD OR OTHER COMPOUNDS HARMFUL IF EATEN. Do not apply on toys, furniture, window sills or any interior surfaces which might be chewed by children . . . Do Not Take Internally . . . USE WITH ADEQUATE VENTILATION . . . Avoid prolonged contact with skin . . . Wash thoroughly after using and before eating or smoking . . . Keep container closed when not in use.
>
> KEEP OUT OF THE REACH OF CHILDREN.

The label for Scotch Laddie Titanized Exterior Primer No. 20 states:

> WARNING COMBUSTIBLE – Keep away from heat and open flame. Do Not Take internally: CONTAINS LEAD OR OTHER COMPOUNDS HARMFUL IF EATEN. Do not apply on toys or surfaces children might chew. Use with adequate ventilation. Avoid prolonged breathing of vapor or spray mist. Avoid prolonged contact with skin. After using and before eating or smoking, wash skin thoroughly. Keep container closed when not in use.

## V.     PLAINTIFFS' NEGLIGENCE CLAIMS

For plaintiffs' negligent failure to warn claims to survive summary judgment, each plaintiff must establish that the defendant manufacturers owed a duty **to that plaintiff** to warn him or her (or his or her parents and caregivers) of the risks associated with WLC when used for residential paint. To establish the existence of a duty to warn in a negligence context, a plaintiff must show that the manufacturer "(a) knows or has

reason to know that the chattel is likely dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶ 58, 236 Wis.2d 435, 613 N.W.2d 142 (quoting Restatement (Second) of Torts, § 388. Thus, plaintiffs claim here relies on showing that defendants "had no reason to believe" that plaintiffs or their caregivers would realize that the pigment on their walls was dangerous. This they cannot do: as plaintiffs acknowledge, Sherwin Williams and other paint manufacturers had issued product warnings since at least 1955, No. 07-CV-0303, ECF No. 797, ¶ 10, while federal, state and local governments have warned of risks of lead in the homes since the 1970s, *id.* at ¶ 31. Defendants therefore had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in the paint, and of the various mechanisms by which that lead might be ingested. Deposition testimony of plaintiffs' witnesses supports this point, as parents or caregivers of each plaintiff testified that they knew, before each plaintiff's lead exposure, that children should not eat paint chips because of the risk of lead exposure. I therefore conclude that the defendants did not owe a duty to plaintiffs or their caregivers to warn them directly of the risks associated with WLC in residential paint. Plaintiffs are therefore foreclosed from pursuing negligence claims that rely on a duty to warn theory. Plaintiffs may, however, continue to pursue negligence claims based on the general duty of ordinary care.

## VI.   PLAINTIFFS STRICT LIABILITY FAILURE TO WARN CLAIMS

To survive Sherwin-Williams' and Armstrong's motions for summary judgment on their strict liability claims, plaintiffs must establish that issues of material fact exist regarding (1) whether each defendant had, at the time of sale, an obligation to warn of the hazards to children arising from ingesting WLC in residential paints, and (2) that the defendants' failure to so warn is a cause of plaintiffs' alleged lead exposure.

### A.  *Existence of Duty to Warn*

The Wisconsin Supreme Court invokes the comments to § 402A of the Restatement (Second) of Torts to explain the circumstances that give rise to a duty to warn in a strict liability context. See *Godoy*, 319 Wis.2d 91, ¶ 36, n. 15 ("Under Section 402A, manufacturers have an obligation to warn consumers about the hidden dangers of their products.")(citing Restatement (Second) of Torts § 402A, cmts. h., i.). "Where . . . [a manufacturer] has reason to anticipate that a danger may result from a particular use, . . . he may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition." Restatement (Second) of Torts § 402A, cmt. h. Further, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.*, cmt. i.

Undisputed facts in the record show that Sherwin-Williams had ample reason to anticipate that danger might result from use of WLC in household paint, long before it ceased to manufacture WLC. As Sherwin-Williams acknowledges, an internal Sherwin-Williams publication dated January 1900 identified WLC as a "deadly cumulative poison," noting that "any paint is poisonous in proportion to the percentage of lead

contained in it" and further indicating that this "noxious quality" of the lead paint "becomes serious in a paint which disintegrates and is blown about by the wind." Another internal publication dated 1904 notes a European expert's declaration that paints containing lead are "poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors."

