UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GLENN BURTON, JR.,
    Plaintiff,

          v.    Case No. 07-CV-0303

AMERICAN CYANAMID et al.,
    Defendants;

RAVON OWENS,
    Plaintiff,

          v.    Case No. 07-CV-0441

AMERICAN CYANAMID et al.,
    Defendants;

CESAR SIFUENTES,
    Plaintiff,

          v.    Case No. 10-CV-0075

AMERICAN CYANAMID et al.,
    Defendants.

---

## DECISION AND ORDER

The plaintiffs in these cases allege they were injured when they ingested paint containing white lead carbonate (WLC) as young children. Defendants are manufacturers or alleged successors-in-interest to manufacturers of WLC. Because plaintiffs allege they cannot identify the specific manufacturer of the WLC that harmed them, they proceed on Wisconsin's risk contribution theory of liability which relaxes the causation standard and allows a plaintiff to establish a prima facie case on the basis that a manufacturer produced the type of product that caused harm and thus

contributed to the risk of injury to the public. In several earlier decisions and orders, I have discussed at length the facts and the legal context underlying this case. See especially No. 07-CV-0303, ECF No. 1070. Before me now are several motions by plaintiffs for partial summary judgment.

## I. CONSTITUTIONAL AFFIRMATIVE DEFENSES

Plaintiffs have moved for summary judgment on defendants' constitutional affirmative defenses, arguing that the Seventh Circuit's decision in *Gibson v. American Cyanamid*, 760 F.3d 600 (7th Cir. 2014) forecloses all such defenses. Certainly, I am bound by Seventh Circuit precedent, but I am unwilling to pass preemptive judgment on issues that have not yet been raised or briefed. I will deny plaintiffs motion.

## II. FUNGIBILITY

A plaintiff may only proceed on risk contribution theory if the product at issue is fungible. The parties dispute whether the Wisconsin Supreme Court's *Thomas* decision amounts to a final resolution of the question whether WLC is fungible. I previously denied a motion for summary judgment by Sherwin Williams which argued that, to proceed on the basis of risk contribution, a plaintiff must produce admissible evidence that identification of the manufacturer of the WLC that caused the plaintiff's injury is impossible for the plaintiff. I concluded that such a requirement was irreconcilable with the burden-shifting mechanism contemplated by the court in *Thomas.* No. 07-CV-0303, ECF No. 1059. For the reasons discussed in that order, I now conclude that the *Thomas* decision established the fungibility of WLC as a matter of law, and I will grant plaintiffs' motions on this issue.

## III. PARENTAL IMMUNITY

Defendants have pled several affirmative defenses that, in various ways, seek to limit defendant's liability by attributing some portion of culpable responsibility for plaintiffs' injuries to plaintiffs' parents and caregivers.[1] Plaintiffs have moved for summary judgment foreclosing these defenses on grounds that they are barred by parental immunity. The Wisconsin Supreme Court has abrogated the doctrine of parental immunity such that it applies only in two narrow circumstances: "(1) where the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." *Goller v. White,* 20 Wis.2d 402, 413 (1963). Plaintiffs argue that the parental conduct alleged by defendants in support of the various defenses (e.g., failure to supervise the children to prevent ingestion of paint chips; failure to clean the house properly; failure to follow protocols for avoiding lead paint hazards of which they had notice) is either entwined with the provision of housing or constitutes "other care," such that it falls within the *Goller* exceptions. Plaintiffs conclude that therefore, as a matter of law, the relevant conduct cannot constitute a breach of any duty of care, and thus evidence of the conduct is inadmissible to support defendants' affirmative defenses.

However, Wisconsin's parental immunity doctrine does not bar the negligence of a parent from being asserted as a defense. The Wisconsin Court of Appeals considered

---

[1] Plaintiffs identify the following defenses as targets of this motion: (1) comparative and contributory negligence; (2) product misuse; (3) intervening, superseding cause; (4) negligence; (5) failure to prevent avoidable consequences; and (6) "any other defense defendants would assert against [plaintiffs' parents or caregivers] in carrying out their parental roles." No 07-C-0303, ECF No.689 at *1.

