# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

GLENN BURTON, JR.,
      Plaintiff,

      v.                                  **Case No. 07-CV-0303**

AMERICAN CYANAMID et al.,
      Defendants;

RAVON OWENS,
      Plaintiff,

      v.                                  **Case No. 07-CV-0441**

AMERICAN CYANAMID et al.,
      Defendants;

CESAR SIFUENTES,
      Plaintiff,

      v.                                  **Case No. 10-CV-0075**

AMERICAN CYANAMID et al.,
      Defendants.

---

## DECISION AND ORDER

In each of the three above-captioned cases, the plaintiff claims that he was injured when, as a young child, he ingested paint that contained white lead carbonate (WLC). Each plaintiff proceeds against the same five defendants: American Cyanamid Co. ("Cyanamid"), Armstrong Containers, Inc. ("Armstrong"), E.I. DuPont de Nemours and Company ("DuPont"), Atlantic Richfield Company ("Atlantic Richfield"), and Sherwin-Williams Co. ("Sherwin-Williams"). The cases have been consolidated for trial. This decision and order will address several motions to exclude from trial the opinions

1

and testimony of various expert witnesses. I have rehearsed the legal theories and facts underlying these cases at length in several prior orders and will not reproduce them here.

## I.   *DAUBERT* STANDARD

Generally, relevant evidence is admissible at trial. Fed. R. Evid. 402. Rule 401 provides that "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401. Rule 403 further provides that I may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir.2007). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The inquiry consists of three general areas: (1) the testimony must be "helpful," which dovetails with the relevance requirements of Fed. R. Evid. 401–403; (2) the expert must be qualified by knowledge, skill, experience, training, or education; and (3)

the testimony must be reliable and fit the facts of the case. *Lyman v. St. Jude Medical S.C., Inc.*, 580 F.Supp. 2d 719, 722 (E.D.Wis.2008).

Under the third part of the analysis, I examine whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. I am to act "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir.2001). It is not my role to determine whether an expert's opinion is correct; I consider only "whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Schultz v. Akzo Noble Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), *citing Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 805 (7th Cir. 2009); Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

## II.    *DAUBERT* AND THE CAUSATION STANDARD

Many of the expert opinions now at issue address causation. Plaintiffs bring their claims under the negligence and strict products liability frameworks articulated by the Wisconsin Supreme Court in *Thomas ex rel, Gramling v. Mallet*, 2005 WI 129. The negligence framework requires each plaintiff to show that he ingested white lead

carbonate, and that the white lead carbonate caused his injuries. *Id.,*¶ 161. The strict liability framework requires each plaintiff to show that a defect in the white lead carbonate was a cause of his injuries. *Id.*, ¶ 162. Under Wisconsin law, negligence or defect "caused" an injury if it was a substantial factor in producing the injury. WIS JI-CIVIL 1500 Cause; *Schultz*, 721 F.3d at 433. As is true in many toxic tort cases, the injuries claimed by plaintiffs here are possibly—indeed likely—the product of several combined causal factors. However, to show that WLC was a "cause" or "substantial factor," plaintiffs here are not required to demonstrate that lead exposure was a *sole* cause of each of their injuries, so long as each shows that the WLC contributed substantially to the development of his injuries or increased his risk of such injuries. *See Schultz*, 721 F.3d at 433.

A "differential etiology" is one accepted and valid method by which experts may render an opinion about the cause of a patient's injury. *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

> [I]n a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment. . .. The question of whether [a differential etiology] is reliable under *Daubert* is made on a case-by-case basis focused on which potential causes should be "ruled in" and which should be "ruled out."

*Id.* (internal citations omitted). In assessing whether an expert employed a reliable method, I have discretion to consider "whether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 (2000) Committee Note. In some cases, this analysis may require me to consider whether the expert has adequately "show[n] why a particular alternative explanation is not, in the expert's view, the *sole*

cause of the [injury]." *Schultz*, 721 F.3d at 434 (*citing Haller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d. Cir. 1999)). This makes sense in cases where it is obvious that an alternative factor may have been solely responsible for the injury, such that the causal factor alleged by the plaintiff could have played no role. Similarly, in cases where obvious alternative causes may have *contributed* to an injury, even though they may not entirely exclude the causal factor favored by the plaintiff, an expert may be excluded as unreliable if he entirely fails to consider or investigate those alternatives. *See Myers*, 629 F.3d at 645; *Brown v. Burlington Northern Santa Fe Ry. Co.,* 765 F.3d 765, 773-774 (7th Cir. 2014).

