# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GLENN BURTON, JR.,                    Case No. 07-cv-0303
     Plaintiff,

     v.

AMERICAN CYANAMID CO., et al.,
     Defendants.

RAVON OWENS,                          Case No. 07-cv-0441
     Plaintiff,

     v.

AMERICAN CYANAMID CO., et al.,
     Defendants.

CESAR SIFUENTES,                      Case No. 10-cv-0075
     Plaintiff,

     v.

AMERICAN CYANAMID CO., et al.,
     Defendants.

## DEFENDANT ATLANTIC RICHFIELD'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

LEGAL STANDARD ..........................................................................................................2

I.  PLAINTIFFS HAVE FAILED TO ESTABLISH THE ELEMENTS OF THEIR
    NEGLIGENCE CLAIM AGAINST ATLANTIC RICHFIELD .......................................3

    A.  Plaintiffs Have Failed to Identify a Legally Recognized Duty That Anaconda
        Owed Them That Could Form the Basis for a Negligence Claim.........................3

    B.  Plaintiffs Did Not Prove That Anaconda Failed to Use Ordinary Care...............11

    C.  Plaintiffs Did Not Prove That Any Purportedly Negligent Conduct Caused
        Them To Ingest White Lead Carbonate Pigment ..................................................13

II. PLAINTIFFS DID NOT ESTABLISH THE ELEMENTS OF THEIR STRICT
    LIABILITY FAILURE-TO-WARN CLAIM AGAINST ATLANTIC RICHFIELD......16

    A.  Under the Component Supplier Rule and this Court's September 12, 2018
        Ruling, Plaintiffs' Failure-to-Warn Claim Against Atlantic Richfield Fails
        Because Anaconda Did Not Sell Paint ...................................................................17

    B.  Plaintiffs Failed to Prove that Anaconda Knew or Should Have Known That
        White Lead Carbonate Pigment Presented a Risk to Children When Used in
        Residential Paint ...................................................................................................19

    C.  Plaintiffs Have Failed to Meet Their Burden to Prove That the Absence of a
        Warning Caused Their Alleged Injuries.................................................................24

    D.  Plaintiffs Failed to Prove that Anaconda Expected White Lead Carbonate
        Pigment to Reach Consumers Without Substantial Change ...............................25

III. ATLANTIC RICHFIELD IS ENTITLED TO JUDGMENT AS A MATTER OF
     LAW ON BOTH CLAIMS BECAUSE ANY REASONABLE JURY WOULD FIND
     THAT ATLANTIC RICHFIELD HAS BEEN EXCULPATED....................................27

IV. PLAINTIFFS DID NOT PROVE INJURY, DAMAGES, OR CAUSATION ...............37

V.  ATLANTIC RICHFIELD IS ENTITLED TO JUDGMENT AS A MATTER OF
    LAW FOR MULTIPLE OTHER REASONS ..............................................................37

CONCLUSION.............................................................................................................38

Case 2:07-cv-00303-LA   Filed 05/29/19   Page 3 of 45   Document 1578

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................3

*Boulet v. Nat'l Presto Indus., Inc.*,
No. 11-CV-840-SLC, 2012 WL 12996297 (W.D. Wis. May 7, 2012).....................................7

*Brierton v. Vermont Log Buildings, Inc.*,
No. 98 C 1486, 1998 WL 611447 (N.D. Ill. Sept. 8, 1998) .....................................5

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991) ..............................................................................11

*Collins v. Eli Lilly Co.*,
116 Wis. 2d 166, 342 N.W.2d 37 (1984) ....................................................*passim*

*Fischer ex rel. Fischer v. Ganju*,
168 Wis. 2d 834, 485 N.W. 2d 10 (1992) ..........................................................14

*Fondell v. Lucky Stores, Inc.*,
85 Wis. 2d 220, 270 N.W.2d 205 (1978) ............................................................15

*Garrett v. Barnes*,
961 F.2d 629 (7th Cir. 1992) ...................................................................3

*Gibson v. American Cyanamid Co.*,
760 F.3d 600 (7th Cir. 2014) ...............................................................37, 38

*Glassey v. Cont'l Ins. Co.*,
176 Wis. 2d 587 (1993) ......................................................................25, 26

*Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*,
2009 WI 78, 319 Wis. 2d 91 (2009)..........................................................5, 25

*Gorton v. Am. Cyanamid Co.*,
533 N.W.2d 746 (Wis. 1995)....................................................................7

*Green Spring Farms v. Kersten*,
401 N.W.2d 816 (Wis. 1987)....................................................................7

*Haase v. Badger Mining Corp.*,
2003 WI App 192, 266 Wis.2d 970, 669 N.W.2d 737....................................17, 18

Case 2:07-cv-00303-LA   Filed 05/29/19   Page 4 of 45   Document 1578

*Haase v. Badger Mining Corp.*,
  2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389 ................................................26

*Hall v. Forest River, Inc.*,
  536 F.3d 615 (7th Cir. 2008) ...........................................................................3

*Hatleberg v. Norwest Bank Wis.*,
  2005 WI 109, 283 Wis. 2d 234, 700 N.W.2d 15 ................................................7

*Home Valu, Inc. v. Pep Boys*,
  213 F.3d 960 (7th Cir. 2000) .........................................................................16

*Insolia v. Philip Morris Inc.*,
  128 F. Supp. 2d 1220 (W.D. Wis. 2000) ...........................................................5

*Lane v. Hardee's Food Sys., Inc.*,
  184 F. 3d 705 (7th Cir. 1999) ...........................................................................3

*Lemmermann v. Blue Cross Blue Shield of Wis.*,
  713 F. Supp. 2d 791 (E.D. Wis. 2010) .............................................................25

*Lewis v. Paul Revere Life Ins. Co.*,
  80 F. Supp. 2d 978 (E.D. Wis. 2000) .................................................................7

*Lexington Ins. Co. v. Horace Mann Ins. Co.*,
  861 F. 3d 661 (7th Cir. 2017) ...........................................................................2

*Metavante Corp. v. Emigrant Sav. Bank*,
  619 F.3d 748 (7th Cir. 2010) ...........................................................................7

*Murray v. Chi. Transit Auth.*,
  252 F. 3d 880 (2001) .......................................................................................3

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................................11

*Nigh v. Dow Chem. Co.*,
  634 F. Supp. 1513 (W.D. Wis. 1986)...............................................................17

*Ollerman v. O'Rourke Co.*,
  288 N.W.2d 95 (Wis. 1980)..............................................................................7

*Pac. Cycle, Inc. v. PowerGroup Int'l, LLC*,
  969 F. Supp. 2d 1098 (W.D. Wis. 2013)............................................................7

*Pulsifer v. U.S. Bank, N.A. (In re Pulsifer)*,
  Nos. 13-C-648, 13-C-835, 2014 WL 4748233 (E.D. Wis. Sept. 23, 2014) ...........7

v

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000) ..................................................................................................2

*Rendler v. Markos*,
    453 N.W.2d 202 (Wis. Ct. App. 1990)........................................................................7

*Shawver v. Roberts Corp.*,
    90 Wis. 2d 672, 280 N.W.2d 226 (1979) ..................................................................14

*Smith v. 2328 Univ. Ave. Corp.*,
    52 A.D.3d 216 (N.Y. App. Div. 2008)........................................................................27

*Thomas ex rel. Gramling v. Mallett*,
    2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523 ..........................................*passim*

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) ................................................................................................11

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ..........................................................................................11, 17

*Von Zuckerstein v. Argonne Nat'l Lab.*,
    984 F. 2d 1467 (7th Cir. 1993) ..................................................................................3

*Westphal v. E.I. du Pont de Nemours & Co.*,
    192 Wis. 2d 347, 531 N.W.2d 386 (1995) ................................................................26

## Statutes and Rules

Wis. Stat. § 895.046 ..........................................................................................37, 38

Fed. R. Civ. P. 36..........................................................................................................2

Fed. R. Civ. P. 50.................................................................................................1, 2, 38

## Other Authorities

Wis. Jury Instructions Civil—1005 ..............................................................................4

Pursuant to Federal Rule of Civil Procedure 50(a), Defendant Atlantic Richfield Company submits this Memorandum of Law in Support of its Motion for Judgment as a Matter of Law.

## INTRODUCTION

Plaintiffs have failed to establish the most essential evidence in a negligence or failure to warn case, and Atlantic Richfield is entitled to judgment as a matter of law on all claims.

*First*, Plaintiffs have failed to establish the elements of their negligence claim. This Court has already ruled that Atlantic Richfield's alleged predecessors ("Anaconda") had no duty to warn any of the Plaintiffs for purposes of the negligence claim, and Plaintiffs have failed to identify any other legally recognized duty that could form the basis of a negligence claim. Plaintiffs' request that the Court instruct the jury that Anaconda breached a duty simply by "continu[ing] to sell" white lead carbonate pigment (Doc. 1490 at 32-33) only highlights that their claim conflicts with binding Wisconsin Supreme Court precedent. Merely selling a lawful product cannot form the basis for a tort claim. In any event, Plaintiffs' negligence claim also fails because they have introduced no evidence that Anaconda failed to take ordinary care and for other reasons discussed below.

*Second*, Plaintiffs have failed to establish the elements of their strict-liability claim. Most significantly, Plaintiffs' experts have now agreed that Anaconda never made or sold paint, and that white-lead-in-oil is not paint. Under this Court's September 12, 2018 ruling that Plaintiffs have no strict-liability failure-to-warn claim against a pigment company that never sold paint, Plaintiffs' failure-to-warn claim against Atlantic Richfield fails as a matter of law. Plaintiffs' failure-to-warn claim also fails because they have failed to present evidence on multiple other elements of that claim, including because they have failed to present evidence from which a

reasonable jury could conclude that Anaconda knew or should have known as of 1946 of the risk that Plaintiffs say should have formed the basis of a warning, and because they have failed to present evidence that the absence of a warning was a cause of any Plaintiff's injury.