Evidence of Sherwin-Williams knowledge of the danger is not sufficient for plaintiffs to survive summary judgment on the question of duty; plaintiffs must also have adduced evidence sufficient to raise a question of fact as to whether the hazards of WLC in paint were "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." The "ordinary consumer" in question here must be understood as the ordinary consumer who purchased or used WLC or paint containing WLC during the years that Sherwin-Williams made WLC, i.e., 1910-1947. The parties agree that since Greek and Roman times, it has been common knowledge that lead is toxic if too much is ingested; thus if the only danger of WLC were that it is toxic when consumed directly, the manufacturer would be under no special duty to warn about the toxicity of lead so long as the purchaser knew that the product contained lead. However, the danger known to Sherwin-Williams was more extensive than mere toxicity. For example, Sherwin-Williams knew that the noxious quality of lead paint "becomes serious in paint which disintegrates and is blown about by the wind." Would ordinary consumers purchasing paint containing WLC between 1910 and 1947 have contemplated the possibility that the paint would disintegrate and possibly distribute lead elsewhere in their homes? Sherwin-Williams also knew that lead was a

"cumulative" toxin. Would ordinary consumers have contemplated the possibility that small amounts of lead ingested over time would yield cumulative injuries?

Though the question is closer, I find that plaintiffs have also adduced evidence sufficient to create a triable question of fact whether ordinary consumers and users of paint during the period that Sherwin-Williams was manufacturing WLC would have contemplated the risk that deteriorating paint would cause children to be exposed to lead. In particular, evidence that during the relevant years lead industry executives affirmatively sought to suppress and rebut news stories and other efforts to inform the product about childhood lead poisoning caused by consumer products supports an inference that the public was not fully informed about lead poisoning and the mechanisms of exposure, and the therefore the extent of the risks known to Sherwin-Williams would not have been contemplated by consumers and users of paint at the time. See No. 07-CV-0303, ECF No. 798-7 at 50-58. Plaintiffs have also adduced evidence that, during the relevant years, Sherwin-Williams and others in the lead industry actively worked to promote a public perception that lead-based paint was safe and hygienic. See *id.* at 29 (Lead Industry Association asserting that its promotional work and advertising "helps to build up good will for out metal and in the long run will share in dispelling anxiety about its use"); *id.* at 18 (Sherwin-Williams advertisements between 1922 and 1928 advocating use of lead-based paint on toys and interior surfaces); *id.* at 30 (book published by Lead Industry association informing readers that while lead poisoning could occur when lead gained "entrance into the human system in measurable quantity either through inhalation of vapors and dusts or ingestion of lead compounds introduced into the mouth on the fingers," ingestion was "by far the less

important [danger] and is most often associated with children chewing on objects coated with paint containing lead"; this book was published 5 years after Sherwin-Williams stopped producing WLC, but it is relevant to the state of public understanding of the mechanisms of lead exposure in the years preceding the book's publication.). Again, this evidence could support a factfinder's inference that the dangers known to Sherwin-Williams at the time the pigment left its control were beyond the contemplation of consumers and users of paint containing Sherwin-Williams WLC. See *Schuh v. Fox River Tractor Co.,* 63 Wis.2d 728, 739, 218 N.W.2d 279, 285 (Wis. 1974) ("Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that . . . there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous.").

As for Armstrong, it argues that MacGregor owed no duty to warn because children's ingestion of lead paint was unintended and an unforeseeable misuse at the time that MacGregor was manufacturing WLC. In support of this argument, MacGregor cites entirely to a portion of the expert report of its expert witness, Christine T. Wood, that I have already excluded as unreliable. No. 07-C-0303, ECF No. 1066. On the other hand, admissible documentary evidence and opinion testimony from plaintiffs' expert historian suggests that MacGregor leadership had knowledge at relevant times that WLC was toxic and, if allowed to deteriorate, might be ingested by children. No. 07-CV-0303, ECF No. 1024 at 28, ¶5. On this summary judgment record, I must infer that MacGregor had reason to anticipate the risk to children of WLC in deteriorating paint. I cannot grant summary judgment to Armstrong on these grounds.