3

this precise question in a case in which a parent was alleged to have been negligent in the provision of medical care (and thus immune under *Goller).* The court held:

> Next, the plaintiffs argue that [the plaintiff's mother] cannot be on the verdict because she was immune from suit. This is not the law. In determining who should be included on a comparative negligence question, a trial court, at the special verdict stage of a lawsuit, must answer only one question: Is there evidence of conduct, which if believed by the jury, would constitute negligence on the part of the person inquired about? *Connar v. West Shore Equip., Inc.,* 68 Wis.2d 42, 45 (1975). It is immaterial that the entity is not a party or is immune from further liability. *Id.* The rationale behind this rule is that "a jury must have the opportunity to consider the negligence of all parties to the transaction, whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tort-feasors either by operation of law because of a prior release." *Id.* at 44-45, 227 N.W.2d 660.

*Gardner v. Wisconsin Patients Compensation Fund*, 2002 WI App 85, ¶ 18. Defendants are therefore entitled to present evidence of parental conduct both rebutting plaintiffs' prima facie case and supporting defendants' affirmative defenses.

IV. **MISUSE**

In their answers to the complaints in each of these cases, defendants Sherwin-Williams, Armstrong Containers and Atlantic Richfield asserted that the plaintiffs' alleged injuries were caused by misuse of the product in question. Plaintiffs have moved for summary judgment on the "affirmative defense of misuse."

Regarding Mr. Owens, defendants have adduced evidence that there was loose, flaking, chipped or peeling paint on both the interior and exterior of the 6th Street home where he alleges he was exposed to lead; that following an elevated blood lead level test, the Milwaukee Health Department inspected the home and ordered the landlord to

4

correct lead violations; that the landlord, Latasha Conley, failed to comply with the order for 10 months and the Health Department ultimately concluded that enforcement was unlikely to gain compliance. In addition, defendants have adduced testimony from Owens' mother that she recalled seeing Owens play with paint chips on windowsills at the 6th street home, and that she did not think the windowsills were ever cleaned. Defendants have also adduced evidence that there was chipped and peeling paint throughout the plaintiff's Locust Street residence; and that the landlord, John Gesell, was served with orders to correct lead violations at the residence in both January, 1995 and April, 1996. Gesell also testified that he believed that plaintiff's family did not clean or care for the unit.

Regarding Mr. Sifuentes: defendants have adduced deposition testimony by Ricardo Pacheco, the owner of the 32nd St. residence where plaintiff alleges he was exposed, stating that he knew of the risks associated with deteriorated lead paint; that when he purchased the property, he hired an inspector who told him that the exterior paint was defective and he needed to repaint; and that he did not have the house repainted before or during the time that he rented to the Sifuentes family. In addition, defendants have adduced evidence that plaintiff's parents had been educated about lead hazards before moving into the 32nd street home; that the parents were aware when they moved in of chipping paint around the windows; that a Milwaukee Health Department inspection following plaintiffs high EBLLs had identified lead paint hazards in several rooms of the home.

Regarding Mr. Burton: defendants have adduced evidence that plaintiff's parents knew of risks associated with lead before his exposure; that there was chipped paint on

a wall and on windowsills of the Burtons' Locust Street home; that the Burtons had been scraping and repainting in the home prior to the plaintiffs first elevated blood lead level; and that the Milwaukee health department inspected the home after Burton was diagnosed with elevated blood lead levels and identified lead paint hazards.

A user of a product has a duty to reasonably use the product for the purpose for which was intended. *Dippel v. Sciano*, 37 Wis.2d 443, 460 (1967). If a plaintiff's injury occurs when a product is being used in a manner unforeseeable to the manufacturer, the manufacturer is not strictly liable for the injury. In *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728 (1974), the Wisconsin Supreme Court explained:

> it is a general proposition that a plaintiff, to recover in strict liability in tort, must establish that the product proved defective, and the injury occurred when it was used in a foreseeable manner. In other words, foreseeable use is a requirement for a case in strict liability in tort, just as it is in negligence or warranty cases. If the plaintiff can be shown to have used the product in a manner other than its intended use, and particularly if that abnormal use related to the occurrence of the injury, liability should not follow unless the abnormal use was itself foreseeable.