But not all cases entail such stark alternative causal factors. It is the more general rule while a reliable expert must *consider* reasonable alternative causes of an injury, an expert need not rule out every alternative cause of an injury. *Id.*; *Cf. Grayton v. McCoy,* 593 F.3d 610, 619 (7th Cir. 2010) (District court that excluded expert on grounds that he did not posit possible alternative causes of plaintiff's injuries "fail[ed] to account for the inefficiencies of requiring an expert to list each and every possible cause of a given outcome."). "An expert need not testify with complete certainty about the cause of an injury, rather he may testify that one factor could have been a contributing factor to a given outcome." *Gayton,* 593 F.3d at 619. The possibility (and the degree to which) other factors may have contributed to plaintiffs' injury is a subject quite susceptible to exploration on cross-examination by opposing counsel. *Id.; see also Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000). Thus, in cases that entail many likely-overlapping causal factors, I assess the reliability of an expert's differential etiology by ascertaining that the expert adequately identified the range of

potential causes, and that he adequately investigated and considered each of these causes in reaching his conclusions. *See Schultz*, 721 F.3d at 433. Such an approach is entirely consistent with Wisconsin tort law's "substantial factor" causation standard. *Id.*

Finally, the standard for reliability may be somewhat different when one party's expert seeks to challenge the opposing party's expert's differential etiology. "In attacking the differential diagnosis performed by the plaintiff's expert, the defendant may point to a plausible cause of the plaintiff's illness other than the defendant's actions. It then becomes necessary for the plaintiff's expert to offer a good explanation as to why his or her conclusion remains reliable." *Kannankeril v. Terminix Intern., Inc.*, 128 F. 3d 802, 808 (3d Cir. 1997); *see also Westberry v. Gislaved Gummi A.B.*, 178 F.3d 257, 265-66 (4th Cir. 1999). Further, under *Thomas,* plaintiffs have the burden of proof on causation, while defendants can rebut plaintiffs' theory of causation by presenting alternative causes. 2005 WI 129, ¶ 156; *see also id.,* ¶ 163 ("[T]he pigment manufacturers here may have ample grounds to attack and eviscerate [plaintiff's] prima facie case, with some of those grounds including that lead poisoning could stem from any number of substances (since lead itself is ubiquitous) and that it is difficult to know whether [plaintiff's] injuries stem from lead poisoning as they are not signature injuries."). As the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Thus, in the present cases, a defendant's expert who opines that a factor other than WLC exposure may have caused part or all of a plaintiff's alleged injury will generally be admissible even if that expert did not expressly consider or exclude lead as a cause,

provided that the expert used an otherwise reliable methodology to arrive at the opinion that the alternative factor may have been a cause.

## III.     ANALYSIS[1]

### A. Idit Trope

Idit Trope is a neuropsychologist retained by plaintiffs to offer diagnostic and causation opinions with respect to plaintiffs' neurocognitive injuries. Defendants have moved to exclude her causation opinions as unreliable because, according to the defendants, she did not perform a proper differential etiology. Defendants argue that she failed to rule out "obvious alternative explanations" such as genetics, other illnesses, and socioeconomic factors."

I disagree. As discussed in Section II, above, when I consider the validity of an experts differential etiology, I consider whether the expert "adequately accounted for" obvious alternative explanations. Such an "adequate accounting" may require the expert to affirmatively rule out the possibility that a certain, obvious alternative factor was the sole cause of an injury.   But not all alternative factors require such treatment. Depending on the specific situation, it may be enough for the expert simply to consider alternative factors, without affirmatively excluding them. I find that, in her evaluation of the plaintiffs, Trope did identify and exclude those obvious alternative factors that required such treatment. Regarding Glenn Burton, Trope excluded his complicated birth history as sole cause of his neurocognitive challenges. No. 07-C-0303, ECF No. 603-1 at 54. The other alternative causes identified by the defendants, such as heredity and

---

[1] The three captioned cases have been consolidated for trial, and the issues raised in the evidentiary motions addressed here overlap significantly. Though the cases do retain their individual character, I find it most efficient to address these motions collectively. I will flag material factual distinctions between the cases as they arise.

socioeconomic status, warrant consideration by the expert but not necessarily exclusion. Through her deposition and reports, Trope explains that she considers these factors as co-contributors to the plaintiffs' injuries, interacting with and perhaps exacerbating the effects of lead to yield each plaintiff's neurological outcome. This is the same approach by the expert whose differential etiology the Seventh Circuit found to be reliable in *Schultz*: he excluded tobacco as a *sole* cause of the plaintiff's cancer, while acknowledging that tobacco and many other factors likely interacted with benzene, the alleged toxic agent, to cause the plaintiffs cancer. 721 F. 3d at 434. I will admit Trope's causation opinions.

### B. James Besunder

James Besunder is a pediatric critical care doctor at Akron Children's Hospital, with significant professional experience treating patients with elevated lead levels. He opines that lead exposure is responsible for a ten-point drop in IQ in each of the three plaintiffs. He bases his opinion in epidemiological studies of the relationship between lead-exposure and IQ combined with a review of each plaintiff's medical history. Defendants seek to exclude his testimony in its entirety.

Defendants first argue that he is not qualified to give this testimony because he is a treating physician and not professionally concerned with the etiology of his patients' conditions. I find, though, that his professional training and his experience treating and counseling patients with elevated lead levels are sufficient to qualify him to give this testimony.