The Court should also grant judgment as a matter of law on all claims because Plaintiffs have failed to establish that they sustained any injury caused by the ingestion of white lead carbonate pigment from paint in their homes, and because a reasonable jury must conclude that Atlantic Richfield is exculpated, and for multiple additional reasons discussed below.

## STATEMENT OF FACTS

The law and facts that entitle Atlantic Richfield to judgment as a matter of law are set forth throughout the arguments below. Moreover, Atlantic Richfield incorporates by reference as if set forth fully herein its previously filed Statements of Undisputed Material Facts, including: Docs. 532, 545, 1127-3 (*Burton*); Docs. 469, 483 (*Owens*); Docs. 399, 412 (*Sifuentes*). Atlantic Richfield also incorporates by reference Plaintiffs' admissions in response to Atlantic Richfield's First Set of Requests for Admission, Doc. 1570-1, and their admissions in connection with Atlantic Richfield's Section Set of Requests for Admission, Doc. 1570-2. These facts are deemed admitted pursuant to the Court's November 18, 2016 minute order and Fed. R. Civ. P. 36, as explained in the Brief by Atlantic Richfield Company Concerning its Second Requests for Admission (Doc. 1489).

## LEGAL STANDARD

A court must grant judgment as a matter of law pursuant to Rule 50(a) after a party has been fully heard on an issue at trial but "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Lexington Ins. Co. v. Horace Mann Ins. Co.*, 861 F. 3d 661, 667 (7th Cir. 2017) (quoting Fed. R. Civ. P. 50(a)(1)); *see also Reeves v.*

2

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 135 (2000). The standard for granting judgment as a matter of law "mirrors" that for granting summary judgment. *Murray v. Chi. Transit Auth.*, 252 F. 3d 880, 886-87 (2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). "In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008). The party bearing the burden of proof must provide "substantial evidence [that] could support a jury verdict." *Lane v. Hardee's Food Sys., Inc.*, 184 F. 3d 705, 706-07 (7th Cir. 1999). A "mere scintilla of evidence" will not suffice to support a finding in the non-moving party's favor. *Id.* (quoting *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F. 2d 1467, 1471 (7th Cir. 1993)). Nor will "sheer speculation and conjecture." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (granting judgment as a matter of law, as "speculation cannot be the basis of a jury verdict").

## ARGUMENT

## I. PLAINTIFFS HAVE FAILED TO ESTABLISH THE ELEMENTS OF THEIR NEGLIGENCE CLAIM AGAINST ATLANTIC RICHFIELD

The Court should grant judgment as a matter of law on Plaintiffs' negligence claim because Plaintiffs have failed to prove that Anaconda negligently breached a duty of care owed to Plaintiffs under the law, and because they have failed to prove that any negligence caused their alleged injuries.

### A. Plaintiffs Have Failed to Identify a Legally Recognized Duty That Anaconda Owed Them That Could Form the Basis for a Negligence Claim

To bring a negligence claim under the risk contribution rule, Plaintiffs must prove, inter alia, that Anaconda "conduct in producing or marketing [] white lead carbonate constituted a

3

breach of a legally recognized duty to" Plaintiffs. *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, ¶ 161, 285 Wis. 2d 236, 701 N.W.2d 523. The Court's September 12, 2018 decision granted summary judgment on negligence claims based on breach of an alleged duty to warn. Doc. 1070 at 15. It held that (i) as stated in the Wisconsin Supreme Court's *Thomas* decision, liability for negligence must be based on breach of a duty owed to the Plaintiffs, not to someone else, and (ii) Defendants did not owe a duty to warn Plaintiffs or their caregivers of the risks associated with white lead carbonate ("WLC") pigments in residential paints because the caregivers knew of those risks and hence needed no warning. *Id.* The September 12 decision left open the possibility that Plaintiffs might pursue negligence claims based on conduct other than failure to warn. *Id.* ("Plaintiffs may, however, continue to pursue negligence claims based on the general duty of ordinary care.").

The law of negligence does not permit Plaintiffs merely to assert that Anaconda breached a duty of "ordinary care" writ large; they must establish that Anaconda failed to take "ordinary care" in connection with specific conduct or a specific duty. Under Wisconsin law, a supplier "is not using ordinary care and is negligent if the [supplier], without intending to do harm, *does something (or fails to do something)* that a reasonable person would recognize as creating an unreasonable risk of injury or damage to the plaintiff." Wis. Jury Instructions Civil—1005 (emphasis added). In their proposed jury instructions, Plaintiffs identified the "something" as selling white lead carbonate pigment. They asked the Court to instruct the jury: "Put simply, the issue is whether Defendants were aware of the dangerous condition posed by their white lead carbonate products but continued to sell them anyway." Doc. 1490 at 32-33 (Plaintiff's Proposed Instruction on "Risk Contribution: Negligence Claim").

Plaintiffs' claims fail as a matter of law because the Wisconsin Supreme Court has specifically held that white lead carbonate manufacturers had no duty to stop selling white lead carbonate, notwithstanding any dangers posed by white lead carbonate when used in residential paint. *Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*, 2009 WI 78, ¶ 2, 319 Wis. 2d 91, 100 (2009). *Godoy* held that plaintiffs cannot bring a claim for defective design, under negligence or strict liability, on the theory that white lead carbonate pigment is "unreasonabl[y] danger[ous]" because of "the presence of lead." *Id.* at 100, 111-15. Plaintiffs' argument that Anaconda breached a duty because it was "aware of the dangerous condition" of white lead carbonate pigment but "continued to sell" is simply a repackaging of the design-defect argument precluded by *Godoy*. It amounts to an argument that it was negligent to make and sell pigment that contained lead as opposed to pigment that did not. But as *Godoy* held, "[w]ithout lead, there can be no white carbonate pigment," and pigment manufacturers do not have a duty to remove the lead from their pigment. *Id.* at 115.

Wholly apart from *Godoy*, this argument should be rejected. It is undisputed that white lead carbonate pigment has many non-harmful uses, including in ceramics, rubber, plastic, non-residential paints, and others. Tr. 3143:15-23. It is also undisputed that Anaconda promoted its white lead carbonate for sale to manufacturers of non-paint products. Tr. 1970. Where a lawful product can be used in multiple ways, some presenting a risk of harm and some not, the manufacturer does not have a duty to refrain from manufacturing or selling the product, and it is not "negligent" to manufacture and sell the product. *See, e.g.*, *Insolia v. Philip Morris Inc.*, 128 F. Supp. 2d 1220, 1223 (W.D. Wis. 2000) (rejecting as unprecedented "a claim of negligence based on continued sales of a product recognized as dangerous"); *Brierton v. Vermont Log Buildings, Inc.*, No. 98 C 1486, 1998 WL 611447, at *4 (N.D. Ill. Sept. 8, 1998) ("Obviously

5

defendants could lawfully and non-negligently sell a product that is dangerous for residential use but otherwise properly designed and manufactured for its intended use."). The manufacturer may have a duty to warn about the product's risks, but the Court already has held that white lead carbonate manufacturers owed no such duty to these Plaintiffs. *Burton* Doc. 1070 at 15; *Burton* Doc. 1066 at 5 n.3. And if merely producing white lead carbonate were automatically a breach of a legally recognized duty to the plaintiffs because white lead carbonate is dangerous to children when used in residential paint, *Thomas*'s requirement that plaintiffs *prove* that "[t]he Pigment Manufacturers' *conduct* in producing or marketing the white lead carbonate constituted a breach of a legally recognized duty" to the plaintiff would make no sense. *Thomas*, 285 Wis.2d at 320 (emphasis added).

Plaintiffs have identified no other legally recognized duty. Any claim that Atlantic Richfield was negligent in "promoting" white lead carbonate would fail as a matter of law for multiple independent reasons. *First*, any such claim would amount to the failure-to-warn claim this Court already dismissed. As Judge Sankovitz observed in *Thomas*, a negligent marketing/promotion theory "resembles quite closely a failure to warn theory" such that "[i]t's just not a sufficiently rigorous distinction" between the claims. Ex. 1 to Declaration of Bruce R. Kelly ("Kelly Declaration") (*Thomas* 3/15/07 Hr'g Tr. at 12-13). Plaintiffs have offered no evidence that Anaconda made any misrepresentation at any point to anyone in connection with white lead carbonate pigment, nor could Plaintiffs possibly establish a breach of a duty to them *themselves* based on a representation by Anaconda about white lead carbonate pigment that Plaintiffs and their caregivers never saw. A claim for negligent misrepresentation under Wisconsin law requires proof that the defendant made a false or misleading representation of fact to the plaintiff or some intermediary representing the plaintiff such as an agent or a prescribing

6

physician,[1] and that the plaintiff or intermediary relied on the representation.[2] Plaintiffs offered

no evidence from which a reasonable jury could find such facts, and they have offered no

evidence that the persons who purchased or applied the paint containing white lead carbonate

pigment to their houses did so in reliance on representations or promotions by Atlantic

Richfield's alleged predecessors, or indeed by anyone.

*Second*, any claim of negligent promotion or negligent misrepresentation would fail

because the risk contribution rule does not apply to "promotion" or misrepresentation; it applies

---

[1] *Gorton v. Am. Cyanamid Co.*, 533 N.W.2d 746, 755 (Wis. 1995) (*citing Green Spring Farms v. Kersten*, 401 N.W.2d 816, 822 (Wis. 1987)); *see Pulsifer v. U.S. Bank, N.A. (In re Pulsifer)*, Nos. 13-C-648, 13-C-835, 2014 WL 4748233, at *5 (E.D. Wis. Sept. 23, 2014) (granting summary judgment on plaintiffs' negligent misrepresentation claim where plaintiffs did not identify any factual misrepresentations made by the defendant to them); *Rendler v. Markos*, 453 N.W.2d 202, 205 (Wis. Ct. App. 1990) (finding that plaintiffs failed to state a claim for negligent misrepresentation where the complaint only alleged that the defendants made false statements to a third party and did "not allege that [the defendants] so advised the [plaintiffs] or intended or had reason to expect that the advice to the [third party] would be communicated to or influence the [plaintiffs]."); *see also Hatleberg v. Norwest Bank Wis.*, 2005 WI 109, ¶¶ 40-41, 283 Wis. 2d 234, 700 N.W.2d 15 (concluding that the defendant was liable for a claim of negligent misrepresentation where the defendant made false statements to the plaintiff to continue funding a trust that the defendant knew was fundamentally flawed and the plaintiff's justifiable reliance on the false statements increased the taxes paid by the plaintiff's estate).