B.  *Duty to Warn of Component Supplier*

Cyanamid and Armstrong further argue that Wisconsin law does not impose a duty to warn on manufacturers of non-defective component parts. They argue that, to the extent that they supplied WLC to other companies for integration into paint, they are shielded from liability by the "bulk supplier" and "sophisticated user" doctrines. I have already addressed component supplier liability and the bulk supplier doctrine in an earlier decision on a motion for summary judgment brought by other defendants to this case, ruling that neither theory established that component parts-suppliers of WLC to the paint industry are exempt from the duty to warn as a matter of law. (No. 07-cv-0303, ECF No. 1058; No. 07-cv-0441, ECF No. 985; No. 10-cv-0075, ECF No. 921). However, I now recognize that that ruling was in error, and I will reverse course for the following reasons.

Sellers of bulk materials to manufacturers of finished products often have no mechanism to reach the end user of the product with warnings. Though the Wisconsin Supreme Court has not ruled on the issue, courts in the state have recognized that bulk suppliers' duties to warn are limited by this practical reality. See, e.g., *Nigh v. Dow Chem. Co.,* 634 F. Supp. 1513, 1517 (W.D. Wis. 1986)("A manufacturer who cannot control the content of the warning passed to the ultimate supplier can hardly be guilty of failing to exercise ordinary care with respect to such warnings or of producing warnings that it did not give and could not improve."). Similarly, the Wisconsin Court of Appeals has ruled that a component manufacturer has no duty to warn end users when the manufacturer supplies a product to a sophisticated intermediary and the end users are individuals to whom the sophisticated intermediary owes a duty of communication.

*Haase v. Badger Mining Corp.,* 2003 WI App 192, ¶¶ 21, 24, 266 Wis.2d 970, 669 N.W.2d 737, *aff'd on other grounds,* 2004 WI 97, 274 Wis.2d 143 (manufacturer of silica sand had no duty to warn foundry or foundry's employees because foundry was "a knowledgeable employer in a knowledgeable industry" and owed its employees a duty to warn).

    *Haase* applied the sophisticated user doctrine only to a negligent failure-to-warn claim, 2003 WI App 970, ¶ 26, and *Nigh* treated negligent and strict liability failure-to-warn claims as indistinguishable, 634 F.Supp at 1517; still, the logic of both cases applies to the strict liability claim outlined in *Thomas* with equal force. Under *Thomas*, the plaintiff must prove that the WLC was defective (i.e., inadequately warned about) at the time it left the possession or control of the pigment manufacturer (i.e., when it was delivered to the paint manufacturer), and that that defect was a cause of the plaintiffs ultimate injuries. It makes little sense for the WLC manufacturer to owe a duty to warn the *consumer* at the moment that the pigment is delivered to the *paint manufacturer,* because the WLC manufacturer has no effective means of communicating that warning. And if the duty could be met by means of a *pro forma* warning to the already-knowledgeable paint manufacturer, a claim that a WLC manufacturer failed to give such a warning would almost inevitably fail on causation.

    Furthermore, recognizing that the bulk supplier/sophisticated user doctrines shield the pigment manufacturers from failure-to-warn liability to the extent that they supplied WLC to third-party paint manufacturers does not subvert the Wisconsin Supreme Court's purpose in making WLC manufacturers subject to suit under the risk contribution theory. To the extent that certain WLC manufacturers used some or all of

their WLC to manufacture their own paint products, those manufacturers might still be subject to ordinary negligence and to strict liability for failure to adequately warn consumers at the time that they released their paint into the market. To the extent that WLC manufacturers supplied their WLC to third-party paint manufacturers, those WLC manufacturers might still be liable for ordinary negligence.

The parties agree that Cyanamid never made paint. No 07-CV-0303, ECF No. 776, ¶ 40. They further agree that the only paint manufacturer to which Cyanamid sold WLC was Armstrong/MacGregor which had been manufacturing paint for decades and was a knowledgeable player in the paint industry. *Id.* at ¶¶ 33, 70-71. I therefore conclude that the bulk supplier and sophisticated user doctrines shield Cyanamid from liability for failure to warn, and that Cyanamid is entitled to summary judgment on plaintiffs' strict liability failure-to-warn claims.

Factual disputes remain as to whether MacGregor sold WLC to other companies for integration into paint. To the extent that it did so, Armstrong is entitled to summary judgment on plaintiffs failure-to-warn claims.