*Id.* at 741 (citing *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79, 83-84 (4th Cir.1962)). On the other hand, if the misuse of the product was foreseeable, then it is not a bar to liability but rather a factor for the jury to consider in apportioning contributory negligence. *Id.*

Defendants have adduced evidence that each plaintiff's parents and caregivers allowed paint at the property where the plaintiff resided to remain in a state of deterioration for some time without intervening to fix it. Defendants have also adduced

evidence that the landlords of the properties where Mr. Owens and Mr. Sifuentes resided failed to remedy degraded paint despite having notice of the problem.

I hold as a matter of law that for the owner or resident of a property to passively allow paint to deteriorate is an eminently foreseeable misuse of paint. No reasonable jury could find otherwise. Further, I cannot find that poor maintenance of paint such as the defendants have alleged constitutes a "use" of WLC other than "the purpose for which it was intended." The WLC was intended to be used as pigment coating the walls of a building, and that is how the property owners and parents "used" it. If they "misused" the WLC, it must be because they failed to use it reasonably. *See Schuh*, 63 Wis.2d at 741 (farmer who stood on edge of crop blower while putting up silage was using the crop blower "for its intended purpose" of putting up silage, but was not using it reasonably.) Also see Wis. JI-CIVIL 3268 ("Us[ing] a product knowing the product was worn out in such a manner as to render the same unsafe" can constitute contributory negligence.) In short, evidence that parents or landlords unreasonably allowed paint to deteriorate is for the jury to consider in allocating proportional fault.

Defendants also argue that plaintiffs "misused" pigment when they ingested it, and that plaintiffs' parents "misused" pigment by allowing their children to ingest it. I disagree. A toddler ingesting deteriorated paint is not so much a standalone misuse of pigment as it is a danger resulting from the foreseeable misuse (i.e., negligent maintenance) of pigment. To establish their prima facie duty to warn case, plaintiffs must show that the defendant manufacturers knew or had reason to know that this danger inhered in a foreseeable use of their product at the time the product left the

7

manufacturer's control.[2] Defendants can rebut plaintiffs' prima facie case by showing that, at the relevant time, they did not know or have reason to know of the risk that children would ingest and be poisoned by negligently maintained paint. As for parents' failure to prevent children from eating paint, the jury may consider this evidence in the allocation of contributory fault.

V. **INTERVENING SUPERSEDING CAUSE**

Plaintiffs move for summary judgment on defendants' affirmative defense of intervening superseding cause, and ask the court to preclude defendants from arguing that the activities of plaintiffs' parents, caregivers, landlords and the city of Milwaukee were an intervening or superseding cause of plaintiffs' lead poisoning.

In Wisconsin, the intervening or superseding cause defense is subsumed within the first of the six "public policy" factors by which a court may limit liability even though a jury has found a defendant negligent and determined that the defendant's negligence was cause-in-fact of the plaintiff's damages. Specifically, the first factor asks whether a plaintiff's injury is too remote from a defendant's causal negligence. *Cefalu v. Continental Western Ins. Co.*, 2005 WI App 187, ¶¶ 20-21 (stating that the "remoteness factor revives the intervening or superseding cause doctrine").

Typically, Wisconsin courts defer analysis of superseding cause and other public policy factors until after trial. *See Thomas,* 2005 WI 29, ¶166 n. 54 ("In most cases the better practice is to submit the case to the jury before determining whether the public

---

[2] I have already held that only those defendants which integrated the WLC they manufactured into their own paint products can be held liable on a failure-to-warn theory. Defendants that sold WLC to third-party manufacturers are shielded by the bulk supplier doctrine. See No. 07-CV-0303, ECF No. 1070 at 21-22.

8

policy considerations preclude liability."); *Alvarado v. Sersch*, 2003 WI 55, ¶20 ("[P]ublic policy factors limiting liability should be considered only after a full resolution of the facts at trial.").

I will comply with the guidance of the Wisconsin Supreme Court and defer my consideration of the intervening, superseding cause defense until after the jury has reached a verdict. Therefore, I will deny plaintiff's motion for summary judgment on this defense.

## VI. FAILURE TO MITIGATE DAMAGES

Each plaintiff claims that his ingestion of lead resulted in cognitive injury, and that this injury impaired his ability to perform in school and reduced his future earning capacity. Defendants have pleaded the affirmative defense of mitigation of damages in each case. Essentially, defendants argue that the plaintiffs unreasonably failed to pursue available treatments (e.g., psychotherapy, occupational training or medication) that might have improved the plaintiffs' ability to perform in school. Each plaintiff has moved for partial summary judgment dismissing this defense.