Defendants argue that Besunder's methodology is unreliable because he uses epidemiological studies, which explore disease patterns in large populations, to draw

conclusions about individual plaintiffs. However, the method of applying epidemiological evidence to the medical records of individual patients is consistent with the practice of doctors and sufficient to withstand Daubert. Defendants object that the epidemiological statistics he relied on are not an adequate basis for etiological conclusions about an individual patient's condition. Further, the epidemiological research he relies on is nuanced about, e.g., the age of exposure and other contributing factors, allowing Besunder to make individualized analyses tailored to each child. Defendants concerns about the validity of the research Besunder draws on when used for this purpose may be addressed to the jury.

Finally, defendants argue that Besunder's methods were unreliable because he failed to perform a valid differential etiology. However, differential etiology was not needed to support his opinion. His opinion, based on epidemiological evidence and the children's exposure histories, is that lead alone caused a ten point IQ drop, while other factors may have caused an *additional* IQ drop.  This is as opposed to starting with an already-established diagnosis of a 10-point IQ drop and opining that lead is a substantial factor relative to other factors in causing that pre-identified outcome. Further, I note that Besunder did consider other factors and acknowledge the existence of several co-contributing factors to plaintiffs' overall IQ drops.

I will admit Besunder's testimony.

### C. Peter Karofsky

Peter Karofsky is a physician and former head of the Children/Teen clinic at the UW-Madison school of medicine. He was retained by defendants to review the plaintiffs' medical records and identify possible alternative causes of their cognitive and

behavioral problems. For each of the three plaintiffs, he constructed a report that identifies many factors—medical, social, genetic, and psychological—that he opines may have contributed to plaintiffs' problems. Each report also includes an opinion that early childhood lead exposure played no discernible role in the plaintiff's neurocognitive injuries.

Plaintiffs correctly point out that, throughout his deposition, when asked to justify his exclusion of lead as a potential cause of the plaintiffs' injuries, Karofsky relied heavily on *ipse dixit.* Karofsky's reports also failed to cite any published studies on early childhood lead exposure to justify his opinion that lead played no role in plaintiff's injuries. The basis for Karofsky's opinion that lead played no role in plaintiffs' injuries is, indeed shaky.

Nevertheless, I will admit Karofsky's testimony for two reasons. First, as an expert for the defense, he may challenge plaintiffs' differential etiologies by identifying potential alternative causes of plaintiffs' injuries, so long as the method by which he identifies those alternative causes is reliable. See Section II, *supra.* Karofsky's reports indicate that he identified potential alternative causes by closely reading plaintiffs medical records and other evidence in the record and that he supported his claims with ample citations to scholarly research. This is a reliable method. Second, each report does include a brief section that provides a rationale for excluding or discounting lead as a possible cause and citing to plaintiffs' medical history. On balance, I will admit Karofsky's testimony to rebut plaintiffs' differential etiologies, and will trust in the adversary trial process to iron out the weaknesses in his testimony.

### D.  William Banner

William Banner is a physician retained by defendants to review plaintiffs' medical records and identify potential alternative causes for each plaintiffs' alleged cognitive deficits. Plaintiffs object that the factors he identifies as potential causes are supported by limited scientific studies that do not take lead exposure into consideration, and further that he fails to consider the body of literature that identifies lead as a cause of cognitive injury. As described in Section II above, Banner's testimony appropriately challenges the testimony of plaintiffs' causation experts by raising possible alternative causes. Plaintiffs' objection to the literature on which he does and does not rely goes to the weight of his testimony and is for the jury.

Banner is also offered to testify that children in the 1960s and 1970s had high blood levels but did not have lower IQs, behavior problems, or other issues. Plaintiffs argue that this statement is unsupported *ipse dixit,* and I agree. Banner's support for the claim that the children of the 60s and 70s suffered no harm from lead is that, though lead levels have dropped in the population, we have not seen a correlating rise in national IQ. Banner offers no research-based support for this claim; instead he invokes "common wisdom." This opinion is speculative and will be excluded for that reason.

### E.  David Jacobs

David Jacobs is an industrial hygienist and the former head of the Office of Healthy Homes and Lead Hazard Control within the United States Department of Housing and Urban development. Plaintiffs retained him to testify on several matters. Defendants seek to exclude certain portions of his testimony.

First, defendants seek to preclude him from offering any opinions regarding the toxicity of lead or the health effects of childhood lead exposure. Defendants argue that Jacobs is not qualified to give such testimony because his expertise is in the prevention and abatement of lead hazards, not toxicology or health. Thus, they argue that if he testifies about toxicology or health he will be in effect a "mouthpiece" for other scientists which 7th Circuit case law doesn't allow. *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)("A scientist, however well-credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.") Indeed, at Jacobs' deposition, plaintiffs' counsel appeared to concede that Dr. Jacobs would not be offered as an expert on "the long-term effects of lead exposure on plaintiffs, in other words, what their injuries, what their damages, what the effects are." I agree with defendants' assessment and will exclude Jacobs' general opinions about lead toxicity and effects on children because his expertise is not in this area. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999), *cert. denied* 529 U.S. 1067 (2000).