[2] *Ollerman v. O'Rourke Co.*, 288 N.W.2d 95, 99 (Wis. 1980); *see Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 767 (7th Cir. 2010) ("Wisconsin law requires that a fraud plaintiff prove that his reliance is reasonable."); *Pac. Cycle, Inc. v. PowerGroup Int'l, LLC*, 969 F. Supp. 2d 1098, 1115 (W.D. Wis. 2013) ("[The plaintiff] also fails to offer any evidence to show that it reasonably relied on statements made by [the defendant] in its press releases to dealers, or that [defendant] knew or should have known that [the plaintiff] would rely on these statements."); *Boulet v. Nat'l Presto Indus., Inc.*, No. 11-CV-840-SLC, 2012 WL 12996297, at *5-6 (W.D. Wis. May 7, 2012) ("[Plaintiff's complaint contains factual allegations identifying . . . detrimental reliance on the part of [the plaintiff] on those representations ([the plaintiff] would not have bought the CoolDaddy® or paid as much as he did for it had he known of the alleged defect)."); *Lewis v. Paul Revere Life Ins. Co.*, 80 F. Supp. 2d 978, 999 (E.D. Wis. 2000) ("The third element of misrepresentation [under Wisconsin law] is reliance: the plaintiff must prove that it relied upon the defendant's representations and was damaged by that reliance.").

only to production or marketing.[3]  The Wisconsin Supreme Court's two decisions on the risk contribution rule did not purport to extend the relaxed rules for negligence applicable to sellers to companies that merely promoted a product but did not sell it.  *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), modified the common-law rule governing claims for DES by permitting recovery without proof of the seller's identity.  *Collins* acknowledged that the plaintiff would lose under traditional rules of law, *id.*, and in response chose to "formulate[] a method of recovery for plaintiffs in DES cases in Wisconsin."  *Id.* at 49.  That method of recovery is narrowly tailored to fit a specific type of claim.  It permits a plaintiff to recover on claims based on manufacturers' production or marketing of a fungible defective product without proving the identity of the manufacturer or seller of the product that caused the harm.  *Id.* at 50.  *Collins* consistently described the new rule it was creating as one establishing liability for "producing or marketing" DES.  *See, e.g.*, *id.*

*Collins* did not state that its new risk contribution rule would apply to claims based on negligent "promotion," as distinguished from negligent production or marketing.  On the contrary, the *Collins* opinion demonstrates an intention that the risk contribution rule should not apply to a claim based on a wrongful representation.  In addition to her claims that DES was defective because of inadequate warning, the *Collins* plaintiff asserted a separate misrepresentation claim.  *Id.* at 54.  As to that claim, she lost under Wisconsin's traditional rules of law:  she could not prove that the conduct of a specific identified defendant actually caused

---

[3] Atlantic Richfield incorporates by reference its Bench Memorandum In Support of Its Proposed Phase 1 Jury Instructions and Verdict Form (Doc. 1507), and its Memorandum in Support of its Motion for Summary Judgment Dismissing Any Non-Warning Negligence Claims (Doc. 1127-2).

the plaintiff's injury rather than merely creating a risk of injury to the public. *Collins* affirmed summary judgment dismissing her misrepresentation claim, as follows:

> In her second amended complaint, the plaintiff alleged that the defendants had "intentionally, deceitfully, fraudulently, recklessly, or innocently" misrepresented that DES was safe and efficacious for use in preventing miscarriages during pregnancy. The plaintiff further alleged that Dr. Wendt, Mrs. Collins' physician, had relied upon these misrepresentations when prescribing DES for Mrs. Collins. However, in an affidavit submitted by the defendants in conjunction with their motions for summary judgment, Dr. Wendt stated that he relied only on general medical information and "did not use [DES] because of anything that any drug company had told me, and as a matter of fact, no drug company had called on me in respect to using this drug." Dr. Wendt confirmed this fact in his deposition taken July 22, 1981. The plaintiff did not submit an affidavit or any other evidence controverting this fact. Even assuming that the defendants made misrepresentations concerning DES, since there was no reliance on those misrepresentations, there can be no recovery under this cause of action.

*Id.*

Sensible reasons underlie *Collins'* differing treatment of claims based on production and marketing of DES (salvaged by the new risk contribution rule) and claims based on misrepresentation (dismissed under traditional common-law rules). A DES plaintiff might not know who manufactured or sold the product that injured her, but someone must have. There is no comparable reason to assume that promotion, whether by the manufacturer or seller of the product or by someone else, had anything to do with the ingestion of DES by the mother of such a plaintiff. Indeed, the facts of *Collins*, as described in the quotation above, illustrate this point. The prescribing physician in *Collins* testified that he received no promotions of the product. *Id.*

The Wisconsin Supreme Court's later decision in *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, ¶ 27, 285 Wis. 2d 236, 701 N.W.2d 523, extended the risk contribution rule to cases alleging injury from ingestion of WLC pigment, but did not purport to make that rule

9

applicable to claims of wrongful promotion as distinct from negligent production and marketing.[4]  The issue of liability for negligent misrepresentation was not before the Supreme Court.  The *Thomas* plaintiff had pleaded a separate count for negligent misrepresentation. When that count was challenged by a summary judgment motion, the plaintiff admitted that he could not prove reliance and asked the trial court to modify Wisconsin law to impose a presumption of reliance.[5]  The trial court rejected that request and granted summary judgment on the negligent misrepresentation claim.  Kelly Decl. Ex. 2 (1/17/03 *Thomas* Hr'g Tr. at 24:7-20). The plaintiff did not appeal that decision.

---

[4] *Thomas* discussed promotion of WLC pigments.  2005 WI 129, ¶¶ 86-98.  That discussion did not state an intention to change Wisconsin law governing liability for promotion as *Collins* had applied it.  It was intended solely to provide factual background, as stated in Footnote 11, *id.* at ¶ 28 n.11, and the introductory paragraphs of Part III of the opinion.  *Id.* at ¶¶ 27-28.  The section on promotion is subpart F of Part III.  *Id.* at ¶¶ 86-98.

[5] The *Thomas* plaintiff argued as follows:

> The nature of Defendants' business and their methods of advertising and marketing their products were not targeted at one individual consumer, but at the entire paint-buying community. . . . Thus, the strict application of reliance is not appropriate under the circumstances of the case at bar and the presumption of reliance should be substituted.

Kelly Decl. Ex. 3 (12/5/02 *Thomas* Plaintiff's Mem. at 63).

10

The risk contribution rule does not preclude a plaintiff from asserting a common-law negligent misrepresentation claim against someone who has made false or misleading statements that induce the plaintiff to buy or use a product. But it does not relax the requirements for proof of such a claim. Plaintiffs did not plead a negligent misrepresentation claim, and the evidence at trial does not even arguably prove one, because there is no evidence of any misrepresentation and no evidence of Plaintiffs relying on product promotions that occurred decades before the Plaintiffs were born.

To the extent that Plaintiffs argue that Anaconda's *truthful* promotion of white lead carbonate pigment breached a legally recognized duty to the Plaintiffs, such an argument would fail for all the reasons that a negligent misrepresentation claim would fail, including that the risk contribution rule does not apply to promotion and that such a claim would just be an impermissible effort to evade precedent establishing that Anaconda owed Plaintiffs no duty to warn or to stop selling. In addition, Wisconsin law does not make a non-misleading statement about a product actionable, and any attempt to impose liability for non-misleading promotional statements about a lawful product would violate the First Amendment. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976). Imposing civil damage liability for speech under state tort law is, for First Amendment purposes, equivalent to outright state regulation of speech. *E.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

### B.     Plaintiffs Did Not Prove That Anaconda Failed to Use Ordinary Care

Even if merely selling or promoting white lead carbonate pigment could potentially constitute a breach of a legally recognized duty to the Plaintiffs—and it cannot—Plaintiffs'

negligence claims would still fail as a matter of law because Plaintiffs offered no evidence that Anaconda failed to used ordinary care in conducting either of those activities (or any activity).

Plaintiffs have repeatedly conceded that that white lead carbonate pigment could be used for purposes creating no potential harm to children, meaning that no reasonable jury could find that Anaconda breached a duty of ordinary care by merely selling white lead carbonate pigment, without more. Plaintiffs' experts, Drs. Gerald Markowitz and David Rosner, testified that white lead carbonate pigment was used to make products like rubber, plastics, and ceramics that created no threat to children. *See* May 10, 2019 Trial Tr. at 1970:2-1972: 5) (Markowitz testifying to use of Anaconda white lead carbonate in ceramics); May 15, 2019 Trial Tr. at 3144-45 (Markowitz); May 8 Trial Tr. at 1059:7-1060:1, 1067:25-1068:25, 1346:12-49:17 (Rosner testifying to different uses of white lead carbonate). These experts also testified that white lead carbonate was used in paint designed for specific types of products, including military, industrial, and marine applications, without posing a hazard. May 15, 2019 Trial Tr. at 3144-45 (Markowitz); May 8, 2019 Trial Tr. at 1067:25-68:10) (Rosner).