Further, I will partially reverse my earlier decision on Atlantic Richfield's motion (in which Sherwin-Williams joined) for summary judgment based on component suppliers' lack of legal duty to warn. Factual disputes remain regarding whether Atlantic Richfield's alleged predecessors manufactured paint. No. 07-C-0303, ECF No. 851, ¶ 11. However, to the extent that Atlantic Richfield's alleged predecessors supplied WLC to third party paint manufacturers, Atlantic Richfield is entitled to summary judgment on plaintiff's failure to warn claims. Similarly, factual issues remain regarding the extent to which Sherwin-Williams supplied WLC to other paint manufacturers. No. 07-C-0303,

ECF No. 797, ¶ 3. To the limited extent to which Sherwin-Williams did so, it is entitled to summary judgment on plaintiffs' failure to warn claims.

I note that Cyanamid's briefs raise certain other issues regarding the adequacy of warnings and the "substantial change" element of the *Thomas* strict liability claim. Because Cyanamid owed no duty to warn and is therefore not subject to strict liability, I will not address those issues.

### C. *Adequacy*

Armstrong argues that plaintiff has failed to prove that the warning labels on MacGregor's paint products containing WLC were "inadequate," so as to render the WLC defective. Both labels contain the language "HARMFUL IF EATEN" and direct the user not to use the paint on surfaces that children might chew. Whether this warning adequately conveys the full extent of the risk known to Armstrong at the time that it issued these warnings so as to render the product not unreasonably dangerous is a question for the jury. *See Tanner v. Shoupe*, 228 Wis. 2d 357, 368 (Wis. Ct. App. 1999).

### D. *Causation*

Sherwin-Williams and Armstrong both also argue that, to the extent that their WLC pigment was defective on a failure to-warn-theory at the time the pigment left their control, they are nevertheless entitled to summary judgment because plaintiffs cannot prove that the defect was a cause of their injuries. Defendants argue that, under Wisconsin products liability law, "[a] plaintiff who has established both a duty and a failure to warn must also establish causation by showing that, if properly warned, he or she would have altered behavior and avoided injury." No 07-CV-0303, ECF No. 572 at 7, citing *Lemmerman*, 713 F.Supp.2d at 811. Defendants therefore asserts that it is

plaintiffs burden to show that, had Sherwin-Williams or MacGregor product labels warned of the alleged risks to children of ingesting WLC during the time that each company manufactured WLC, such a warning would have changed someone's conduct and prevented each plaintiff's lead exposure and alleged harm. Defendants also argues that plaintiffs cannot meet their burden of proof with respect to causation on the warnings claim because they have not provided expert testimony.

I begin my discussion of this point by clarifying the precise nature of the causal relationship that must be established between a WLC defendant's failure to warn and a plaintiff's subsequent injury in order to meet the standard for strict liability under *Thomas.* The defendants want the standard to be a direct line between the individual defendant's conduct and the individual plaintiff's harm. However, that interpretation is fundamentally incompatible with the purpose of risk contribution theory to enable a plaintiff to recover without identifying the specific manufacturer of the product that caused his or her harm. And, indeed, the *Thomas* strict liability formulation requires no such individualized chain of causation. Rather, as relevant here, *Thomas* requires the plaintiff to prove "that the white lead carbonate was defective when it left the possession or control of the pigment manufacturers," and "that the defect was a cause of the plaintiff's injuries or damages." *Thomas*, 285 Wis.2d 236, ¶ 162. The outcome of the "defect" analysis is properly a conclusion about the condition of the product and not the conduct of the manufacturer; if a plaintiff prevails on the "defect" element on a failure to warn theory, then "inadequately-warned-aboutness" becomes, in a sense, a property of the product itself. The causation element of *Thomas* then requires the plaintiff to show a

causal connection between that defect (i.e., that property of the product) and the plaintiff's eventual harm.

The *Thomas* court's discussion of the concept of fungibility is salient here. 285 Wis. 2d 236, ¶¶ 141-148. As the court explained,

> "Fungibility . . . is not a term that is capable of being defined with categorical precision. Its character will depend on the context of the injury, its cause, and the particular obstacles encountered in linking the causation to the possibly negligent defendants. See *Hamilton,* 32 F.Supp.2d at 51 ("It is the characteristic relevant to the matter at issue that determines whether a product is the same as and substitutable for another, and therefore whether the two are interchangeable. . . ").