The Wisconsin law on mitigation of damages in tort actions is as follows: "An injured party is obligated to exercise that care usually exercised by a person of ordinary intelligence and prudence, under the same or similar circumstances; to seek medical or surgical treatment; and to submit to and undergo recommended surgical or medical treatment, within a reasonable time, which is not hazardous and is reasonably within his means, to minimize his damages." *Lobermeier v. General Telephone Co. of Wisconsin*, 119 Wis. 2d 129, 149 (1984). Plaintiffs who are minors are still obligated to exercise reasonable care in mitigating their damages: recognizing that parents and caregivers

generally make treatment decisions on behalf of minors, the Wisconsin Supreme Court has held that

> [i]t is reasonable to expect and require that the child would rely upon his parents' judgment. While the duty to mitigate under these circumstances might devolve on both child and parent, we hold that the standard of reasonableness involved is the adult standard as to what is reasonable in the acceptance or rejection of [elective treatment] to mitigate damages.

*Hargrove v. Peterson,* 65 Wis. 2d 118, 125-126 (Wis. 1974).

Regarding Plaintiff Glenn Burton Jr., defendants have adduced evidence that doctors recommended he seek treatment for his neuropsychological conditions on June 1, 2007, September 10, 2007 and in 2009, but that he did not receive or pursue such recommended treatments until sometime after July, 2010. Defendants have further adduced evidence that, on several occasions, Burton failed to show up for scheduled treatment or therapy appointments or failed to follow through with treatment plans that had been developed for him. For example, on September 15, 2010, Children's Hospital developed a treatment plan for Burton that involved teaching anger management to Burton and parenting techniques to his parents; a follow-up appointment was scheduled for September 30, but Burton did not show up, and his mother later informed the hospital that they did not want to reschedule and did not want to pursue the treatment plan. I conclude that this evidence is sufficient for a jury to find that Burton breached his duty to reasonably seek and/or submit to treatment.

Regarding Plaintiff Ravon Owens, defendants have adduced evidence that after examining him in both 2008 and 2015, his testifying experts recommended that he seek psychological treatment; Owens admits that he has not sought treatment from a

psychologist. I conclude that this evidence is sufficient for a jury to find that Owens breached his duty to reasonably seek medical treatment.

Regarding Plaintiff Cesar Sifuentes, defendants have adduced evidence that in 2007, a doctor examined him and recommended that he receive psychologist/psychiatrist and social worker counseling 4-5 times a week. Plaintiff has testified that following this examination, he did not receive any therapy or counseling. Furthermore, though plaintiff claims that his ingestion of lead has caused cognitive and neurobehavioral injuries, plaintiff's mother has testified that plaintiff has had no treatment for an elevated blood lead level since 2005-2006; he is not taking any prescription medication; and he only goes to the doctor for problems with his athsma. Plaintiff has also testified that he is not receiving any treatment from a physician on a regular basis. I conclude that this evidence is sufficient for a jury to find that Sifuentes breached his duty to reasonably seek medical treatment.

Defendants also seek to present to the jury a novel failure-to-mitigate theory, namely that plaintiffs failed to avail themselves of educational opportunities that might have improved their earning capacity. In support of this theory, they have adduced evidence that, e.g., plaintiffs were frequently absent from class, routinely failed to complete assigned work, had been cited for behavioral issues at school, failed to take advantage of opportunities for extra help and tutoring, and used illegal drugs. Plaintiffs request that I foreclose this theory on summary judgment.

I will do so, for several reasons. First, defendants cite no case law supporting extension of the duty to mitigate into the domain of k12 student behavior. *Hargrove,* which holds minors to an adult standard of reasonableness in their decisions to seek

and undergo medical treatment, does so because the court recognized that parents and caregivers generally make such decisions on behalf of their children, and children rely on their judgment. 65 Wis. 2d at 125. The same is not true of children's decisions to complete classwork or comply with class instructions, and for a court to essentially mandate parental control of such day-to-day decisions would almost certainly undermine the development of autonomy and personal responsibility that is part of the purpose of schooling. Second, the maladaptive behaviors that defendants characterize as breaches of plaintiffs' duty of reasonableness are likely better construed as symptoms of the underlying cognitive or neurological disabilities that plaintiffs allege were caused by lead exposure in early childhood. Finally, much of the evidence cited in support of this defense is sufficiently prejudicial to warrant exclusion under Rule 403 of the Federal Rules of Evidence.