Second, defendants seek to exclude Jacobs' opinions that lead paint was the main cause of each plaintiff's elevated blood lead levels. Defendants argue that Jacobs opinions are unreliable because he did not perform a differential etiology. Defendants argue that Jacobs bases his opinions on Milwaukee Health Department reports for plaintiffs' residences at the time of their lead exposure, and these reports do not explore or identify all possible sources of lead exposure in the residences. Defendants also object that Jacobs bases his opinion on the fact that plaintiffs' blood lead levels dropped following lead paint abatement at their residences, but Jacobs fails to rule out other

possible explanations for the declining blood lead levels such as family education on cleaning, hygiene and nutrition. I conclude, however, that Jacobs did perform a reliable differential etiology as defined by the Seventh Circuit case law. He considered and ruled out water and soil as primary sources of plaintiffs' lead exposure; thus, to my mind, he dealt adequately with the "obvious alternative causes" contemplated by the committee Rule 702. That he did not consider and exclude *all* possible factors (i.e., family hygiene and nutrition) goes to the weight and not the admissibility of his testimony. *Myers*, 629 F.3d at 645. I will admit Jacobs' specific causation testimony. I will further admit his testimony that exposure from water and soil cannot explain plaintiffs elevated blood lead levels.

Defendants next seek to exclude Jacobs' opinion that "exposure to lead based paint is not limited to the top layer of paint." Defendants argue that both the Wisconsin Administrative Code and HUD guidelines specify that intact lead paint in good or fair condition is not a hazard. Defendants also argue that Jacobs had no testing done to determine the sources of lead in any dust at the plaintiffs' residences, and that Jacobs did not do any investigation to support an opinion that any plaintiff in fact ingested a paint chip containing WLC. However, the committee notes to Fed. R. Evid. 702 provide

> It might also be important in some cases for an expert to educate the factfinder about general principles without ever attempting to apply them to the specific facts of the case. . .. For this kind of generalized testimony, Rule 702 simply requires that (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by the expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702 advisory committee's note (2000 Amends.). Jacobs' testimony about mechanisms of lead paint exposure falls within this category of "generalized testimony." And it meets all four of the Rule 702 requirements. Jacobs is qualified by his training and his professional work in lead abatement. The testimony will help the jury in determining whether the WLC found in paint chip samples taken from places where no lead paint hazard had been identified can be causally linked to plaintiffs' lead exposure. The testimony is reliable because it is based in research and in professional experience. (That the experts responsible for creating the HUD and Wisconsin Administrative Code standards reached a different conclusion is a matter for cross examination.) Finally, the testimony closely fits the facts of the case. I will admit this testimony.

Finally, defendants seek to exclude Jacobs' opinions about population trends in blood lead levels; racial and socioeconomic disparities in blood lead levels; societal impacts, and so on. I have already addressed this issue at No. 07-C-0303, #1063. Consistent with that decision, I will admit these opinions to the extent that they are relevant to issues of duty and breach with respect to plaintiffs' negligence claims, or relevant to rebut defendants' affirmative defenses.

### F. Jenifer S. Heath

Jenifer S. Heath is a toxicologist and environmental consultant retained by plaintiffs to opine about pathways of lead paint exposure in the various homes where the plaintiffs allege they were exposed. Defendants have moved narrowly to exclude the opinion, offered in her supplemental report with respect to each of the three plaintiffs, that each plaintiff was poisoned by WLC (as opposed to other lead compounds) that was present in the paint in his home.

In her initial expert reports, Heath opined that there was a clear exposure pathway and that each plaintiff was poisoned by lead paint in his home. Defendants do not challenge these opinions. These initial opinions were based on evidence that the Milwaukee Health Department had conducted risk assessments in the homes and identified locations in the homes where there was deteriorating paint that contained lead. The MHD inspectors did not identify the specific lead compounds in these locations.

Several years later, plaintiffs' expert John Halverson took paint chips from various locations in the homes; these chips were then tested for WLC. Halverson could not take chips from the areas where the MHD had identified lead hazards, because those areas had already been remediated. Many of the chips that Halverson collected from the residences revealed very high percentages of WLC. Certain of the chips contained different lead compounds.

In Heath's deposition testimony, she conceded that the paint history can vary from location to location in a home, and that, indeed, there were variations in the paint chip samples that were taken in each home. However, Heath opines that, assuming that the Halverson samples are representative of the types of paint present more broadly in the plaintiffs' homes, exposure pathways to WLC can be established on the facts on the record.

Defendants argue that Heath lacks sufficient facts and data from which to conclude that the plaintiffs were exposed to white lead carbonate, because the only basis for finding an exposure pathway is the MHD report, and the lead paint identified in the MHD report is not the same as the paint sampled by Halverson and found to contain

WLC. Defendants also argue that Heath failed to exercise a reliable methodology in drawing a link between exposure to lead paint and exposure to white lead carbonate; they argue that she makes an impermissible link from "exposure to lead-based paint" to "exposure to white lead carbonate pigment," and provides no scientifically valid reason for doing so.