Plaintiffs' experts acknowledged that when Anaconda sold white lead carbonate pigment to a paint manufacturer, it had no control over how the manufacturer would use the white lead carbonate pigment. May 8, 2019 Trial Tr. at 1067:8-1068:25 (Dr. Rosner). Plaintiffs' experts acknowledged that they had "no information" about what a purchaser of Anaconda white lead carbonate used that white lead carbonate for. May 10, 2019 Trial Tr. at 2056:3-12 (Dr. Markowitz). They acknowledge that they had no statistics on the output of the East Chicago, Indiana plant or the uses of white lead carbonate produced at that plant. May 10, 2019 Trial Tr. at 1971:7-11 (Markowitz) ("Q. You don't have any statistics on what the output of the Indiana plant -- Anaconda's Indiana plant was, right? A. Chicago plant, no? Q. It's - it's East Chicago,

12

Indiana, right? A. Yes, exactly."). Given the complete absence of any evidence that Anaconda's predecessors did anything in the course of selling its white lead carbonate pigment other than simply selling it, there is no basis for a jury to find that Anaconda failed to use ordinary care.

The same goes for evidence about promotion and advertising. Even assuming that such conduct could be actionable (which it cannot, *supra* § I.A), Plaintiffs presented no evidence that Anaconda's promotion or advertising of white lead carbonate pigment breached any duty of ordinary care. Plaintiffs simply presented evidence that Anaconda advertised its white lead carbonate pigment in national trade journals for the paint industry and in national trade journals for non-paint industries like ceramics. May 9, 2019 Tr. 1498:24-1499:23 (Dr. Markowitz); May 10, 2019 Tr. 1971:12-1972:5 (Dr. Markowitz). Plaintiffs offered no testimony that there was anything unreasonable about any of those advertisements other than the absence of a specific warning about risks to children—which this Court has held cannot be the basis for a negligence claim.

### C. Plaintiffs Did Not Prove That Any Purportedly Negligent Conduct Caused Them To Ingest White Lead Carbonate Pigment

Plaintiffs have presented no evidence that any alleged negligence by Anaconda or any other producer or marketer of white lead carbonate pigment caused Plaintiffs' alleged injuries. Plaintiffs have no evidence establishing that white lead carbonate pigment would not have been applied to their home if the unknown pigment manufacturer had done something differently or taken "more" care in producing or marketing white lead carbonate pigment—or, for that matter, promoting or advertising or distributing it. (Plaintiffs' arguments with respect to failure-to-warn-causation and a heeding presumption, addressed below, do not apply to the negligence claim.)

13

This absence of evidence is fatal to Plaintiffs' claims because *Thomas* did not eliminate the requirement that a plaintiff bringing a negligence claim establish a causal link between the asserted negligence and the plaintiff's injury. As explained in Atlantic Richfield's brief concerning its proposed jury instructions (Doc. 1507), which Atlantic Richfield incorporates here by reference, proof that the pigment manufacturers' negligence caused the plaintiff's harm is an essential element of a negligence claim. *E.g., Fischer ex rel. Fischer v. Ganju*, 168 Wis. 2d 834, 857, 485 N.W. 2d 10, 25 (1992). That requirement applies fully where the negligence claim is asserted against a product manufacturer whose product allegedly injured the plaintiff. *E.g., Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 687, 280 N.W.2d 226, 233 (1979) (manufacturer's failure to exercise ordinary care constitutes a breach of duty for which liability will result "if harm is caused by that breach of duty").

The risk contribution rule adopted in *Collins* and *Thomas* modified Wisconsin tort law in a narrowly defined class of cases to permit recovery without proof that the defendant was the tortfeasor whose negligent act or omission caused the harm. That was a significant step, and the opinions in both cases explained at length why the Supreme Court thought it to be justified.

The *Collins* and *Thomas* opinions did not state that they intended to relieve a plaintiff from proving any elements of a claim ***other*** than the tortfeasor's identity. *Thomas*, however, omits causation from the list of elements to be proved to establish a plaintiff's negligence claim, while at the same time identifying causation as an element of a plaintiff's strict liability claim. *Thomas* at ¶¶ 161-62. But the omission of causation from the *Thomas* court's recital of the negligence elements was not intentional.

14

First, if *Thomas* intended to relieve a risk contribution plaintiff from the need to prove that the negligence of the unidentified producer or marketer of the white lead carbonate pigment, the court would have explained why it was modifying the law in that way. It did not do so.

Second, *Collins*, the novel decision that created the risk contribution rule and that *Thomas* extended, did not eliminate the causation requirement. *Collins* described the proof required for a negligence claim as follows:

> On a negligence theory, the plaintiff must prove that a defendant drug company had a duty of care and breached that duty of care when it produced or marketed DES. *See Fondell,* 85 Wis.2d at 226-27, 270 N.W.2d 205. We note, however, that on the issue of identifying the defendant that caused the plaintiff's injury, the plaintiff need only prove by a preponderance of the evidence that an allegedly negligent defendant drug company produced or marketed the type of DES taken by the plaintiff's mother.

*Collins*, 116 Wis. 2d at 195. The citation to *Fondell v. Lucky Stores, Inc.*, 85 Wis. 2d 220, 270 N.W.2d 205 (1978), shows an intention to preserve, rather than abandon, the requirement of proof of causation as an element of a negligence claim. *Fondell* emphatically stated that causation is an element of a negligence claim. 85 Wis. 2d at 226-27. The second quoted sentence, while accepting the premise that some DES manufacturer "caused the plaintiff's injury" says only that the plaintiff need not prove any given defendant was that manufacturer. It instead is enough to place a defendant is "in the pool" of those who will be liable if the plaintiff proves that the defendant "produced or marketed the type of DES taken by the plaintiff's mother." That does not mean, however, that a DES plaintiff relying on the risk contribution rule is relieved from the burden imposed by *Fondell* and countless other Wisconsin negligence decisions of proving that the negligence of the (unidentified) tortfeasor caused her harm.

In *Thomas*, the only white lead carbonate pigment case under the risk contribution rule ever tried, the state court gave a causation instruction on the plaintiff's negligence claim. In that

15

case the negligence theory was negligent failure to warn, a theory the Court has ruled out in this case based on case-specific proof that Plaintiffs parents and caregivers knew of the hazards of lead paint. Doc. 1070 at 14-15. Question 9 of the *Thomas* verdict form asked the jury, "Was the negligent failure to provide an adequate warning at the time of sale or marketing a cause of any injury you found in response to Question Nos. 3 or 5?" Kelly Decl. Ex. 4 at 5. And the court gave an instruction on negligence explaining that the jury was being asked to decide whether negligence by someone caused the plaintiff's claimed harm without resolving the identity of the person or persons whose negligence caused it. Kelly Decl. Ex. 5 at 5988-89.

Federal courts sitting in diversity, when "faced with two opposing and equally plausible interpretations of state law," should "choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000). Because the only state court case to decide the issue retained a causation requirement for negligence claims under the risk contribution rule, this Court should follow suit and require Plaintiffs to prove that negligence by a pigment manufacturer caused Plaintiffs' injuries. Plaintiffs cannot so prove.

## II. PLAINTIFFS DID NOT ESTABLISH THE ELEMENTS OF THEIR STRICT LIABILITY FAILURE-TO-WARN CLAIM AGAINST ATLANTIC RICHFIELD

Atlantic Richfield is entitled to judgment as a matter of law on each Plaintiff's failure-to-warn claim for multiple independent reasons. To establish a strict-liability failure-to-warn claim, Plaintiffs must prove, *inter alia*, that white lead carbonate pigment was defective when it left Anaconda's possession or control because of the lack of a warning, that the white lead carbonate pigment was unreasonably dangerous to the user or consumer, that the lack of a warning was a cause of their alleged injuries, and that Anaconda expected its white lead carbonate to reach the

16

user or consumer without substantial change in condition and that it did. *Thomas*, 285 Wis. 2d at 320-21. Plaintiffs have failed as a matter of law to prove any of these elements.[6]

### A. Under the Component Supplier Rule and this Court's September 12, 2018 Ruling, Plaintiffs' Failure-to-Warn Claim Against Atlantic Richfield Fails Because Anaconda Did Not Sell Paint

The Court correctly held in its September 12, 2018 decision that component suppliers "lack … a legal duty to warn" under Wisconsin law. Doc. 1070 at 22; *see, e.g.*, *Nigh v. Dow Chem. Co.*, 634 F. Supp. 1513, 1517 (W.D. Wis. 1986) ("A manufacturer who cannot control the content of the warning passed to the ultimate supplier can hardly be guilty of failing to exercise ordinary care with respect to such warnings or of producing warnings that it did not give and could not improve."); *Haase v. Badger Mining Corp.*, 2003 WI App 192, ¶¶ 21, 24, 266 Wis.2d 970, 669 N.W.2d 737, *aff'd on other grounds*, 2004 WI 97, 274 Wis.2d 143. The Court explained that a white lead carbonate pigment manufacturer has no "duty to warn the *consumer* at the moment that the pigment is delivered to the *paint manufacturer*." Doc. 1070 at 21. Thus, plaintiffs cannot establish a failure-to-warn claim against a pigment manufacturer because, as a matter of law, the pigment is not defective for lack of warning when it leaves the control of that manufacturer. The Court held that a white lead carbonate pigment manufacturer could only be liable under a strict-liability failure-to-warn theory to the extent that the manufacturer "used some or all of their WLC to manufacture their own paint products." Doc. 1070 at 21-22.

The Court first applied that principle to American Cyanamid. It noted that "[t]he parties agree that Cyanamid never made paint." *Id.* Based on that record, it concluded that the bulk supplier and sophisticated user doctrines preclude any strict liability claim against Cyanamid

---

[6] Atlantic Richfield incorporates by reference the arguments and authorities cited in its motion for summary judgment on the strict-liability failure-to-warn claims and the accompanying brief. Doc. 530, 531 (*Burton*); Docs. 467, 468 (*Owens*); Docs. 397, 398 (*Sifuentes*).

17

based on failure to warn, and that Cyanamid was entitled to summary judgment dismissing Plaintiffs' strict liability claim in its entirety. *Id.*

As to Atlantic Richfield, the Court granted Atlantic Richfield only a partial summary judgment on the strict liability claim. The claim escaped complete dismissal only because "[f]actual disputes remain regarding whether Atlantic Richfield's alleged predecessors manufactured paint." Doc. 1070 at 22.