*Thomas*, 285 Wis.2d 236, ¶ 145. The court then discussed three overlapping meanings of fungibility as functional interchangeableness, physical indistinguishableness, and uniformity of risk. A product is fungible in the sense of uniformity of risk when "as a result of sharing an identical or virtually identical chemical formula, each manufacturer's product pose[s] the same amount of risk as every other manufacturer's product," such that the products are "identically defective, with none being more or less defective than the rest." *Id.* at ¶ 144. Applying this analysis to WLC, the court concluded that on the summary judgment record in that case, all WLCs were identically defective because all contained lead. *Id.* at ¶ 148. This finding partially justified the court's relieving the plaintiff of the requirement to identify the individual manufacturer that caused harm. Failure to warn effectively adds another layer to the uniformity of risk presented by WLC. Inadequacy of warning constitutes a product defect over and above the presence of lead, and all manufacturers that supplied WLC for use in paint without adequate

warning placed an identically defective product on the market. This reading is bolstered by the *Thomas* court's use of the plural "pigment manufacturers" in the first element of the strict liability framework: ". . . the white lead carbonate was defective when it left the control of the pigment manufacturers." *Id.* at ¶ 162. This choice, which contrasts with the use of the singular "manufacturer" in other elements of the claim, reflects the court's understanding that multiple manufacturers might have caused the identical defect.

Therefore, to satisfy the causation element of the *Thomas* strict liability framework on a failure-to-warn theory of defect, a plaintiff must prove to the satisfaction of the trier of fact that the presence of inadequately-warned-about WLC on the market during the existence of the residence where the plaintiff ingested WLC was a substantial factor in causing the plaintiff's injury. Human behavior is implicated in the question of causation, in addition to the medical[1] and mechanical[2] issues already built into the risk contribution model of proof.

To prove such a tenuous connection to the satisfaction of a jury will be a tall order, but at this juncture I believe it is reasonable to permit plaintiffs to proceed on their failure to warn claims. Although plaintiffs still bear the ultimate burden of showing causation, a jury might find in their favor by making the permissible inference, e.g., that the persons responsible for selecting and applying paint in the plaintiffs' homes throughout the buildings' existence would have heeded warnings regarding the risk of childhood lead exposure if such warnings had been issued.  *See Michael's v. Mr.*

---

[1] I.e., were the plaintiff's symptoms caused by lead exposure, as opposed to other genetic or environmental factors?

[2] I.e., was WLC in paint the source of plaintiff's lead exposure, as opposed to lead in water or soil?

*Heater, Inc.,* 411 F.Supp.2d 992, 1007 (W.D. Wis. 2006); *Tanner v. Shoupe*, 228 Wis.2d 357, 379 (1999). Defendants' citations to *Lemmerman* to disallow such an inference is unpersuasive, as the plaintiff in that case had failed to adduce evidence that her exposure to the product in question was a cause of her injuries in a medical sense. 713 F.Supp.2d 791, 812 (2010). Defendants' argument that plaintiffs must produce an expert witness to testify as to causation on a failure to warn claim is also unpersuasive, as the necessary inference here does not require specialized technical, scientific or medical knowledge, but may be made on the basis of common understandings of human behavior.

## VII.   **CHEMICAL ANALYSIS DEFENSE**

Both Cyanamid and Armstrong assert that they are entitled to summary judgment because scientific analysis of paint chips taken from the houses where the plaintiffs allegedly consumed WLC excludes them as the producer of the WLC that caused plaintiffs' harm. Experts on behalf of the Plaintiffs and defendant DuPont had previously conducted analyses identifying the elemental composition of each discernable layer of paint in the chips. Cyanamid and Armstrong's expert then calculated elemental ratios for the components of the actual paint in each layer, and compared that data to a formula for Scotch Laddie paint that had been published in Scotch Laddie advertisements in 1964 and 1971, and to a 1942 formula for Elliots paint. The expert concluded that none of the layers of paint matched the Scotch Laddie or Elliots formulas.

Cyanamid asserts that the only residential paint manufacturer to which it sold WLC was the manufacturer of Scotch Laddie paint, such that the only possible pathway for Cyanamid WLC into the plaintiffs' homes would be in Scotch Laddie paint. Cyanamid

would have me conclude from this evidence that no Cyanamid WLC was present in plaintiffs' homes, and that therefore Cyanamid could not have caused the plaintiffs' injuries.

Armstrong asserts that the analysis shows that the Scotch Laddie and Elliots formulas were not present in the plaintiffs' homes, and that therefore plaintiffs cannot assert a risk contribution theory as to these formulas.