In summary, for each of the three plaintiffs, defendants may present a failure to mitigate defense on the theory that the plaintiff failed to reasonably seek and undergo medical treatment, but may not proceed on the theory that plaintiff failed to take advantage of educational opportunities to improve his earning capacity.

### VII. TIME AND GEOGRAPHIC MARKET EXCULPATORY DEFENSES

In extending the risk contribution theory to WLC cases, the Wisconsin Supreme Court made two exculpatory defenses explicitly available to defendant WLC manufacturers:

> "[o]nce [the plaintiff] makes a prima facie case [under risk contribution theory], the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market

12

> where the house is located. However, if relevant records do not exist that can substantiate either defense, we believe that the equities of white lead carbonate cases favor placing the consequences on the pigment manufacturers.

*Thomas,* 285 Wis. 2d 236, ¶163. Essentially, these defenses give the defendant an opportunity to disprove causation. See my discussion at No. 07-C-0303, ECF No. 1070 at 28-29. Plaintiffs have moved for summary judgment foreclosing each of the defendants' use of the both the time and the geographic market defenses specified in *Thomas*, on grounds that defendants have produced no evidence to support either defense. The parties have raised several questions about the specific proof requirements of the defense.

According to *Thomas,* it is a defendant's burden to show that it "did not produce or market white lead carbonate" in the relevant time or area. 265 Wis.2d 236, ¶ 163. Defendants advocate a strict reading of the language just quoted, such that a manufacturer might establish the defense by showing that it, itself, did not actively manufacture or advertise WLC (as distinguished from products *containing* WLC) in the relevant time or place. On this interpretation, a defendant that manufactured WLC in a different state and sold it to retailer that actively advertised the WLC in the relevant market could establish the defense because it was the retailer, not the manufacturer, that "marketed" the WLC. Likewise, a company that produced WLC in a different state, integrated it into its own paint, and then advertised and sold the paint in the relevant market could also establish the defense because it marketed paint, rather than WLC.

Such results would be counter to the express intentions of the *Thomas* and *Collins* courts in designating the "when and where" defenses. As described in *Thomas,*

13

the *Collins* court "was concerned that only those defendant drug companies that *reasonably could have* contributed *in some way* to the actual injury be held accountable." *Thomas*, 285 Wis.2d 136, ¶ 107 (citing *Collins*, 116 Wis. 2d at 191, n. 10). Thus, the *Collins* court provided that a defendant drug company might escape liability "if it proved by a preponderance of the evidence that the DES it produced *could not have reached the plaintiffs mother.*" *Thomas,* 285 Wis.2d 136, ¶ 107; *Collins,* 116 Wis. 2d at 197-98. "A defendant could accomplish this by establishing that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES." *Id.* Time and geographical market thus function as proxies for actual causation. A WLC manufacturer can demonstrate that its product could not have actually caused the harm by showing that the WLC it manufactured was not sold in the relevant time and area, either on its own or as a component of a paint product. This is the test I will apply.

The parties also dispute the meanings of the terms "relevant time period" and "relevant geographic market" in the context of this defense. Again, I am guided by the Thomas court's intent that the risk contribution procedure yield a "pool of defendants which can reasonably be assumed could have caused the plaintiff's injuries." *Id.* at ¶ 164. My focus is on causation.

Plaintiffs assert that the "relevant time period" for exculpation must be "the duration of the house's existence," citing ¶161 of the *Thomas* opinion. Paragraph 161, however, does not address the exculpation defense; instead it addresses what a plaintiff must prove in order to establish a prima facie case. The relevant time period for exculpation purposes must be narrower; it is the period when paint containing WLC

14

pigment was applied to the plaintiff's house. For example, if analysis of the layers of paint in a home satisfies the trier of fact that all paint containing WLC was applied before 1920, and a certain manufacturer did not manufacture WLC until 1950, then that manufacturer is exculpated. This is an obvious example; the jury must resolve closer questions.