I disagree. The principles and methods that Heath employed in forming her opinion that plaintiffs were exposed to WLC-based paint are the same as the principles and methods that Heath employed in forming her opinion that the plaintiffs were exposed to lead-based paint—an opinion to which defendants did not object. The difference here is that Heath has incorporated an additional assumption into her analysis: the assumption that she can extrapolate from the Halverson samples to draw conclusions about the makeup of the paint in other areas of the homes. The validity of this assumption is uncertain, but such questions go to the weight of the testimony rather than its admissibility and are properly resolved through rigorous cross-examination. See *Stollings v. Ryobi Technologies, Inc.,* 725 F. 3d 753, 767 (7th Cir. 2013). I will deny defendants' motion to exclude this portion of Heath's testimony.

**G. Timothy Riley**

Timothy Riley is a vocational counselor, retained by plaintiffs to provide an opinion regarding how much plaintiffs lost in terms of lifetime earnings as a result of their alleged neurocognitive injuries. Defendants seek to exclude his testimony as unreliable.

Riley concedes that he did not apply a single established methodology; rather he took "bits and pieces" of various vocational rehabilitation methodologies in the literature

and put them together to create his approach to the question posed. Defendants argue that his method fails to satisfy various Daubert reliability factors: it has not been peer reviewed or independently tested, and it is not certain that another expert could replicate the method and achieve the same results. Defendants also challenge certain choices that Riley made with respect to the data on which he based his analysis. For example, to assess the likelihood that plaintiffs would have gone to college absent their cognitive injuries, he looked at college enrollment rates for high-school graduates nationwide rather than rates for MPS graduates.

Nevertheless, I will permit Riley to testify. He did not apply an established methodology, but the questions posed to him were unusual. He does demonstrate a robust understanding of the various published methodologies, examines factors that other vocational counselors would examine, identifies the various assumptions on which he relies, and provides an account of his reasoning sufficient for a fact-finder to determine the validity of his reasoning as compared to conclusions drawn by another expert. He provides more than a bottom line. *See McMahon v. Bunn-o-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998).

### H. Vanessa Elliot Bell

Vanessa Elliot Bell is a psychiatrist retained by defendants. She opines that plaintiffs do not have psychological disorders or deficiencies that can be attributed to ingestion of lead during childhood. She opines that other factors like genetics, family history, environment and socioeconomic factors can account for plaintiffs' current behavioral, social and emotional functioning. As a trained clinical psychologist of more

than twenty years' experience, she is amply qualified to conduct a psychological examination and to opine on a child's psychological state and the factors affecting it.

Plaintiffs also argue that Bell's causation opinions are flawed because she did not rule out lead as a causal factor in plaintiff's injuries. However, the reliability of Bell's opinion does not rely on her ruling out lead. As described in Section II above, Bell's testimony appropriately challenges the testimony of plaintiffs' causation experts by raising possible alternative causes. She appropriately relies on scholarly literature in forming her opinions. Plaintiffs objections to her choices and interpretation of the scholarly literature must be addressed through cross-examination and the testimony of plaintiffs' experts.

## I. Elissa Benedek

Elissa Benedek is a psychiatrist retained by defendants. Plaintiffs have moved narrowly to exclude two of her proffered opinions.

First, plaintiffs seek exclusion of her opinions that each of the plaintiffs is "psychologically and emotionally healthy." Plaintiffs concede that Benedek can dispute whether plaintiffs have, variously, ADHD, Oppositional Defiant Disorder, and other *cognitive* deficits (i.e., the specific neurocognitive disorders diagnosed by plaintiffs' experts). Plaintiffs argue, however, that their *psychological* and *emotional* health is not a fact in issue because they do not allege any problems that have a psychological pathology. I agree with plaintiffs. Benedek may rebut plaintiffs' experts' diagnoses of neurocognitive deficit, but may not make broad statements about plaintiffs' psychological or emotional health.

Plaintiffs also seek exclusion of Benedek's opinions that "lots of people in [their] 30s, 40s, 50s have been exposed to a certain level of lead and they didn't show effects" and that "generations have been exposed to lead and didn't show any effects." As plaintiffs explain, it would certainly be appropriate for Benedek to discuss the results of studies involving cohorts of children with identified lead exposure. However, Benedek's language is so sweeping that it could be interpreted as including all children in the United States, regardless of their degree of lead exposure. Such sweeping assertions are not capable of scientific support, and indeed Benedek offers no such support. I will narrowly exclude as unreliable this portion of Benedek's testimony.

### J. Brian Magee

Brian Magee is a toxicologist and risk assessor hired by defendants. He has a PhD in Toxicology from MIT and thirty-five years of experience in risk assessment, including experience consulting with government on the remediation of Superfund sites. He used a methodology relied upon by the EPA, the "IEUBK" model, to form the opinion that exposure pathways other than lead paint could account for the blood lead levels seen in the plaintiffs. The IEUBK model is a mathematical model is typically used to estimate risks from childhood lead exposures that might be seen at Superfund sites, and to predict changes in lead exposure that might result from lead abatement efforts or changes in the concentration of lead from in various environmental sources.