The undisputed evidence now shows, and Plaintiffs and their experts have conceded, that Atlantic Richfield's alleged predecessors did ***not*** make paint. Plaintiffs' opening statement featured a slide stating that Anaconda, like American Cyanamid, did not make "white lead in paint." Kelly Decl. Ex. 6 (Pltf. Opening slide 27). Their historical expert, Dr. Rosner, accepted as accurate his prior testimony that Anaconda never made, sold, or promoted lead-based paint. 5/8/19 Tr. 1066:7-1067:7 (Q: "Doctor, you were asked this question, you gave this answer: 'You know that Anaconda never made, sold, or promoted lead-based paint?'" A: That's right. They sold the pigment.). Plaintiffs' experts also have admitted that white-lead-in-oil, like dry white lead carbonate pigment, is not a paint. 5/8/19 Tr. 1069:5-19 (testimony by Dr. Rosner that lead-in-oil "comes as a paste" the master painters could use "to make paint"); 5/10/19 Tr. 1969:24-1970:1, 1972:20-1973:23 (testimony by Dr. Markowitz that white lead-in-oil is "a paste" and agreeing that "white lead paste isn't really a paint itself, it needs to be mixed with other things to become paint."); 5/10/19 Tr. 1972:20-25 (testimony by Dr. Markowitz that paint manufacturers "would use white lead in oil as a component of prepared paint"). Sherwin-Williams' expert on paint formulation agreed that white lead-in-oil is not paint. 5/16/19 Tr. 3716:21-3718:20 (description by Dr. Webster of how white lead-in-oil was used to make paint, and stating that

18

white lead-in-oil was not "something a painter could take out of that bucket and put it on a wall.").

The record also shows that white lead-in-oil was sold to paint manufacturers and master painters for use as a component in making paint. 5/8/19 Tr. 1069:5-19, 1278:13-17 (testimony by Dr. Rosner that master painters were the primary customers for white lead-in-oil); 5/10/19 Tr. 1753:4-14, 1800:2-14 (testimony by Dr. Markowitz that white lead-in-oil "isn't going to be sold directly to a consumer"); 5/16/19 Tr. 3718:21-3719:12 (testimony by Dr. Webster explaining making paint from white lead-in-oil would have been difficult for an unskilled homeowner).

The record makes clear that Plaintiffs avoided a full, rather than partial, summary judgment on their strict liability claim by predicting at the summary judgment stage that they would present evidence that Anaconda made paint. No such evidence was presented. Atlantic Richfield is entitled to judgment as a matter of law.

**B.      Plaintiffs Failed to Prove that Anaconda Knew or Should Have Known That White Lead Carbonate Pigment Presented a Risk to Children When Used in Residential Paint**

There is no dispute in the record that Anaconda manufactured and marketed white lead carbonate between 1920 and 1946. 5/8/19 Tr. at 1057:6-11 (Rosner); Ex. 8015 (FTC Memorandum). As set forth below, the evidence adduced at trial overwhelmingly establishes that the exposure pathway of lead-containing dust or chips and flakes from deteriorating lead paint on walls was not known or reasonably foreseeable until after Anaconda stopped manufacturing and marketing white lead carbonate. No reasonable jury could conclude otherwise.

Defendants' experts agree that, as of the beginning of 1920, the public health community in the United States had not yet called for any limitation or restriction of the use of lead paint as

19

interior house paint for the protection of children. 5/8/19 Tr. at 1137:12-17 (Rosner); 5/16/19 Tr. at 3473:22-3474:23 (English). The evidence shows that, at that time, there were only three reported cases in the medical literature in the United States concerning children having been poisoned by eating lead paint. 5/8/19 Tr. at 1136:25-1137:11 (Rosner); 5/16/19 Tr. at 3473:12-21 (English). Specifically, in 1914, Dr. Blackfan and Dr. Thomas published the first report in the United States of a child poisoned by "white lead paint which he had bitten from the railings of his crib." Ex. 4002; 5/8/19 Tr. at 1122:7-1125:22 (Rosner); 5/16/19 Tr. at 3467:15-3470:19 (English). In 1917, Dr. Blackfan published a second report concerning two siblings who gnawed on painted furniture and other painted articles, and urged that "prophylactic measures be taken with children who habitually eat painted articles." Ex. 10; 5/16/19 Tr. at 3470:20-3473:11 (English); 5/8/19 Tr. at 1130:15-1134:5 (Rosner). Plaintiffs' expert conceded—and Defendants' expert testified—that neither of the foregoing case reports implicated lead poisoning by dust or chips and flakes from deteriorated lead-based wall paint. 5/16/19 Tr. at 3474:9-23 (English); 5/8/19 Tr. at 1125:15-22, 11:32:22-24 (Rosner);

The record further shows that, after the start of Anaconda's manufacture and sale of white lead carbonate in 1920, the next published report in the United States concerning children with lead poisoning was in 1924 when Dr. Ruddock published an article in the Journal of the American Medical Association linking pica to lead poisoning in children. Ex. 11; 5/8/19 Tr. at 1141:17-1145:3 (Rosner); 5/16/19 Tr. at 3474:24-3479:21 (English). As Dr. Rosner acknowledged, Dr. Ruddock characterized pica then as an "abnormal condition" among children and concluded that it was "one of the most important etiologic factors in lead poisoning in children." Ex. 11; 5/8/19 Tr. at 1142:4-1143:3, 1149:22-1150:1 (Rosner). Dr. Ruddock's report, as Dr. Rosner further acknowledged, did not concern ingestion of chips and flakes of deteriorated

wall paint or dust and recommended as "prophylactic" measures the "[c]areful supervision of children of children during the age from one to three years in which pica is most prevalent" as well as "wide publicity education through periodicals and home journals in order to educate parents" Ex. 11; 5/8/19 Tr. at 1148:5-1149:15. It did not contain any recommendation as to the restriction of lead-based paint for use in painting homes. Ex. 11; 5/8/19 Tr. at 1151:15-1152:3 (Rosner).

The next cases were published in 1926 by Dr. McKhann, who reported, as both Dr. Rosner and Dr. English testified, that lead poisoning in children was "secondary to a perverted appetite," or pica, and that children were ingesting paint from chewing on "toys, cribs, and woodwork." Ex. 4007; 5/8/19 Tr. at 1158:11-1161:15 (Rosner); 5/16/19 Tr. 3481:10-3483:14 (English). As Dr. Rosner acknowledged, the cases did not concern ingestion of chips and flakes of deteriorated wall paint or dust. 5/8/19 Tr. at 1161:5-15 (Rosner). The cases reported by Dr. McKhann, as Dr. English explained, led to the Boston Health Department concluding in 1927 that lead poisoning in children was due to the "childhood habit of sucking paint from cribs," not the ingestion of chips and flakes of deteriorated wall paint. Ex. 4008; 5/16/19 Tr. at 3484:18-3488:5 (English). The Boston Health Department recommended "mothers and others entrusted with the care of children in cribs to watch for this common habit in early child life and to take steps to correct it wherever it is found," but did not issue any recommendation restricting the use of lead paint on toys and other objects in children's environments or for painting homes. Ex. 4008; 5/16/19 Tr. at 3484:18-3488:5 (English).

Later, in 1931, as both Dr. Rosner and Dr. English testified, Hugh Cumming, the U.S. Surgeon General and head of the U.S. Public Health Service, published an article recognizing the occurrence of lead poisoning in infants and children "due to biting lead paint from cribs, toys, et

21

cetera." Ex. 4010; 5/8/19 Tr. at 1168:4-1172:9 (Rosner); 5/16/19 Tr. at 3490:5-3493:12 (English). The Surgeon General expressly warned that "though lead paint has wide fields of usefulness, the painting of babies' toys and cribs is not one of them" and that "[g]enerally, manufacturers of these articles are seeing to it that lead paint is not used for this purpose but warning is necessary that parents, especially in repainting cribs, should use paints that are free from lead." Ex. 4010; 5/8/19 Tr. at 1168:4-1172:9 (Rosner); 5/16/19 Tr. at 3490:5-3493:12 (English). Significantly, as Dr. Rosner conceded—and Dr. English testified—the Surgeon General did not issue any warning or recommendation restricting the use of lead paint as house paint. Ex. 4010; 5/8/19 Tr. at 1173:16- 1174:24 (Rosner); 5/16/19 Tr. at 3492:12-3493:12 (English). Dr. Rosner also conceded that the Surgeon General's article did not address chips or flakes from deteriorated wall paint or dust. 5/8/19 Tr. at 1174:25-1175:4 (Rosner); *see also* Ex. 4010.

Indeed, as Dr. Rosner testified, as of 1931, there had not been a single case report in the American medical literature of a child in the United States being lead-poisoned from eating chips and flakes of deteriorated wall paint nor had dust been identified as a likely source of lead. 5/8/19 Tr. at 1175:18-1176:21 (Rosner). Dr. English explained, and the foregoing evidence and testimony demonstrates, that the "public health consensus" by around 1935 was that the prime exposure pathway for lead was through chewing and gnawing "intact lead paint" on toys, cribs, and woodwork—specifically, "infants repetitively gnawing on toys and cribs and unsupervised toddlers repetitively gnawing on woodwork." 5/16/19 Tr. at 3529:17-3531:3 (English). At this point, just as in 1931, there still had not been a report anywhere in the medical literature of a child in the United States having been lead poisoned by lead dust or chips and flakes of

22

deteriorated wall paint, and no public health authority had issued a recommendation against the use of lead paint as house paint. 5/16/19 Tr. at 3531:21-3532:2 (English).