I have already ruled that defendants in WLC risk-contribution cases are entitled to present a chemical-analysis defense along these lines. See my discussion at No. 07-C-0303, ECF No. 1060 at 4-6. I have also ruled that the testimony of Cyanamid's expert chemist is admissible, but that questions about the accuracy of the published formulas on which he relies must be resolved by a jury. No. 07-C-0303, ECF No. 1069 at 5-6. Because these factual issues remain, I will not grant summary judgment to either Cyanamid or Armstrong on the chemical analysis defense.

VIII.    **GEOGRAPHIC MARKET DEFENSE**

Cyanamid also requests summary judgment on the basis of the "geographic market" exculpatory defense framed in *Thomas*: once the plaintiff has established a prima facie case under the risk contribution doctrine, the "burden of proof shifts to the defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographic market where the house is located." *Thomas*, 285 Wis. 236 at ¶ 163 (emphasis added). Essentially, this defense gives the defendant an opportunity to disprove causation: if the defendant did not produce or market WLC in the geographic area where the plaintiff

ultimately ingested lead, then the defendant could not have reasonably contributed to the plaintiff's alleged injuries.

Certain of Cyanamid's arguments on the geographic market exculpation defense resemble the "purposeful availment" arguments that arise in the context of personal jurisdiction. Cyanamid insists that its "only conduct regarding white lead carbonate occurred in Chicago and it did not purposefully direct any production or sales of that product to Wisconsin." (No. 07-cv-0303, ECF No. 554 at 29). This approach misses the mark: while many of the facts relevant to personal jurisdiction will also be relevant to the geographic market defense, the focus here is not on the intentional conduct of the defendant with respect to the geographic region but on the possibility of an actual causal relationship between the defendant's product and the plaintiff's harm. See *Collins* 116 Wis.2d 166, 198 (1984)("In utilizing these [time period and geographical market] defenses [in risk-contribution cases involving the drug DES], the defendant must establish that the DES it produced or marketed **could not have reached** the plaintiff's mother") (emphasis supplied); *Thomas*, 285 Wis.2d at 325 (geographical defense part of a procedure designed to "result in a pool of defendants which can reasonably be assumed could have caused plaintiff's injuries."). Cyanamid states that it only sold WLC to the manufacturer of Scotch Laddie paint in Chicago, and that it does not know where the Scotch Laddie paint was subsequently sold. Even taking those facts as true, they do not lead to a conclusion as a matter of law that Cyanamid WLC could not have caused plaintiffs' harm.

## IX.    WIS. STAT. § 895.046

Armstrong argues that it is entitled to summary judgment because plaintiffs' use of risk contribution theory is barred by Wis Stat. § 895.046. I previously considered this issue in the context of a motion for summary judgment filed by defendant Sherwin Williams, and concluded that I was bound by the Seventh Circuit's holding in *Gibson v. American Cyanamid Co.*, 760 F.3d 600 (7th Cir. 2014) that retroactive application of the statute would deprive plaintiffs of their rights under the due process clause of the Wisconsin constitution. (ECF No. 07-CV-0303, No. 1057). I reject Armstrong's argument for the same reason.

## X.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that defendant Sherwin-Williams' Motion for Summary Judgment on Failure to Warn (No. 07-CV-0303, ECF No. 570; No. 07-CV-0441, ECF No. 497; No. 10-CV-0075, ECF No. 427) is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that defendant American Cyanamid's Motion for Summary Judgment (No. 07-CV-0303, ECF No. 553; No. 07-CV-0441, ECF No. 498; No. 10-CV-0075, ECF No. 436) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that defendant Armstrong Containers' Motion for Summary Judgment (No. 07-CV-0303, ECF No. 613; No. 07-CV-0441, ECF No. 551; No. 10-CV-0075, ECF No. 494) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that defendant Atlantic Richfield Company's Motions for Summary Judgment Based on Component Suppliers' Lack of Legal Duty to Warn

(No. 07-cv-0303, ECF No. 530; No. 07-cv-0441, ECF No. 467; No. 10-cv-0075, ECF No. 397) are **GRANTED IN PART.**

      **SO ORDERED** at Milwaukee, Wisconsin this 12th day of September, 2018.

                        s/Lynn Adelman         
                        LYNN ADELMAN
                        District Judge