As for "relevant geographic market": plaintiffs argue that the relevant market should be the entire state of Wisconsin, but this interpretation is far too expansive to satisfy the *Thomas* court's intent that the geographic market be one in which the sale of the defendant's product "reasonably could have contributed in some way to the actual injury." 285 Wis.2d 236. ¶164. Defendants argue that the relevant geographic market should be understood as the neighborhood in which the home is located. They cite to Plaintiff's expert historian, John Gurda, who has described Milwaukee as a historically a "city of neighborhoods," and who conceded in his deposition that "for heavy products like paint or lead pigment," it is a "reasonable inference that if [the product] were available in [a consumer's] neighborhood, they would choose that outlet before the one that was across town." Ultimately it is for the jury to determine what size geographic market is sufficient to exculpate; certainly it is no larger than the city of Milwaukee, loosely defined, but it may be smaller.

Therefore, to prevail on their summary judgment motions, plaintiffs must demonstrate, with respect to each defendant, that no issue of fact exists as to whether that defendant's WLC was available for sale, on its own or as a component of paint, at a time and location such that the WLC reasonably could have been a cause of plaintiff's actual injury. Plaintiffs have clearly not met this burden as the scope of both the relevant

time and the relevant geographic market remains unresolved. I will deny plaintiffs' motions for summary judgment on these exculpatory defenses.

## VIII. PLAINTIFFS' MOTION TO FILE EXHIBITS AS RESTRICT

Plaintiffs moved to file as restricted Exhibits A, B, and C to their motions for summary judgment on the exculpatory "when and where" defenses. These exhibits are compilations of the plaintiffs' medical records. In general, this court "consider[s] any document . . . filed with [it] to be public" and requires that a "motion to seal . . . demonstrat[e] good cause for withholding the document . . . from the public record." General L. R. 79(d)(1), (3) (E.D. Wis.). However, "[t]he strong presumption of public disclosure applies only to the materials that formed the basis of the parties' dispute and the district court's resolution." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002). I did not rely on these exhibits in deciding the underlying motion for summary judgment. Thus, the presumption of public disclosure does not apply to the documents plaintiff moves to seal. I will, therefore, grant that motion.

## IX. CONCLUSION

**IT IS ORDERED** that Plaintiffs' Motions for Partial Summary Judgment on Defendants Constitutional Affirmative Defenses (No. 07-CV-0303, ECF No. 617; No. 07-CV-441, ECF No. 541; No 10-CV-0075, ECF No. 477) are **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' motions for summary judgment on the Fungibility of White Lead Carbonate (No. 07-CV-0303, ECF No. 682; No. 07-CV-0441, ECF No. 616; No. 10-CV-0075, ECF No. 543) are **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Partial Summary Judgment on Parental Immunity (No 07-C-0303, ECF No.689; No. 07-C-0441, ECF No. 625; No. 10-C-0075, ECF No. 553) are **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Summary Judgment on Misuse (No. 07-CV-0303, ECF No. 674; No. 07-CV-0441, ECF No. 610; No. 10-CV-0075, ECF No. 530) are **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Summary Judgment on Superseding, Intervening Cause (No. 07-C-0303, ECF No. 688; No. 07-C-0441, ECF No. 624; No. 10-C-0075, ECF No. 552) are **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Summary Judgment on Failure to Mitigate Damages (No. 07-C-0303, ECF No. 662; No. 07-C-0441, ECF No. 587; No. 10-C-0075, ECF No. 521) are **GRANTED IN PART and DENIED IN PART.**

**IT IS FURTHER ORDERED** that Atlantic Richfield's motions for leave to file Sur-Reply in Opposition to Plaintiff's Motions for Partial Summary judgment on Exculpatory Defenses (No. 07-C-0303, ECF No. 1029; No. 07-C-0441, ECF No. 959; No. 10-C-0075, ECF No. 895) are **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Summary Judgment on the Exculpatory "When and Where" Defenses (No 07-C-0303, ECF No. 710; No. 07-C-0441, ECF No. 645; No. 10-C-0075, ECF No. 579) are **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motions to Restrict Documents (No 07-C-0303, ECF No. 707; No. 07-C-0441, ECF No. 643; No 10-C-0075, ECF No. 577) are **GRANTED.**

Dated at Milwaukee, Wisconsin, this 9th day of October, 2018.

                                                        _s/Lynn Adelman_
                                                        LYNN ADELMAN
                                                        District Judge