Plaintiffs seek to exclude his testimony on several grounds, but their arguments are unavailing. First, they argue that he is not qualified to opine on these matters, because his experience is with the remediation of large Superfund sites rather than individual homes. I find, however, that Magee is qualified by his education alone;

further, he explains that he frequently assessed individual homes within the Superfund sites. Second, plaintiffs argue that the IEUBK model was not designed to precisely predict blood lead levels for any one child, or to identify the sources of a child's lead exposure. But Magee does not attempt any such diagnosis. Instead he opines that the IEUBK model can suggest **plausible** lead exposure pathways other than paint that can account for the blood lead levels seen in the plaintiffs, which is all that is necessary for defendants to challenge plaintiffs' causation theory. Finally, plaintiffs challenge the validity of the data to which Magee applied the model—for example, his reliance on studies of lead concentration in various sources in properties close to plaintiffs' homes, and his assumptions regarding the amount of dust and water plaintiffs consumed as children. These challenges to his underlying data and assumptions go to the weight of his testimony and are for the jury.

Magee also opines that, while government agencies used to treat lead paint as the major contributor of lead contamination, they now take a more nuanced view and treat lead paint as one of several possible sources. Plaintiffs object that he cannot cite to sources for this assertion. I find that his experience consulting with government agencies (and, indeed, his application of an EPA-endorsed model that contemplates many pathways of lead exposure) are sufficient basis for him to give this testimony. His opinion is best tested through cross-examination and the testimony of plaintiffs' expert witnesses. I will admit Magee's testimony in full.

### K. David Schretlen

David Schretlen is a neuropsychologist retained by defendants. He opines that plaintiffs' neuropsychological test results are most likely explained by factors other than lead, including genetic endowment, home environment, socioeconomic status, demographics and medical conditions. Plaintiffs object to two aspects of his testimony.

First, Schretlen used plaintiffs' education and work histories to estimate the IQs of plaintiffs' parents so that he could then opine that the plaintiffs were performing at a level consistent with their genetic endowment. Plaintiffs argue that he did not apply a reliable methodology in reaching these estimates, and I agree. To defend Schretlen's IQ-estimation method, defendants offer only that it is "grounded in record evidence, well-accepted tenets of psychology regarding the contribution of genetics to a child's IQ, and his clinical experience." No. 07-CV-0303, ECF No. 84 at 2-3. The "well-accepted tenets" defendants invoke may point to the relevance of Schretlen's opinion but do nothing to support the reliability of his method. And his reliance on "record evidence" and "clinical experience" are inadequate to salvage a method so frankly speculative.

Plaintiffs also object that the forensic data on which Schretlen relies has never been subject to proper peer review. This "data" is derived from 132 lead poisoning cases in which Schretlen or his colleagues served as a defense expert. The lack of peer review and the strong suggestion that Schretlen's materials were developed for the purpose of testifying in cases of this sort both weigh against admissibility.

Finally, I note that Schretlen's report and depositions are replete with racially charged claims which, even if admissible, are sufficiently prejudicial to warrant exclusion under Fed. R. Evid. 403.

I will exclude Schretlen's testimony in its entirety.

**L.  John Sharpless**

The defendants have designated John Sharpless, a historian, to provide the following four opinions: (1) The historical record reflects that the public health understanding in the City of Milwaukee of lead toxicity and hazards, during and since the time lead paint was applied to plaintiffs residences, was similar to the public health understanding nationally; (2) the City of Milwaukee and US Government used and specified lead-containing paints for use in residential and public buildings accessible to children at a time when government officials knew that lead could be hazardous if ingested in sufficient quantities; (3) Wisconsin did not regulate or otherwise prohibit the use of lead-containing paints on residences until the 1980s, and the City did not do so until the 1990s; (4) the changes that took place over time in Milwaukee's inner city housing stock, including plaintiffs' neighborhoods, were unforeseeable. Plaintiffs seek to exclude his opinions on grounds of relevance and reliability.

Sharpless' opinions are relevant to the questions of public knowledge and manufacturer knowledge upon which will hinge the jury's determination whether WLC was defective on a failure to warn theory; they are also relevant to issues of contributory negligence on the part of the City and plaintiffs' landlords. As for plaintiffs' reliability arguments: they are actually objections to his conclusions. Plaintiffs argue that Sharpless should have examined a different body of historical evidence and reached a different outcome. These issues should be worked out through cross examination and the contrasting testimony of plaintiffs' expert historians. I will deny plaintiffs motions.

A final note: I have already placed limits on testimony by plaintiffs' experts on grounds that such testimony might be prejudicial to the defendants, but I reserved the right to admit the testimony if necessary to rebut defendants' affirmative defenses. See No. 07-C-0303, # 1063. If Sharpless testifies to his opinion (4), it may well trigger admissibility of the "alleged disparity" evidence.