This remained true until 1949—three years after Anaconda stopped manufacturing and selling white lead carbonate. 58/19 Tr. at 1207:12-15 (Rosner). As Dr. Rosner and Dr. English both testified, Dr. Huntington Williams, and the Baltimore City Health Department of which he was the head, observed a spike in childhood lead poisoning in 1948 and undertook an investigation and published their findings in 1949. 5/8/19 Tr. at 1199:19-1203:7 (Rosner); 5/16/19 Tr. at 3538:4-3539:2 (English); *see also* Ex. 4663. They found that many of the children had been lead-poisoned from "eating dried paint flakes which had cracked or chipped from repainted indoor woodwork areas." Ex. 4663; 5/8/19 Tr. at 1201:8-1204:3 (Rosner); 5/16/19 Tr. at 3540:15-3541:25 (English). Dr. English testified that such finding was the "first articulation of a new pathway" for child lead exposure. 5/16/19 Tr. at 3541:14-25 (English). As the evidence and testimony show, the Baltimore City Health Department recommended in the publication that parents should not only observe children carefully and not allow them to chew painted surfaces but also should prevent them from eating dried paint flakes "that may crack and flake from old heavily coated surfaces." Ex. 4663; *see also* 5/8/19 Tr. at 1204:15-1205:10 (Rosner) (testifying to the same); 5/16/19 Tr. at 3543:3-20 (English) (same). It likewise recommended to "[u]se only paint which does not contain lead for repainting indoor surfaces, furniture or toys" and to "not buy paint for indoor use unless it is free from lead." Ex. 4663; *see also* 5/8/19 Tr. at 1205:11-1206:7 (Rosner) (testifying to the same); 5/16/19 Tr. at 3543:12-3544:1 (English) (same). Two years later, in 1951, Dr. Williams and the Baltimore City Health Department issued a regulation banning the use lead-based paint for the interiors of homes in Baltimore. 5/8/19 Tr. at 1207:19-22 (Rosner); 5/16/19 Tr. at 3545:1-12 (English). As Dr.

23

Rosner testified, it was the first time anywhere in the United States that there was a ban on the use of lead-based paint for the interior of homes.  5/8/19 Tr. at 1207:23-1208:2 (Rosner).

As the evidence and testimony demonstrates, prior to 1949—three years after Anaconda ceased its manufacture and sale of white lead carbonate—there had not been a single report by a public health authority of a child in the United States being lead-poisoned from the ingestion of chips and flakes of deteriorated wall paint.  5/16/19 Tr. 3542: 1-13 (English).  Likewise, there had never been in the United States any recommendation or regulation by a public health authority restricting or limiting the use of lead paint as house paint.  5/16/19 Tr. at 3542:23-3543:2, 3545:9-17 (English); *see also* 5/8/19 Tr. at 1207:1208:2 (Rosner) (testifying as to regulation).  Based on the foregoing, there is no evidence in the record sufficient to prove that Anaconda should have reasonably foreseen that white lead carbonate would be dangerous to children when used in residential paints, and a reasonable jury could not find that Anaconda owed a duty to warn.

## C.    Plaintiffs Have Failed to Meet Their Burden to Prove That the Absence of a Warning Caused Their Alleged Injuries

Under *Thomas*, to succeed on their strict liability claims, plaintiffs must prove that the absence of a warning about the risks to children of white lead carbonate pigment was a cause of their alleged injuries.  *Thomas*, 2005 WI 129, ¶162.  They have offered no evidence that would support such a conclusion.  Plaintiffs have presented no evidence concerning (1) who owned their homes when paint containing white lead carbonate was applied to those homes, (2) who purchased the paint that was applied to their homes; (3) who decided to apply the paint to their homes; and (4) whether any children under the age of ten resided in the homes at the time when paint containing white lead carbonate was applied.

24

A jury would have no basis other than speculation to conclude that the presence of a warning about risks to children would have prevented the application of paint containing white lead carbonate pigment to plaintiffs' home. As this Court recognized, proving causation under these circumstances is a "tall order," and Plaintiffs have not satisfied it. Doc. 1070 at 26. Plaintiffs cannot evade the requirement of proving causation by asking the jury to presume, in the absence of any evidence, that a warning would have been heeded. *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 812 (E.D. Wis. 2010). That is especially so given the testimony of Plaintiffs' expert Dr. Markowitz that white lead carbonate pigment "isn't going to be sold directly to a consumer," but instead would be sold to "professional painters" or "paint manufacturers." Tr. 1800:2-14. There is simply no evidence in the record that could support a presumption that professional painters and paint manufacturers would have changed their behavior if white lead carbonate pigment had contained a warning.

### D. Plaintiffs Failed to Prove that Anaconda Expected White Lead Carbonate Pigment to Reach Consumers Without Substantial Change

Under the risk contribution doctrine, a strict liability plaintiff must prove that the white lead carbonate product manufactured by Anaconda "was one which [Anaconda] expected to reach the user or consumer without substantial change in the condition it was when sold." *Thomas*, 2005 WI 129, ¶ 162. The purpose of the "substantial change" requirement is to "protect a manufacturer from liability when the dangerously defective aspect of the product was altered or introduced after the product left the manufacturer's control." *Godoy*, 2009 WI 78, ¶ 46. "A substantial and material change is a change in the design, function or character of the product linked to the accident." *Glassey v. Cont'l Ins. Co.*, 176 Wis. 2d 587, 600 (1993). "A product need not be completely obliterated or undergo a chemical transformation to be substantially changed, rather [courts] look at whether the product has been combined with another or treated

25

in such a manner that renders it substantially and materially different from its condition when it left the control of its manufacturer." *Westphal v. E.I. du Pont de Nemours & Co.*, 192 Wis. 2d 347, 362, 531 N.W.2d 386, 391 (1995).

Plaintiffs bear the burden of proving the absence of a substantial and material change, and they have presented no evidence on which a reasonable jury could base such a finding. First, Plaintiffs concede that white lead carbonate pigment that is not incorporated into paint for use in residential applications is not dangerous and requires no warning. *See supra* § I.B (citing testimony from Plaintiffs' experts). When the white lead carbonate pigment left Anaconda's control, it was pigment, not paint, and other companies or master painters combined the pigment with other products to transform it into paint. *See* 5/10/19 Tr. 1969:24-1970:1, 1972:20-1973:23 (testimony by Dr. Markowitz that white lead-in-oil is "a paste" and agreeing that "white lead paste isn't really a paint itself, it needs to be mixed with other things to become paint."); *supra* § II.A (citing additional testimony). Combining pigment with other products to form paint constitutes a substantial and material change as a matter of law. *See, e.g.*, *Glassey,* 176 Wis. 2d at 600 (recognizing the change in the cap as a substantial change in the design, function and character of the product that precluded Glassey from asserting a strict liability design defect claim against the tank manufacturer); *Haase v. Badger Mining Corp.*, 2004 WI 97, ¶ 27, 274 Wis. 2d 143, 682 N.W.2d 389 (holding that the steps taken by the defendant to combine silica sand with other ingredients to make molds for metal casting process substantially changed the silica sand product from the ingredient sold to the defendant and precluded a strict liability design defect claim against the silica sand manufacturer).

Second, after the pigment is made into paint, it undergoes a further substantial and material change from the condition it was in when sold: deterioration into dust and paint chips.

26

The undisputed evidence shows that white lead carbonate pigment in paint is not a hazard until it deteriorates. 5/7/19 Tr. 777:10-14 (Jacobs); 5/16/19 Tr. 3814:17-3815:10, 3916:24-3917:1 (Connor); *see Smith v. 2328 Univ. Ave. Corp.*, 52 A.D.3d 216, 218 (N.Y. App. Div. 2008) (dismissing strict liability claims because "[a]ny problems with lead-based paint arise only after years of inadequate maintenance of the premises by the owner").

## III. ATLANTIC RICHFIELD IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON BOTH CLAIMS BECAUSE ANY REASONABLE JURY WOULD FIND THAT ATLANTIC RICHFIELD HAS BEEN EXCULPATED

A white lead carbonate manufacturer may exculpate itself by proving, by a preponderance of the evidence, that "it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the [plaintiff's] house is located." *Thomas*, 2005 WI 129, ¶ 163. The evidence at trial establishes that Atlantic Richfield is entitled to be exculpated, and no reasonable juror could conclude otherwise.

The evidence shows by a preponderance that Anaconda did not market WLC in Milwaukee:

- The only extant records of Anaconda sales by state, covering the years 1935-1937, show no sales of dry WLC and no sales of white lead-in-oil in Wisconsin. Exhibit 8004.

- Plaintiffs' thorough search, directed by Dr. Markowitz, for advertisements in the *Milwaukee Journal* during 1900-1972 found no advertisements by Anaconda or by anyone else for Anaconda's WLC. Tr. 1974:12-1981:4.

- Plaintiffs' thorough search, directed by Dr. Markowitz, of Milwaukee business and telephone directories during 1900-1972 for offices, stores, or any other physical facility in Milwaukee found no listing for any Anaconda company. Tr. 1981:5-1984:9, 1984:21-1985:15.

- The *Milwaukee Journal's* "Consumer Analysis" lists brands homeowners reported using in painting their homes. Exhibits 168-174. The "Consumer Analysis" provides no information as to whether any of the listed brands contain lead. Tr. 2064:11-19. Anaconda's WLC is not listed in any of the "Consumer Analysis" publications.

27

- Pritzlaff Hardware Store, which Dr. Markowitz identified as a Milwaukee wholesaler (Tr. 1857:12-14), listed the brands of white lead-in-oil Pritzlaff offered for sale in its catalogues in the early 1920s, 1936 and 1939. Exhibits 7017, 7086, 7087. Pritzlaff's catalogues did not list Anaconda's WLC.

- Records of price quotations for white lead-in-oil offered for sale to the city of Milwaukee in 1940, 1942 and 1943 include offers by eleven different companies quoting prices on nine different brands of white lead-in-oil. Exhibit 11778.11. There was no offer to sell by Anaconda. No one quoted a price on Anaconda's WLC.

Plaintiffs will cite Dr. Markowitz's opinion that Anaconda sold WLC to twelve paint manufacturers who used Anaconda's WLC to make prepared paints that were available for sale and purchase in Milwaukee. Tr. 1504:2-1504:15; 1488: 3-12, 1488: 20-1489:17, 1493:18-1494:12. Dr. Markowitz based this opinion on his understanding of selected Anaconda accounting records (Exhibits 86-108), advertisements by paint manufacturers and stores in the *Milwaukee Journal*, and listings of addresses of paint manufacturers, wholesalers, and dealers in Milwaukee directories. Exhibits 109-131. Notably, Dr. Markowitz did not opine that Anaconda sold WLC to Badger Paint Co. or Patek Brothers. These two Milwaukee paint manufacturers together accounted for more than 50% of the Milwaukee paint market in the 1920s, 1930s and 1940s, as reported by the *Milwaukee Journal* "Consumer Analysis." Exhibits 168, 169, 173.