### M. Laurence Steinberg

Laurence Steinberg is a professor of psychology; he specializes in "delinquency" and in behavior and development during childhood and adolescence. He has been designated by defendants to rebut plaintiffs' expert testimony that lead ingestion contributed to or increased plaintiffs' risk of behavior issues. He opines that (1) according to the scientific literature, lead is not an established risk factor for delinquency or other conduct problems; (2) published studies that purport to find a statistical association between lead and conduct problems are scientifically flawed; and (3) there is no evidence that lead contributed to plaintiffs' behavior issues, which were likely a result of other factors.

Plaintiffs argue that these opinions are unreliable because Steinberg did not read or account for a large body of scientific literature purporting to document links between lead and conduct. Plaintiffs also argue that the studies he relies on to identify alternative causes of plaintiffs' behavior issues are flawed because they did not factor lead exposure into their analysis.

I will admit Steinberg's testimony. He does not opine that there is in fact no relationship between lead and conduct issues, but that rather that his review of the literature doesn't establish that relationship and that the studies that do suggest such a

relationship can be called into question on scientific grounds. The underlying method of literature review by which he reached this opinion is valid. Plaintiffs objections are to his conclusions and proper subject for cross examination or challenge by an opposing expert with an alternative literature review.

**N. Dean Webster**

Dean Webster is a professor of coatings and polymeric materials designated by defendant Sherwin Williams to offer the following opinions in all three cases: (1) white lead carbonate is not fungible; (2) it is possible for the plaintiffs to identify the manufacturers of the paint in their homes containing WLC; and (3) "since the early 1900s, paint formulators and consumers have known that interior and exterior architectural paints should be used for their intended uses."

Webster's first two opinions are irrelevant and will be excluded as such. I have already ruled that, under *Thomas,* WLC is fungible as a matter of law; I have also ruled that the plaintiffs in these cases are not obligated to prove that product identification is impossible. *See* No. 07-C-0303, #1074 and #1059. As for Webster's third opinion: Webster is not a trained historian, and this opinion is not of a sort that he is qualified to give. Further, his opinion is not based on a reliable historical methodology, which generally involves a thorough review of the pertinent historical record. See my discussion at No. 07-C-0303, #1064, *4-15.

**O. Roxane Tibbits**

Roxane Tibbits is an English as a Second Language (ESL) teacher whom defendants have designated in the *Sifuentes* case only to offer opinions related to specific causation of plaintiff Cesar Sifuentes' language deficits. Specifically, Tibbits

opines that (1) the plaintiff's educational development has been impaired due to many factors, including beginning English-speaking school while still developing literacy in Spanish, receiving little education and language support at home, poor school attendance, and so on; (2) the early identification of plaintiff's learning disability was premature and invalid due to plaintiff's language confusion at the time of the diagnosis; and (3) plaintiff's poor educational development is consistent with these obstacles. Plaintiffs argue that Tibbits' opinions should be excluded as unreliable because she did not at all address in her report whether lead could be a cause of plaintiff's educational challenges. In other words, plaintiffs argue that she failed to account for an "obvious alternative cause."

I will not exclude Tibbits' testimony on these grounds. As discussed in Section II of this decision and order, a defendant's expert may attack a plaintiff's expert's differential etiology by pointing to a plausible cause of plaintiff's injury other than the defendant's conduct. *Westberry*, 178 F.3d at 265-66. That is precisely Tibbits' role in this case. Further, I find that she is qualified by her professional training and experience to give this testimony, that her testimony is based on sufficient facts (i.e., a thorough review of plaintiff's education records), and that she reliably applied her professional experience to analyze plaintiff's education records. See Fed. R. Evid. 702 advisory committee's note (2000 Amends.).

I note, however, that some of Tibbits' proffered testimony verges on prejudicial (e.g., it possibly taps into prejudices relating to uneducated Mexican immigrants being inadequate parents or about the Milwaukee Public Schools being sloppy in the provision

of special education/English as a second language services). Defendants are warned that I may invoke Rule 403 and limit Tibbits' testimony if it ventures into these areas.

### P. Tatiana Joseph

Tatiana Joseph is a former teacher, holds a PhD in Education, and is an instructor in the School of Education at UW-Milwaukee. She has been designated by plaintiff Cesar Sifuentes to rebut the testimony of Roxanne Tibbits. Defendants seek to exclude her opinion that Tibbits's methodology is unreliable because she failed to consider lead as a cause of Sifuentes educational challenges. The basis of defendants' objection is that her report relies heavily on quotations from the reports of Sifuentes' other experts describing his lead exposure and its symptoms. Defendants argue that she is effectively parroting the testimony of others and thus improperly using her expert status to enhance their credibility, rather than using their testimony as the basis of an independent analysis using her own expertise. *Estate of Cape v. United States*, 2013 WL 4522933 (ED Wis. Aug 27,2017) ("An expert cannot vouch for the truth of what another expert told him.").