Dr. Markowitz agreed on cross-examination that his opinion depends on a chain of inferences:

1. Anaconda sold WLC to the identified paint manufacturer.

2. The paint manufacturer used WLC in residential paint.

3. The paint manufacturer used Anaconda's WLC in its residential paints.

4. The paint manufacturer used Anaconda's WLC in residential paint it sold in Milwaukee.

Tr. 2036:13-25.

28

But the record disproves the chain of inferences for each of the twelve paint manufacturers identified by Dr. Markowitz.

**CertainTeed**.  The accounting records on which Dr. Markowitz relied list locations for CertainTeed in Buffalo, New York, East St. Louis, Illinois, and Richmond, California.  Exhibits 100, 104.  Dr. Markowitz relied on excerpts from three audit reports of Anaconda's Zinc Oxide Department.  Exhibits 93-95.  The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045, 8049 and 8050.  Dr. Markowitz also relied on four audit reports of Anaconda Sales Company.  Exhibits 98, 100, 101 and 104.  The Anaconda Sales Company audit reports do not identify which products, if any, were sold to CertainTeed.  None of these documents provides any evidence that Anaconda sold WLC to CertainTeed.  Tr. 2050:12-21, 2044:20-23.  Further, Dr. Markowitz found no evidence that CertainTeed ever advertised any paint containing lead in Milwaukee.  Exhibit 8032.  Dr. Markowitz admitted he has no evidence that manufacturers (like CertainTeed) who did not advertise lead paint in Milwaukee ever sold paint containing Anaconda WLC in Milwaukee.  Tr. 2054:4-18.

**Devoe & Reynolds**.  The accounting records on which Dr. Markowitz relied list locations for Devoe & Reynolds in Brooklyn, New York and Chicago, Illinois.  Exhibits 90, 91, 93, 95, 99, 100, 101, 104.  Dr. Markowitz relied on excerpts from six audit reports of Anaconda's Zinc Oxide Department.  Exhibits 90-95.  The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045-8050.  Dr. Markowitz also relied on six audit reports of Anaconda Sales Company.  Exhibits 98-102 and 104.  The Anaconda Sales Company audit reports do not identify which products, if any, were sold to Devoe & Reynolds.  None of these documents provides any evidence that Anaconda sold WLC to Devoe & Reynolds.  Tr. 2050:12-21, 2044:20-23.

29

Dr. Markowitz also relied on a January 3, 1929 internal Anaconda document that discussed Devoe & Reynolds. Exhibit 103 at 3. The document states in pertinent part:

> Another favorable factor is the purchase of a Louisville factory by Devoe & Reynolds. They are now getting under way on the Devoe formula and this should mean more lead for our good customer.

Even if this statement supports an inference that Anaconda sold some WLC to Devoe & Reynolds in 1928 or 1929, there is no indication to which Devoe & Reynolds location (Brooklyn, Chicago, Louisville) the WLC was sent or that Devoe & Reynolds used Anaconda WLC in making residential paint. There is no evidentiary support for an inference that Devoe & Reynolds sold residential paint containing Anaconda WLC in Milwaukee. The only advertisements for a Devoe product containing lead Dr. Markowitz could identify were advertisements in 1922 and 1923 for Devoe "Lead & Zinc Paint." Exhibit 8032. The 1923 advertisement predates by five years the earliest evidence of Anaconda WLC sales to Devoe & Reynolds.

**Du Pont**. Du Pont produced WLC for its own use from 1917-1924 and thereafter bought WLC from National Lead. Tr. 856:21-24, 1291:21-25, 4557:14-21, 4513:22-4514:5. For his opinion that du Pont bought Anaconda WLC, Dr. Markowitz relied on excerpts from five audit reports of Anaconda's Zinc Oxide Department. Exhibits 90-93 and 95. The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045-8048 and 8050. Dr. Markowitz also relied on five audit reports of the Anaconda Sales Company. Exhibits 98-102. The Anaconda Sales Company reports do not identify which products, if any, were sold to du Pont. None of these documents provides any evidence that Anaconda sold WLC to du Pont. Tr. 2050:12-21, 2044:20-23.

30

**Glidden.**  The accounting records on which Dr. Markowitz relied list a location for Glidden in San Francisco, California.  Exhibit 104.  Dr. Markowitz relied on excerpts from six audit reports of Anaconda's Zinc Oxide Department.  Exhibits 90-95.  The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045-8050.  Dr. Markowitz also relied on four audit reports of Anaconda Sales Company.  Exhibits 98, 99, 101 and 104.  The Anaconda Sales Company reports do not identify which products, if any, were sold to Glidden.  Tr. 2038:13-2040:4; 2040:19-2043:14; 2044:17-2045:2, 2045:16-2046:23.  None of these documents provides any evidence that Anaconda sold WLC to Glidden.  Tr. 2050:12-21; Exhibit 8031.

Dr. Markowitz also referred to a contract pursuant to which Glidden was to use Anaconda WLC to manufacture white lead-in-oil that Glidden would then sell as Anaconda white lead-in-oil.  Tr. 2059:2-14, 3255:18-24.  Dr. Kalt explained in the deposition testimony played for the jury that this contract began in September 1921 and ended in February 1924.  Court Exhibit 4.  Dr. Markowitz admitted there are no records of Anaconda sales of dry WLC to Glidden under that contract and that he has not seen any records showing that Glidden sold any Anaconda white lead-in-oil.  Tr. 3257:6-13.  If Glidden had sold Anaconda white lead-in-oil in Milwaukee sometime between September 1921 and February 1924, it would be reasonable to expect that such white lead-in-oil would have been advertised for sale.  But the thorough search of Milwaukee newspaper advertisements directed by Dr. Markowitz found no advertisements for Anaconda white lead-in-oil during the contract term or at any other time.  Tr. 1980:10-15, 2060:4-2061:5.  Nor did Pritzlaff, a leading Milwaukee wholesaler, carry Anaconda white lead-in-oil in the early 1920s or at any other time.  Exhibit 7017.

31

**Mautz Paint & Varnish Co.**  Dr. Markowitz relied on excerpts from two audit reports of Anaconda's Zinc Oxide Department.  Exhibits 90 and 91.  The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8046 and 8047.  None of these documents provides any evidence that Anaconda sold WLC to Mautz.  Tr. 2050:12-21, 2044:20-23.

Dr. Markowitz also relied on a White Lead Department accounting document that lists a Mautz debit as "not yet due."  Exhibit 108.  This entry does not support an inference that Anaconda completed a sale of WLC to Mautz.  But even if Anaconda eventually shipped some WLC to Mautz, Dr. Markowitz conceded that he has "no information" about whether Mautz used Anaconda WLC to make house paint and, if it did, whether it sold such paint in Milwaukee or elsewhere.  Tr. 2055:21-2056:12.  Moreover, according to notes prepared by Dr. Markowitz, the earliest advertisement in Milwaukee of a Mautz paint Dr. Markowitz can identify as containing lead was in 1951 -- five years after Anaconda stopped making and selling WLC.  Exhibit 8032.  Dr. Markowitz admitted it is "probable" that none of the lead paint Mautz advertised in Milwaukee in 1951 contained Anaconda WLC.  Tr. 2057:14-2058:8.

**Pittsburgh Plate Glass Co.**  The accounting records on which Dr. Markowitz relied list locations for Pittsburgh Plate Glass Co. in Milwaukee, Newark, New Jersey and Portland, Oregon.  Exhibits 90, 91 and 93-95.  Dr. Markowitz relied on excerpts from six audit reports of Anaconda's Zinc Oxide Department, which include the documents that refer to a Milwaukee location.  Exhibits 90-95.  The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045-8050.  Dr. Markowitz also relied on three audit reports of Anaconda Sales Company.  Exhibits 98-100.  The Anaconda Sales Company audit reports do not identify which products, if any, were sold to Pittsburgh Plate Glass Co.  None of these

32

documents provides any evidence that Anaconda sold WLC to Pittsburgh Plate Glass Co. Tr. 2050:12-21, 2044:20-23.

Dr. Markowitz also relied on a January 3, 1929 internal Anaconda document that discussed Pittsburgh Plate Glass Co. Exhibit 103. The document states:

> On the other hand a fairly high pig lead market brings the customers on a differential basis up to approximately the card price for white lead. An example of this is the Pittsburgh Plate Glass Company. They buy principally from the National Lead Company. Since we have taken over the sale of white lead, we have been able to introduce our product for a certain high grade premium paint that they desire to make. More of our lead will go into this paint when our price is close to National than when the differential is large. For this reason on a high pig lead market, we might sell a larger tonnage of lead to Pittsburgh Plate Glass Company and yet not show any profits.

Exhibit 103 at 2. The letter goes on to point out Anaconda's difficulties in competing with National Lead Company and Eagle-Picher for WLC sales to "large carload buyers" and says Pittsburgh Plate Glass Co. "are such large users that they can get a lower price than we can offer." Exhibit 103 at 3.

Even if these statements supported an inference that Anaconda sold some WLC to Pittsburgh Plate Glass Co. in 1928 or 1929, there is no indication to which Pittsburgh Plate Glass Co. location the WLC was sent or that the "high grade premium paint" was a residential paint. There is no evidentiary support for an inference that Pittsburgh Plate Glass Co. sold residential paint containing Anaconda WLC in Milwaukee. Dr. Markowitz could not identify any advertisements in Milwaukee for a Pittsburgh Plate Glass Co. paint containing lead. Exhibit 8032. Thus, as Dr. Markowitz admitted, there is no evidence that Pittsburgh Plate Glass Co. ever sold any paint containing Anaconda WLC in Milwaukee. Tr. 2053:18-2054:10.

**Sherwin-Williams.** Sherwin-Williams produced its own WLC from 1910 to 1947 and used that WLC in its own paints and the paints manufactured by its affiliated companies. Tr. 4882:14-16, 4899:13-4900:5, 5074:12-15, 5075:3-8, 5083:10-15, 5085:4-16. For his opinion that Anaconda sold WLC to Sherwin-Williams, Dr. Markowitz relied on five audit reports of Anaconda's Zinc Oxide Department. Exhibits 90-94. The full Zinc Oxide Department audit reports for these excerpts are in evidence as Exhibits 8045-8049. Dr. Markowitz also relied on six audit reports of Anaconda Sales Company. Exhibits 98-102 and 104. The Anaconda Sales Company audit reports do not identify which products, if any, were sold to Sherwin-Williams. None of these documents provides any evidence that Anaconda sold WLC to Sherwin-Williams. Tr. 2050:12-21.

Dr. Markowitz also relied on a White Lead Department accounting record that lists a debit of Sherwin-Williams Co., Cleveland, Ohio for $24.08 as "not yet due." Exhibit 108. But even if Anaconda eventually shipped a minimal amount of WLC to Sherwin-Williams in Cleveland, there is no evidence that Sherwin-Williams used Anaconda WLC to make residential paint or that Sherwin-Williams sold residential paint containing Anaconda WLC in Milwaukee.

**Acme White Lead & Color Works (Sherwin-Williams affiliate).** There is no reference to Acme White Lead & Color Works in the Anaconda accounting records (Exhibits 86-108) on which Dr. Markowitz relied. Dr. Markowitz agreed that Acme should therefore be crossed off the list of companies that purportedly sold paint containing Anaconda WLC. Tr. 2047:15-23.

**Detroit White Lead (Sherwin-Williams affiliate).** There is no reference to Detroit White Lead in the Anaconda accounting records (Exhibits 86-108) on which Dr. Markowitz

relied. Dr. Markowitz agreed that Detroit White Lead should therefore be crossed off the list of companies that purportedly sold paint containing Anaconda WLC. Tr. 2047:15-23.

**Lowe Brothers (Sherwin Williams affiliate).** There is no reference to Lowe Brothers in the Anaconda accounting records (Exhibits 86-108) on which Dr. Markowitz relied. Dr. Markowitz agreed that Lowe Brothers should therefore be crossed off the list of companies that purportedly sold paint containing Anaconda WLC. Tr. 2047:15-2048:1.

**Martin-Senour (Sherwin Williams affiliate).** An accounting record on which Dr. Markowitz relied lists a location for Martin-Senour in Los Angeles, California. Exhibit 104. Dr. Markowitz relied on excerpts from an audit report of Anaconda's Zinc Oxide Department. Exhibit 95. The full Zinc Oxide Department audit report for this excerpt is in evidence as Exhibit 8050. Dr. Markowitz also relied on an audit report of Anaconda Sales Company. Exhibit 104. The Anaconda Sales Company audit report does not identify which products, if any, were sold to Martin-Senour. None of these documents provides any evidence that Anaconda sold WLC to Martin-Senour. Tr. 2050:12-21, 2044:20-23. Moreover, Dr. Markowitz could not identify any advertisement in Milwaukee for any Martin-Senour paint containing lead. Exhibit 8032. Thus, as Dr. Markowitz admitted, there is no evidence that Martin-Senour sold any residential paint containing Anaconda WLC in Milwaukee. Tr. 2054:4-18.

**Zummach.** Dr. Markowitz relied on excerpts from an audit report of Anaconda's Zinc Oxide Department. Exhibit 90. The full Zinc Oxide Department audit report for these excerpts is in evidence as Exhibit 8046. This document provides no evidence that Anaconda sold WLC to Zummach. Tr. 2050:12-21. Dr. Markowitz also relied on two documents that refer to a personal debt owed by M.W. Leep and that make no reference to any sale of WLC. Exhibits 89, 105. Dr. Markowitz further relied on White Lead Department accounting documents that list debits of

35

Wm. F. Zummach, Inc., but make no reference to sales of WLC. Exhibits 87, 107, 108. Even if these debits support an inference that Anaconda sold some WLC to Zummach, there is no evidence supporting the further inferences that would be necessary to conclude that Zummach cold residential paint containing Anaconda WLC in Milwaukee. According to notes prepared by Dr. Markowitz, the earliest advertisement in Milwaukee for a Zummach paint that Dr. Markowitz can identify as containing lead was in 1950 — four years after Anaconda ceased making and selling WLC. Exhibit 8032; Tr. 2063:14-17. Thus, Dr. Markowitz concedes that, prior to 1950, "we cannot show that Zummach sold white lead paints in Milwaukee." Tr. 2063:4-5.

Plaintiffs will also cite an exhibit consisting of advertisements in two trade journals during February-December 1921 that include a reference to a warehouse in Milwaukee. Exhibit 10606. But no reasonable jury could conclude that this warehouse existed, or that the reference was anything other than puffery by a new entrant into the WLC business. One indicia of puffery is that several of the advertisements solicit orders in 1921 for lead-in-oil, a product Anaconda did not begin to make until 1931 – ten years later. Exhibit 8015 at 1; Tr. 1993:6-10. As noted above, Plaintiffs' review of Milwaukee business and telephone directories found no listing in 1921 or any other year for an Anaconda warehouse or any other Anaconda facility in Milwaukee. Tr. 1996:24-1997:6. Further, Dr. Markowitz's review found no advertisements by Anaconda or anyone else in Milwaukee for Anaconda's brand of WLC in 1921 or any other year. Finally, Anaconda made a formal written submission in 1946 to the Federal Trade Commission in an antitrust proceeding concerning its WLC business that, among other things, provided a list of cities where there were warehouses "at various times." Exhibit 8015 at 4. Milwaukee is not included in this list of cities where there were warehouses. Tr. 2034:22-2035:15.

36

Finally, Plaintiffs may point to advertising in national trade journals. But evidence of advertising in national trade journals would not permit a reasonable jury to find that Anaconda's white lead carbonate was offered for sale in Milwaukee.

## IV.    PLAINTIFFS DID NOT PROVE INJURY, DAMAGES, OR CAUSATION

Plaintiffs' claims all fail as a matter of law because each plaintiff has failed to prove that he sustained a cognizable injury caused by the ingestion of white lead carbonate pigment contained in paint in his home, and because each plaintiff has failed to prove damages. In support, Atlantic Richfield joins in and incorporates by reference the Sherwin Williams Company's Motion for Judgment As a Matter of Law Regarding Injury, Damages, Causation, and Risk-Contribution, and the accompanying brief in support. Docs. 1561, 1562.

## V.    ATLANTIC RICHFIELD IS ENTITLED TO JUDGMENT AS A MATTER OF LAW FOR MULTIPLE OTHER REASONS

Atlantic Richfield is independently entitled to judgment as a matter of law because imposing liability on the basis of the risk contribution rule violates the Takings Clause and the Due Process Clause of the United States Constitution. Atlantic Richfield incorporates by reference the arguments and authority cited in its motion for summary judgment on constitutional grounds, and in the memorandum in support thereof. Docs. 83, 84 (*Burton*); Docs. 87, 88 (*Owens*); Docs. 77, 78 (*Sifuentes*). Atlantic Richfield acknowledges that the Seventh Circuit rejected Due Process and Takings Clause arguments in *Gibson v. American Cyanamid Co.*, 760 F.3d 600 (7th Cir. 2014), but preserves those arguments for appeal.

Atlantic Richfield is also entitled to judgment as a matter of law because Plaintiffs' lawsuits, which rely on the risk contribution theory, are barred by the Wisconsin Legislature's 2013 amendment to Wis. Stat. § 895.046. The 2013 Act prohibits the application of the risk-contribution theory to white lead carbonate pigment claims. Atlantic Richfield acknowledges

37

that the Seventh Circuit held in *Gibson*, 760 F.3d 600, that the 2013 Act violated the due process clause of the Wisconsin Constitution as applied to claims pending at the time of the 2013 Act's enactment. For the reasons explained in Sherwin-Williams' Motion for Summary Judgment Pursuant to Wis. Stat. §895.046 and the accompanying memorandum of law, which Atlantic Richfield incorporates by reference, the Seventh Circuit's prediction as to how the Wisconsin Supreme Court would apply the Wisconsin Constitution is incorrect. *See* Docs. 653, 654 (*Burton*); Docs. 582, 583 (*Owens*); Docs. 516, 517 (*Sifuentes*). Section 895.046 bars these claims, and Atlantic Richfield preserves that argument for appeal.

Atlantic Richfield is also entitled to dismissal of all of the claims against it because Plaintiffs have failed to prove facts permitting this Court to exercise personal jurisdiction. Out of an abundance of caution and to the extent such an argument might fall within Rule 50, Atlantic Richfield incorporates herein its Second Renewed Motion to Dismiss for Lack of Personal Jurisdiction and the accompanying memorandum (Docs. 1569, 1570). Atlantic Richfield incorporates its previously-filed motion for judgment as a matter of law on successorship, which the Court has denied. Docs. 1525, 1526.

## CONCLUSION

For the foregoing reasons, the Court should grant Atlantic Richfield's motion for judgment as a matter of law as to both claims.

38

Respectfully submitted this 29th day of May, 2019.

/s/ Daniel T. Flaherty
Daniel T. Flaherty
Anthony S. Baish
Godfrey & Kahn, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, Wisconsin 53202-5615
Telephone: (414) 273-3500
dflaherty@gklaw.com
abaish@gklaw.com

Philip H. Curtis
Bruce R. Kelly
William H. Voth
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
philip.curtis@arnoldporter.com
bruce.kelly@arnoldporter.com
william.voth@arnoldporter.com

Jonathan L. Stern
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: (202) 942-5000
jonathan.stern@arnoldporter.com

*Attorneys for Defendant Atlantic Richfield Company*