Rule 703 of the Federal Rules of Evidence permits expert opinions to be based on the reliable opinions of other experts. Though Joseph does rely heavily on other experts' opinions, I am satisfied that her purpose is not to vouch for the truth of these experts opinions but rather to rebut Roxanne Tibbits' testimony by presenting an alternative version of how an educator qualified as an ESL expert by training and experience might apply her professional expertise to the analysis of Sifuentes' education records yielding a different conclusion. I will admit her testimony.

### Q. Sheila Moore

Sheila Moore is a radiologist and the former head of the radiology department at the Children's Hospital of Wisconsin. She has been designated by defendants to testify in the *Sifuentes* case only. Her testimony addresses certain X-rays taken of Cesar Sifuentes' abdomen in May 2001 when he was admitted to the hospital for chelation therapy following diagnosis of his elevated blood lead levels. The X-rays show some white flecks in the abdomen and the radiologist who interpreted the images at the time they were taken identified the flecks as consistent with lead paint chips.

Moore's proffered opinion is that the flecks in the X-ray images are not lead. Her opinion is based on the shape and density of the flecks; the fact that there are other flecks in the images positioned outside the body, which Moore suggests is indicative of dust on the cassette; and the fact that the flecks are not visible in another X-ray taken shortly afterwards. Plaintiffs object that these opinions as speculative, arguing that Moore failed to take into account that Sifuentes had elevated blood lead levels at the time these images were taken, and that chips of lead paint had been found in his home. They also object that her conclusion fails to take into account the conclusion of the radiologist who interpreted the images when they were taken.

I will admit Moore's testimony. Moore is amply qualified to give the testimony, and it is well established that expert testimony drawing conclusions "from a set of observations based on extensive and specialized experience" is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 139, 156 (1999). I find that Moore's testimony falls squarely within this category. The fact that she did not reach the same conclusion as the radiologists who first interpreted the images does not affect admissibility. "That two

different experts reach opposing conclusions from the same information does not render their opinions inadmissible." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000). Ultimately, Sifuentes' objection is not to her methods, but to the conclusions she reaches—not a basis for exclusion under *Daubert.*

## IV.    CONCLUSION

**THEREFORE, IT IS ORDERED** that defendants' motions to exclude the causation testimony of Idit Trope (No 07-C-0303, # 601; No. 07-C-0441, # 533; No. 10-C-0075, # 469) are **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motions to exclude all opinions of James Besunder, DO (No. 07-C-0303, # 672; No. 7-C-441, # 592; No. 10-C-75, # 524) are **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' motions to exclude the testimony of Peter Karofsky (No 07-C-0303, # 578; No. 07-C-0441, # 513; No. 10-C-0075, #442) are **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' motions to exclude the testimony of William Banner (No. 07-C-0303, # 694; No. 07-C-0441, # 620; No. 10-C-0075, # 565) are **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that defendants' motions to exclude certain opinions and testimony of David Jacobs (No 07-C-0303, #632; No 07-C-0441, #572; No. 10-C-0075, #511) are **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that defendants' motions to exclude opinions of Dr. Jenifer S. Heath (No. 07-C-0303, #660; No 07-C-0441, #607; No. 10-C-0075, #544) are **DENIED.**

IT IS FURTHER ORDERED that defendants' motions to exclude opinions of Timothy Riley (No. 07-C-0303, # 541, No. 07-C-0441, #477, No. 10-C-0075, # 402) are **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude opinions and testimony of Vanessa Elliot Bell (No. 07-C-0303, # 581; No. 07-C-0441, # 517; No. 10-C-0075, #451) are **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude opinions of Elissa Benedek (No. 07-C-0303, # 715; No. 07-C-0441, # 649; No. 10-C-0075, # 583) are **GRANTED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude expert opinion testimony of Dr. Brian Magee (No 07-C-0303, # 606; No. 07-C-0441, # 539; No. 10-C-0075, #472) are **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude expert opinion testimony of David Schretlen (No 07-C-303, # 590; No. 07-C-0441, # 523; No. 10-C-0075, #456) are **GRANTED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude expert opinions and testimony of John Sharpless (No. 07-C-0303, #557; No. 07-C-0441, #487; No. 10-C-0075, #416) are **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motions to exclude opinions of Laurence Steinberg (07-C-0303, # 657; No. 07-C-0441, # 586, No. 10-C-0075, # 526) are **DENIED.**

**IT IS FURTHER ORDERED** that plaintiffs' motions to exclude the testimony of Dean Webster (No. 07-C-0303, #666; No. 07-C-0441, #597; No. 10-C-0075, #528) are **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff Cesar Sifuentes' motion to exclude the testimony of Roxanne Tibbits (No. 10-C-0075, #409) is **DENIED.**

**IT IS FURTHER ORDERED** that defendants' motion to exclude certain testimony of Tatiana Joseph (No 10-C-0075, #473) is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff Cesar Sifuentes' motion to exclude expert opinions and testimony of Sheila Moore, M.D., F.A.C.R (No. 10-C-0075, #448) is **DENIED.**

Dated in Milwaukee, Wisconsin, this 25th day of January, 2019.

_s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge