# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLENN BURTON, JR,**
                    **Plaintiff,**

      **v.**                                            **Case No. 07-CV-0303**

**AMERICAN CYANAMID CO, et al.,**
                    **Defendants;**

---

**RAVON OWENS,**
                    **Plaintiff,**

      **v.**                                            **Case No. 07-CV-0441**

**AMERICAN CYANAMID CO, et al.,**
                    **Defendants;**

---

**CESAR SIFUENTES,**
                    **Plaintiff,**

      **v.**                                          **Case No. 10-CV-0075**

**AMERICAN CYANAMID CO, et al.,**
                    **Defendants.**

---

## DECISION AND ORDER

The plaintiffs in these cases experienced elevated blood lead levels as young children and brought these negligence and strict product liability lawsuits against former manufacturers or successors-in-interest to manufacturers of White Lead Carbonate paint pigment (WLC). Because plaintiffs did not know the identities of the manufacturers of the specific WLC that caused their harm, they relied on Wisconsin's risk contribution theory, which allows a plaintiff to make a prima facie products liability case on the basis that the manufacturer made the *type* of product that caused the plaintiff's harm, and shifts to the defendant manufacturer the burden to exculpate itself by showing that its product did not in fact cause the harm. *See Thomas ex rel. Gramling v. Mallett*, 285 Wis.2d 236 (2005). The three cases were consolidated and tried earlier this year, and in each case the jury

1

found against three of the defendants: Sherwin Williams, Armstrong Containers, and DuPont. These three defendants now move for judgment notwithstanding the verdict ("JNOV") on grounds that liability is precluded by the various public policy factors that comprise Wisconsin courts' test for legal causation. Sherwin Williams also moves for judgment as a matter of law on grounds that plaintiffs have not proven that risk contribution theory properly applies; Armstrong joins this motion.

## I.   BACKGROUND

The risk contribution model of recovery requires that the jury first identify a pool of liable defendants (i.e., defendants against which the elements of negligence or strict liability have been established and which have not exculpated themselves) and then allocate responsibility among those defendants on the basis of various equitable factors including market share. Well before the trial, plaintiffs had reached a *Pierringer* settlement with Millenium Holdings, successor-in-interest to National Lead (NL), a company understood to have controlled a large share of the market for WLC and WLC-based paints in Milwaukee.  Because I was concerned that evidence and argument relevant only to the allocation question might infect the jury's treatment of exculpation, I bifurcated the trial, reserving the allocation question for a second phase after the jury had identified the pool of liable defendants. I excluded evidence of market share and of National Lead's role in the Milwaukee market from phase one of the trial, because such evidence was relevant only to allocation and not to the liability of any of the non-settled defendants.

Phase one of the trial lasted four weeks. Both sides relied heavily on expert witnesses. Plaintiffs presented evidence that testing of paint chips from the home(s) where each plaintiff lived when he was exposed revealed the presence of WLC. Plaintiffs' expert Jenifer Heath testified that the paint in the plaintiffs' homes was the primary source

of each plaintiff's lead exposure, and that the likely pathway of exposure was that the paint had deteriorated into dust which the plaintiffs likely ingested when it stuck to their fingers. E.g., ECF # 1683 at 31. Plaintiffs presented epidemiological evidence suggesting a causal relationship between lead exposure and diminished IQ, and their neuropsychiatric expert testified that each plaintiff's pattern of neuropsychiatric test scores was consistent with brain injury caused by lead poisoning. Ravon Owens' elevated blood lead levels were reported and treated in 1993, Cesar Sifuentes' in 2001, and Glenn Burton's in 2002.

Plaintiffs' expert historians presented medical journal articles from the early 20th century describing cases of childhood lead poisoning linked to paint. Trial testimony indicated Sherwin Williams manufactured WLC between 1910 and 1947, MacGregor Lead Company manufactured WLC for use in paint between 1937 and 1971, and DuPont manufactured WLC between 1917 and 1924. DuPont continued to manufacture paint containing WLC until 1966 (though trial evidence suggests it stopped marketing such products in Milwaukee in the mid-1940s).

At the end of phase one, in each of the three cases, the jury found that the plaintiff had ingested WLC, that the ingestion of WLC had caused him injury, that each of Sherwin Williams, Armstrong Containers (as successor to the MacGregor Lead Company), and DuPont had both negligently produced or marketed WLC and failed to adequately warn about WLC, and that those defendants' negligence and inadequate warnings had been a substantial factor in causing the plaintiff's injury. The jury awarded $2 million in damages to each of the three plaintiffs—$6 million total. Rather than proceed with the second, allocation phase of the trial, the plaintiffs and the three liable defendants elected to settle

the second phase, allocating 12.5% of the responsibility to National Lead and allocating the remainder to the three remaining defendants on a joint-and-several basis. ECF No. 1612 at 16.

## II.    WISCONSIN PUBLIC POLICY FACTORS

As a preliminary matter, plaintiffs argue that defendants lack a procedural basis for their post-verdict public policy motions. Plaintiffs argue that Rule 50(b) of the Federal Rules of Civil Procedure allows a party to move for judgment as a matter of law after entry of a verdict only if the party preserved the issue by filing a Rule 50(a) motion before the verdict was entered—which defendants did not do. Defendants counter that such a motion under Rule 50(a) would have been improper for various reasons including that Rule 50(a) is addressed to sufficiency-of-the-evidence arguments whereas the application of the Wisconsin public policy factors is a pure question of law. Because I conclude that defendants' public policy arguments fail on their merits, I need not resolve the difficult procedural questions the parties raise; I assume without deciding that defendants' motions are not procedurally barred.

In Wisconsin, a court may determine that judicial public policy precludes liability even where the plaintiff has proved the elements of negligence, *Casper v. American Intern. South Ins. Co.*, 336 Wis.2d 267, 305 (2011), or strict liability, *Ransome v.Wis. Elec. Power Co.*, 87 Wis.2d 605, 625 (1979). To make such decisions, Wisconsin courts rely on the following six "public policy factors": (1) whether the injury is too remote from the negligence; (2) whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor; (3) whether, in retrospect, it appears too extraordinary that the

negligence should have brought about the harm; (4) whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor; (5) whether allowance of recovery would be too likely to open the door to fraudulent claims; or (6) whether allowance of recovery would enter a field that has no sensible or just stopping point. *Fandrey ex rel. Connell v. American Family Mut. Ins. Co.*, 272 Wis.2d 46, 52 n. 1 (2004). "When a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause in fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery." *Id.* at 62. The "capsule form" of this public policy analysis is as follows: "When it would shock the conscience of society to impose liability, the courts may hold as a matter of law that there is no liability." *Bowens v. Lumbermens Mut. Cas. Co.,* 183 Wis.2d 627, 656 (1994) (citing *Pfeifer v. Standard Gateway Theater*, 262 Wis. 229, 238 (1952)). "Cases in which a causally negligent tortfeaser is relieved of liability on judicial public policy grounds are infrequent and present unusual and extreme considerations." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 325 Wis.2d 56, 110 (2010).

Sherwin Williams, DuPont and Armstrong now assert that each of the six factors is applicable to these cases and precludes liability despite the jury's verdict. The application of the public policy factors to the facts of a particular case is a legal question and solely the function of the court. *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 541 (1976). The Wisconsin Supreme Court has counseled that it is generally the best practice for the court to wait until the facts of a case have been developed at trial before considering whether the public policy factors preclude liability. *Alvarado v. Sersch*, 262 Wis.2d 74, 84 (2003). Indeed, before trial I denied plaintiffs' motion for summary judgment on the defense of intervening, superseding cause—which Wisconsin courts treat as

subsumed within the first, "remoteness" public policy factor, *see Cefalu v. Continental Western Ins. Co.*, 285 Wis.2d 766, 780 (Wis.App. 2005)—and indicated that I would address the question after the facts had been fully developed before the jury. *Burton v. American Cyanamid*, 341 F.Supp.3d 941, 948 (2018). For purposes of this motion for JNOV, defendants admit and I assume that the findings of the jury's verdicts are true; the motion asserts that judgment should be granted to defendants on grounds other than those decided by the jury. *Allison v. Ticor Title Ins. Co.,* 979 F.2d 1187, 1195-96 (7th Cir. 1992).

*Remoteness.*

Wisconsin's first public policy factor precludes liability when "the injury is too remote from" a defendant's conduct. *Hass v. Chicago & N.W.R. Co.*, 48 Wis.2d 321, 326 (1970). The word "remote" as it is used here means "removed or separated from the negligence by time, space, or sequence of events." *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis.2d 740, 762 (1993).

The defendants argue that their negligence is too remote in time from plaintiffs' injuries to permit liability. It is true that decades passed between the defendants' manufacture or marketing of WLC and the plaintiffs' exposures. Sherwin Williams cites to *Cefalu*, a Wisconsin Court of Appeals case in which the court held that a car accident was too remote from a second accident involving emergency responders 30 minutes later at a different intersection to sustain liability. 285 Wis.2d at 780. Sherwin Williams also cites *Casper,* a Wisconsin Supreme Court case which held that a trucking company officer's negligent approval of a route was too remote in time from an accident involving one of that company's truck's 18 months later to sustain liability. 336 Wis.2d at 900. Sherwin

Williams argues that because gaps of 30 minutes and 18 months have been held too long to support liability under Wisconsin law, the decades-long gap between negligence and injury in this case must also be too long. That reasoning fails; the remoteness analysis is fact-driven and holdings from car-accident cases cannot be uncritically superimposed on a products liability case. *See, e.g., Zielinski v. A.P. Green Indus., Inc.*, 263 Wis.2d 294 (Wis.App. 2003)(plaintiff allowed to maintain a lawsuit alleging that exposure to asbestos in 1957-1963 resulted in a 1999 diagnosis of mesothelioma).

Defendants also argue that changes in the fields of public health and medicine between the time they made or marketed WLC and the time of plaintiffs' exposures render the span of years too remote. That argument is misplaced; it is essentially an attempt to relitigate negligence and duty to warn, both of which the jury already found after having heard the same evidence defendants now cite. For purposes of this motion, I must treat that finding of negligence as true. Similarly, defendants argue that their negligence was too remote in space from plaintiffs' injuries, because the exposure to lead happened inside plaintiffs' homes where defendants had no control. Again, this argument makes little sense in a products liability case. In particular, the jury instructions for the product liability claim required the jury to find that "the defective condition of the product existed while the product was under the control of the manufacturer" and that "the product was expected to and did reach the consumer without substantial change in the condition in which it was sold." In other words, the jury has already factored the question of manufacturer control into its finding of liability, and I can't disrupt that finding on the present motion.

Causation, or "sequence of events," is the heart of defendants "remoteness" argument. The "sequence of events" analysis encompasses the traditional tort defense of superseding, intervening cause. *Cefalu,* 285 Wis.2d at 780. A determination that the injury is too removed or separated from the negligence is "essentially just a determination that a superseding cause should relieve the defendant of liability." *Id.* But "[a]n intervening act is not superseding if it is a normal consequence of the situation and is not done in a manner that is extraordinarily negligent." *Id.* (citing *Voigt v. Riesterer*, 187 Wis.2d 459, 470 (Wis.App. 1994)).

Defendants assert that intact lead paint is not a hazard and only becomes hazardous when allowed to deteriorate. They argue that the properties where plaintiffs ingested WLC passed through the hands of many landlords and owners in the years between the defendants' culpable conduct and plaintiffs' exposure. Defendants argue that these landlords and owners failed to properly maintain the properties or otherwise act to minimize the risk of lead exposure, despite mounting public awareness of the issue and despite state and federal regulations requiring landlords to address deteriorated lead paint and to notify tenants of lead paint's presence in a home. They argue that this intervening conduct by the landlords and owners of the property is an intervening, superseding cause and disrupts the chain of causation such that defendants cannot be liable.

I disagree. A landlord or property owner allowing paint to deteriorate enough to make chips or dust containing WLC available to children is an eminently "normal consequence" of a company's negligently manufacturing or marketing WLC for use in residential paint. It is hard to imagine a more predictable sort of intervening negligence.

And such intervening negligence does not sever the causal connection between plaintiffs' injuries and defendants' negligence. If WLC had not been present in the paint on the walls, the children would not have suffered lead exposure from ingesting the paint, no matter how badly the paint had been allowed to deteriorate in the years between the WLC's manufacture and the childrens' exposure.

*Proportion.*

The second public policy factor allows me to bar liability if the plaintiffs' injury is wholly out of proportion to the culpability of the negligent tortfeasor. The defendants present three sorts of argument addressed to this factor. First, each of the three defendants argues that its share of the Milwaukee market for WLC paint products was very small and thus its culpability is minimal and out of proportion to plaintiffs' injuries. Second, each defendant argues that WLC was a legal product and much in demand at the time they manufactured it—governments specified it for use in public buildings and consumers and master painters considered it a high quality form of paint. Presumably, the implication is that this acceptance of and demand for WLC makes the defendants' conduct in manufacturing and marketing WLC less unreasonable and therefore less culpable. Third, Sherwin Williams and DuPont both argue that their culpability is reduced because they played an active role in developing new paint formulas that did not use WLC.

There are several problems with the market share argument. The defendants would have had the opportunity to present this evidence to the jury at the allocation phase of the trial, and to argue that the lion's share of responsibility ought to be allocated to National Lead. Instead, defendants elected to settle phase two. This was not technically

a waiver of their market share argument: at phase two the defendants would have used market share to argue for a reduced share of proportional responsibility, whereas here they are arguing for an absolute bar to liability. Nevertheless, it is a bit rich for defendants to make this argument now, having voluntarily foregone their opportunity to fully develop the relevant facts before the jury.

More crucially, I do not believe the market share argument has any bearing on the proportionality between defendants' culpability and plaintiffs' injury. Regarding culpability, the jury found that defendants breached a duty of care by manufacturing or marketing WLC pigment despite their awareness that children might ingest the pigment and it might cause the children harm. Regarding injury, the jury found that the plaintiffs in this case ingested WLC and it caused them harm. Culpability and injury are in proportion. The market share evidence does not affect this calculus. Instead, market share is a causation argument: defendants are arguing that liability should be precluded because chances are slim that their product was the factual cause of plaintiff's injury. To bar liability on these grounds would directly contravene the Wisconsin Supreme Court's explicit holding in *Thomas ex rel. Gramling v. Mallett*, 285 Wis.2d 236, 322 (2005)("The [risk contribution] procedure is not perfect and could result in drawing in some defendants who are actually innocent, particularly given the significantly larger time span at issue in this particular case. However, *Collins* declared that 'we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law.")(quoting *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 198 (1984)).

As for the arguments that WLC was specified by various levels of government for public use, and that it was in demand among master painters, and that Sherwin-Williams

and DuPont played an important role in developing lead-free paint formulas: they may add some nuance to the story, but they do not diminish the culpability found by the jury sufficiently to warrant a complete bar to liability as a matter of law. Again, the jury found that the defendants breached a duty of care by manufacturing and marketing products that they knew could cause harm to children, and by failing to adequately warn about the risk. It does not "shock the conscience" to impose liability based on these findings, even with the knowledge that the harmful products were in demand and that the defendants were developing alternative products.

*Extraordinariness.*

The third factor precludes liability if it is too highly extraordinary that the culpable conduct should have brought about the harm. I am to consider whether the injury was "within the realm of expectant possible harm," *Steffen v. Luecht*, 233 Wis.2d 475 (Wis.App. 2000), and bar liability if the injury is too bizarre or unforeseeable. In *Steffen,* for example, the Wisconsin Court of Appeals held that it was too highly extraordinary that a landlord's negligent eviction of a tenant should lead to the tenant's death of a heart attack a week later and upheld the dismissal of a wrongful death claim against the landlord. *Id.* at 491.

Defendants argue that the factor applies to bar liability because the brain injuries that the jury found plaintiffs had sustained were not recognized as a risk at the time defendants were manufacturing WLC. Defendants also argue that the blood lead levels plaintiffs experienced were not known to be dangerous at the time of manufacture, and that it was not understood that children might ingest deteriorated paint in the form of household dust or that children might be exposed to lead from exterior household paint.

This is splitting hairs. At trial, plaintiffs presented evidence that, early in the 20th Century, doctors were already documenting cases of children poisoned by ingesting deteriorated lead paint. Plaintiffs' experts testified that the defendant corporations knew or should have known of these medical findings. The jury found negligence. Though the cognitive impairments plaintiffs sustained are more subtle forms of injury than the seizures and comas documented in patients in the early 20th century, the basic narrative of ingestion of deteriorated paint leading to brain injury is the same. Unlike in *Steffen,* where the defendant landlord had no way of knowing that evicting the plaintiff's wife might contribute to her death by heart attack, here the injury suffered by the plaintiffs was different only in degree, not in type, from the risks known to defendants that rendered their conduct negligent as determined by the jury.

*Unreasonable Burden.*

The fourth public policy factor considers whether allowing recovery would impose too great a burden on the tortfeasor. This factor recognizes "that tort law should not seek to deter all conduct that involves risk, just conduct that involves too much risk." *Fandrey*, 272 Wis. 2d at 63 n.12.

Sherwin Williams argues that to allow liability in this case would be to impose too great a burden on manufacturers:

> If the standard becomes that manufacturers are liable if they make and promote any product, though lawful and safe when used as intended, that becomes harmful when not maintained or improperly ingested, then manufacturers will become absolute guarantors of products over their entire lifetime, and the law can dispense with rules of negligence and strict liability in favor of absolute liability.

ECF # 1660 at 24. This hyperbolic argument oversimplifies the legal and factual landscape of this case. To begin, misuse is a defense to products liability. If a plaintiff's injury occurs while a product is being used in a manner unforeseeable to the manufacturer, the manufacturer is not strictly liable for the injury; if the misuse was foreseeable to the manufacturer, the misuse is a factor for the jury to consider in apportioning contributory negligence. See my discussion of this point at ECF # 1074 at 7-8. Negligent maintenance is one form of foreseeable misuse that will be available as a defense in many cases. Further, Wis. Stat. § 895.045(3)(b) provides additional protection in strict liability cases: if an injured party's percentage of causal responsibility exceeds the percentage resulting from the defect in the product, the injured party cannot recover from the manufacturer of the product. In this case, the defendants did not mount a robust contributory negligence defense at trial. Thus, it is incorrect to say that the outcome of this case makes manufacturers absolutely liable for products that are not maintained. In strict liability cases, liability accrues when the negligent maintenance was foreseeable to the manufacturer and the percentage of causal responsibility of the injured party does not exceed that of the defective product. In negligence cases, negligent maintenance may be factored by the jury into the allocation of responsibility.

Sherwin Williams' assertion that allowing liability in this case would make manufacturers liable any time a child improperly ingests a product that is otherwise safe and legal when used as intended is also a distortion. Sherwin Williams lists "laundry detergent, nail polish, ammonia and pesticides" as examples of products that can be harmful if ingested. ECF # 1660 at 24. But these products are factually distinct from paint pigment. Paint pigment is by nature uniquely available to children. When used as

intended, it is applied to the walls of homes where children may live and it remains there for the lifespan of the building unless affirmatively removed. Even in the early 20th century, the manufacturers of paint pigment knew that the pigment they made would be used this way. And the jury's decision in this case reflects its finding that the manufacturers were aware that inherent in this foreseeable use of pigment was the risk that children would ingest paint that had been allowed to degrade. See ECF # 1614 at 132-133. Thus, allowing liability in this case does not translate into blanket liability any time a child improperly ingests a product. Rather, liability in this case reflects these manufacturers' failure to reasonably act on their knowledge of a risk inherent in a foreseeable misuse of their product, an outcome consistent with existing tort law.

Defendants' remaining arguments addressed to this factor are improper for a motion for JNOV; they are effectively challenges to the jury's verdict and properly addressed through a motion for judgment based on insufficiency of the evidence.[1]

*Fraudulent Claims.*

With the fifth public policy factor, courts consider whether allowing liability would open the door to fraudulent claims. Sherwin Williams argues that plaintiffs provided concrete evidence only of lead *exposure*, and that their claims of brain *injury* are based on epidemiological studies and neuropsychological testing which Sherwin Williams argues are unreliable. Sherwin Williams argues that allowing recovery here would allow any child with a blood lead level above the CDC reference level to bring a claim. Sherwin

---

[1] Dupont argues, e.g., that it "does not know how it supposedly breached any duty owed to the plaintiffs." ECF # 1663 at 11-12. Sherwin Williams argues that its liability "stems from an indeterminate, expansive time period spanning decades" and that plaintiffs did not identify a specific time period at which to assess the state of public knowledge for purposes of the failure to warn claim. ECF # 1660 at 24-25.

Williams relies on *Bowens*, in which the Wisconsin Supreme Court held that allowing an accident victim's estate to recover on a negligent infliction of emotional distress theory for apprehension and fear the victim suffered in the moments before impact would be too likely open the door to fraudulent claims, because it was mere speculation to assert that the victim knew of the impending impact or suffered emotional distress because of it. 183 Wis.2d at 662. The evidentiary support for the present plaintiffs' injuries is far more robust than that for the emotional distress of the accident victim in *Bowens.* Plaintiffs' epidemiological and neuropsychological experts withstood *Daubert* scrutiny and were thoroughly cross-examined before a jury. That is sufficient to remove their claims from the realm of the speculative. If many future plaintiffs successfully prove their claims for brain injury caused by lead in paint, water, or otherwise, that is a reflection of the scope of the lead problem and not of widespread fraud.

*Just or Sensible Stopping Point.*

Finally, the sixth factor allows a court to intervene and bar liability that has no just or sensible stopping point. Sherwin Williams claims that "allowing plaintiffs to recover against Sherwin Williams would mean that any individual or company who marketed, promoted, specified or recommended WLC, WLO or paint with WLC for residential use at any time may be found liable, under plaintiffs' theory, to any person exposed to WLC." ECF # 1660 at 28. That is simply not true. It remains the plaintiff's burden to prove that the defendant was negligent. In these cases, the jury found that Sherwin Williams, Dupont and Armstrong's predecessor had been negligent in manufacturing and marketing WLC and had breached their duty to warn. It also found that defendant Atlantic Richfield's predecessor had not been negligent or failed to warn, even though it too had

manufactured WLC. That indicates that the legal standards on which the jury was instructed are sufficient to draw lines between liable and non-liable defendants. And, as discussed above, plaintiffs are responsible to prove injury, not mere exposure. Risk contribution theory relaxes the causation standard, but in all other respects holds plaintiffs to their traditional proof.

I will not grant judgment notwithstanding the verdict to defendants on public policy grounds.

### III. DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

It is established in the case law that risk contribution theory may only be applied to fungible products. *Godoy v. E.I. du Pont de Nemours and Co.*, 319 Wis.2d 91, 109 (2008). Before trial, plaintiffs moved for summary judgment on the issue of WLC's fungibility. Defendants objected, arguing *inter alia* that different grades and qualities of WLC were available for use in paint pigment, and that different chemical markers in the lead atoms could indicate where the lead had been mined. I granted summary judgment to the plaintiffs ruling that the Wisconsin Supreme Court had established that WLC is fungible as a matter of law in *Thomas.*

Sherwin-Williams now argues that I erred in my decision; it argues that the *Thomas* court did not establish fungibility as a matter of law, but rather intended fungibility to be a jury question. Sherwin-Williams moves for judgment as a matter of law or, in the alternative, for a new trial on grounds that plaintiffs failed to prove at trial that WLC is fungible. I have closely examined Wisconsin's risk contribution case law, and I am satisfied (1) that fungibility for risk contribution purposes is a question of law for resolution by the courts, and (2) that WLC is fungible.

Wisconsin's risk contribution case law makes clear that fungibility is a question for judicial determination. The Wisconsin Supreme Court crafted the risk contribution theory in the exercise of its powers under Article 1, sec. 9 of the Wisconsin Constitution, which provides, in part, that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property or character." *Collins,* 116 Wis.2d at 182. The court interpreted that constitutional provision to mean that "[w]hen an adequate remedy or forum does not exist to resolve disputes, the courts, under the Wisconsin constitution, can fashion an adequate remedy." *Id.* (quoting *In interest of D.H.,* 76 Wis.2d 286, 294 (1977).

Thus, in *Collins,* the court first concluded that the DES plaintiff was without an adequate remedy for her claim. In reaching this conclusion, the court examined the summary judgment record and determined that the plaintiff had evidence sufficient to establish the negligence and the injury elements of the claim. *Id. at* 177-180. The court then determined that the plaintiff faced insurmountable obstacles to identifying the specific manufacturer whose negligence had harmed her. These obstacles included the generic status of DES (i.e., its fungibility), the number of DES manufacturers, the loss of records, and the passage of time between the plaintiff's exposure to DES and the manifestation of her cancer. *Id.* at 180-181. In light of these obstacles, the court concluded that the traditional tort requirement that the plaintiff identify the specific defendant that harmed her left the plaintiff without an adequate remedy for her claim. *Id.* at 182. Because the plaintiff lacked an adequate remedy for her claim, the court had the authority under Article 1, sec. 9 to fashion a remedy for her, which it did by crafting the risk contribution

method of recovery: relaxing the traditional causation standard and shifting the burden of exculpation to the manufacturer. *Id.* at 191.

Three points are worth emphasizing here. First, it is very clearly the province of the court to make the initial determination under Article I, sec. 9 that a plaintiff lacks an adequate remedy for her claim. Second, the discussion of fungibility/generic status in *Collins* arose in the course of the court's initial determination that the plaintiff lacked an adequate remedy for her claim. Third, the *Collins* court made clear that the risk contribution method of recovery would be available to *all* plaintiffs with DES claims similar to the claim then before it. *Id.* at 192 ("[W]e have formulated a method of recovery for plaintiffs in DES cases in Wisconsin.").

In *Thomas,* the court again exercised its Article I, sec. 9 authority, this time to make the risk contribution model available to WLC plaintiffs. *Thomas*, 285 Wis.2d at 306-307. It did so following the same steps it had followed in *Collins.* First, it examined the summary judgment record and concluded that the plaintiff had sufficient evidence to support findings of culpable manufacturer conduct and of injury. *Id.* at 257-287. Then it made a judicial determination that the plaintiff faced insurmountable obstacles to manufacturer identification and therefore lacked an adequate remedy for his claim. *Id.* at 309. Because the plaintiff lacked an adequate remedy, the court fashioned one for him by adapting the risk contribution model from *Collins* to his WLC claim. *Id.* at 320. Again, as in *Collins,* the court discussed the issue of fungibility only in the course of its determination that the plaintiff lacked a remedy for his claim and was entitled to proceed under risk contribution. *Id.* at 309-317.

The *Thomas* court did acknowledge that whether WLC was fungible was a harder question than whether DES was fungible. It noted that, whereas DES was a chemically identical drug, WLC could be manufactured according to three different chemical formulas. *Id.* at 310. Further, defendants' experts had opined that factors like particle size and chemical composition of the lead could vary between manufacturers and result in different biological effects when the lead was ingested. *Id.* at 310, n. 47. However, the *Thomas* court rejected the manufacturers' argument that these nuanced differences between WLC products meant that risk contribution could not apply. *Id.* at 309 ("[The pigment manufacturers] argue that because white lead carbonate was not 'fungible' or manufactured from a chemically identical formula, *Collins'* risk-contribution cannot be applied here. We disagree."). Instead, the court adopted a practical, context-dependent definition of "fungibility," which was consistent with the broader question whether the plaintiff faced such obstacles to manufacturer identification that he would be without an adequate remedy absent intervention by the court.

First, "[t]o prevent the triumph of form over substance," the *Thomas* court held that chemical identity is not required for fungibility. *Id.* at 310. Fungibility instead meant "interchangeability due to generic status." *Id.* The court then discussed several ways in which a product might be fungible, i.e., interchangeable. A product might be functionally interchangeable, physically indistinguishable, or present a uniformity of risk. *Id.* at 312-313. The court made very clear that each of these possible meanings of fungibility was flexible and contingent. *Id.* ("Whether a product is [functionally interchangeable] is a matter of degree and heavily dependent on the context of whatever 'function' is at issue. . . . Because appearances can be deceiving, the degree of physical similarity required [for

products to be physically indistinguishable] depends heavily on context."); *id.* at 313, n. 49 (In contrast to market share liability which requires strict uniformity of risk, "risk contribution theory is akin to 'proportional share liability,' which does not require products that pose 'uniform risks.'"). The *Thomas* court concluded,

> Fungibility, therefore, is not a term that is capable of being defined with categorical precision. Its character will depend on the context of the injury, its cause, and the particular obstacles encountered in linking the causation to the possibly negligent defendants. *See Hamilton,* 32 F.Supp.2d at 51 ("It is the characteristic relevant to the matter at issue that determines whether a product is the same as and substitutable for another, and therefore, whether the two are interchangeable….").

*Id.* at 314. Put differently, for risk contribution purposes, a product is fungible if any manufacturer's product might have caused the same or very similar harm, and if the different manufacturers' products were so similar to each other that the challenge of identifying the manufacturer was likely to prevent the plaintiff from obtaining a remedy for his or her claim. The *Thomas* court found that WLC met this definition of fungibility, and thus the court could exercise its constitutional power to craft a remedy for the plaintiff, which took the form of an extension of risk contribution theory.

Sherwin-Williams' argument that fungibility is a jury question is incompatible with fungibility's role in the *Thomas* and *Collins* courts' Article I, sec. 9 analysis. It is obviously the province of the court, not a jury, to determine whether a plaintiff lacks an adequate remedy for his or her claim and to craft such a remedy where one is lacking. And this is a determination best made as early as practicable in the litigation to prevent needless expenditure of litigation resources on cases where risk contribution is not appropriate— i.e., cases where the obstacles to manufacturer identification are insufficiently high,

relative to the strength of plaintiff's claims and other equitable factors, to justify relaxing the causation standard. In other words, the application of risk contribution theory depends on a preliminary determination by the court that the product in question is fungible. If that determination were contingent on facts to be decided by the jury at the end of the case, parties could undergo years of litigation and complicated discovery on a theory that might turn out at the close of the case not to apply. And early determination of the fungibility question benefits defendants as well as plaintiffs. The *Collins* court intended that named defendants would facilitate an appropriate allocation of liability and reduce their own exposure by impleading other manufacturers that they knew to have produced the product at issue. *Collins*, 116 Wis.2d at 195. A defendant can't implead other manufacturers of a fungible product until the product's fungibility has been established. Overall, a Wisconsin court's resolution of the fungibility question might be analogized to a federal court's resolution of a 12(b)(6) motion or a motion for class certification: it lets the plaintiff know early on whether a viable remedy is available, and allows all parties to move forward with litigation understanding the contours of the claim.

Nevertheless, Sherwin-Williams makes several arguments that the *Thomas* court intended fungibility to be treated as a jury question, which I now address. First, Sherwin-Williams points out that the *Thomas* court considered the fungibility issue on review of a decision granting summary judgment for defendants and therefore construed the facts in the light most favorable to the plaintiffs. Sherwin-Williams argues that therefore the court decided only that, on the facts presented at summary judgment, a jury *could* find that WLC is fungible. As Sherwin-Williams repeatedly points out, appellate courts do not find facts. However, Sherwin Williams' analysis *presumes* that whether a product is fungible

as a prerequisite to risk contribution theory is a question of fact, and not a question of law that a court may decide based upon established or uncontested facts. Further, because the court heard the issue on appeal of a summary judgment in favor of defendants, its options were limited to granting judgment on the issue to defendants or denying it. The court could not have granted judgment to the plaintiffs on that procedural posture absent a *sua sponte* motion and further briefing. That may explain why the court's holding on the fungibility issue is not more affirmative. Finally, recall that the Article I, sec. 9 analysis begins with the court reviewing the summary judgment record to determine whether the plaintiff has evidence sufficient to establish the negligence and injury elements of the claim. The *Thomas* court's assertion that it was construing the facts in the light most favorable to the plaintiffs may be understood as applying to those elements of the claim, and not to the judicial determination that the plaintiff lacked an adequate remedy.

Sherwin Williams also points to Footnote 47 of the *Thomas* decision as evidence that the court intended the jury to decide the fungibility question. The footnote appears in the paragraph comparing the facts of the WLC cases to the facts of *Collins* for purposes of answering the question whether chemical identity is required to establish fungibility. It is appended to a sentence which reads, "According to [plaintiff's toxicologist], the formulary differences between white lead carbonates do not affect the bioavailability of, and hence the consequences caused by, the lead pigment." *Thomas*, 285 Wis. at 311. The footnote itself reads:

> This point, of course, is controverted by the pigment manufacturers. The pigment manufacturer's expert witness, William Banner, M.D., opines that lead in different products is not biologically fungible. He asserts that the bioavailability of lead in lead-paint varies, depending on many chemical and physical factors, such as the chemical composition of the lead

> used as pigment, the size of the particles of pigment or other lead-bearing material, the pigment manufacturing process, and the physical and chemical properties of paint film.
>
> However, on summary judgment, we construe the facts in the light most favorable to the non-moving party. Further, we do not resolve factual disputes.

*Id.* at 311, fn. 47. The paragraph concludes that because DES and WLC are "in a sense on the same footing in the sense of being inherently hazardous," it would be imprudent to require chemical identity as a touchstone for fungibility.

Thus, the fact issue preserved in the footnote is not the basis of a factual decision about whether WLC is fungible or not. The court uses the presence of lead in the various compounds of WLC as an explanation of how products might be interchangeable without being chemically identical. It is an example used to support the legal conclusion that fungibility does not require chemical identity. The footnote allows the court to use this example without endorsing its factual truth. Further, that the court preserves the question of fact in the footnote does not imply that the court finds the issue relevant to the ultimate determination of fungibility. The relative bioavailability of lead compounds might be relevant, for example, to the allocation of proportional responsibility. Footnote 49's discussion of "uniformity of risk" suggests as much: it notes that risk contribution theory does not require strict uniformity of risk, and suggests that the varying degrees of risk posed by different products might be a factor for the jury to consider along with market share for purposes of apportionment. *Id.* at 314, fn 49. In short, that the Wisconsin Supreme Court declined to decide a question of fact about the bioavailability of lead in Footnote 47 of the *Thomas* decision does not indicate that it intended the jury to decide fungibility as a question of fact.

As its final piece of support for its argument that fungibility is a question for the jury, Sherwin-Williams points to the pattern jury instruction for risk contribution, WIS JI-CIVIL 3295, which instructs the jury to consider "the characteristic of the product's function at issue, the physical appearance of the product and the physical similarity of the product, and the risks posed by the products use and whether such products have substantially identical defects which pose a uniformity of risk" when answering the verdict question whether the defendant had manufactured the "type" of product that caused the plaintiff's harm. I am not bound to follow these pattern jury instructions, and here I think that—very understandably, given the dearth of Wisconsin risk contribution case law—the civil jury instructions committee made a mistake when it imported language from the *Thomas* court's discussion of fungibility into its explanation of the verdict question regarding "type" of product. Indeed, it is only with the benefit of my experience seeing this trial to completion that I can explain why the fungibility question and the "type" of product question require different sorts of analysis.

When the *Collins* court framed the elements of the risk contribution claim, it had already determined that manufacturer identification presented an insurmountable obstacle to the plaintiff's claim and that therefore the plaintiff was entitled to have the court fashion a remedy. *Because the court had concluded that identifying the manufacturer posed too great an obstacle to the plaintiff's claim*, the court only required the plaintiff to prove "that the defendant produced or marketed the type of DES taken by the plaintiff's mother," *id.* at 193, and explained that by "type" it meant, "e.g., color, shape, markings, size or other identifiable characteristics," *id.*, at 194. (Presumably, this would be based on the plaintiff's mother's recollection of the color, shape, etc. of the pills she took when

24

pregnant.) It also allowed that, "in the situation where the plaintiff cannot allege and prove what type of DES the mother took, as to the third element the plaintiff need only allege and prove that the defendant drug company produced or marketed the drug DES for preventing miscarriages during pregnancy." *Id.* at 193-194. The court was making it easier for the plaintiff to establish a prima facie causal link to a given defendant using low-tech, common-sense evidence, while also filtering out of the case those defendants who could not have caused plaintiff's harm based on knowledge readily available to the plaintiff. For example, if the plaintiff knew that her mother had taken a red pill, she could only proceed against defendants who had manufactured red DES pills; if the plaintiff knew only that her mother had taken DES while pregnant, the plaintiff's claim could extend to any manufacturer of DES for use in pregnancy. This was consistent with the risk contribution methodology of shifting to manufacturers the burden to exculpate because of their better technical knowledge and access to records.

The *Thomas* court included a similarly phrased element in its articulation of a WLC risk contribution claim. It required the plaintiff to prove "that the Pigment Manufacturers produced or marketed the type of white lead carbonate he ingested." *Thomas*, 285 Wis.2d at 320. The court did not indicate in any way that the jury was to consider the definition of fungibility the court had relied on in deciding that risk-contribution theory applied to WLC. To require a jury to decide fungibility would be inconsistent with the procedure outlined in *Collins.* And, it would make no sense: requiring a plaintiff to prove by a preponderance of evidence that the defendant made or marketed WLC that was functionally interchangeable, physically indistinguishable and uniform in risk to the WLC he ingested comes very close to requiring the plaintiff to prove the identity of the manufacturer of the

WLC that harmed him—exactly what risk contribution theory sets out to avoid. Instead, consistent with the *Collins* approach, all that a WLC plaintiff needs to prove to meet their burden on the "type of WLC" element is that the defendant manufacturers had produced or marketed WLC for use in paint.[2]

I have established that whether a product is fungible for risk contribution purposes is a question of law properly resolved by a court. The question remains whether the Wisconsin Supreme Court's conclusion in *Thomas* that WLC was fungible applied only to that case or was intended to set precedent for future WLC cases. In contrast to the *Collins* court, which explicitly stated that all DES plaintiffs in Wisconsin might avail themselves of the risk contribution method it had fashioned, the *Thomas* court carefully used Thomas' name in describing what he would have to prove to succeed on his claim, perhaps suggesting that the holding was intended to apply only to him. *Thomas*, 285 Wis.2d at 320-21. It is plausible that the *Thomas* court intended the fungibility question to be resolved case-by-case even in future WLC cases, since the definition of fungibility the court adopted was so contingent on facts. And it is not inconceivable that some dramatic technological innovation might make the identification of a WLC manufacturer much less burdensome for plaintiffs, in which case the fungibilty calculus would have to change. On the other hand, at other points in the *Thomas* decision, the court uses language

---

[2] Here I'll note that some of the evidence Sherwin-Williams presents in support of its argument that WLC is not fungible—different isotopes of lead, different sizes and shapes of particle, and so on—might have been the basis of an exculpatory defense at trial. (In fact, I explicitly allowed the defendants to present defenses at trial based on chemical analysis of paint samples from the plaintiffs' homes and this evidence might well have been admissible under that holding.) What's important is that it is the defendant's burden to build an exculpatory argument from this evidence, because it is the defendants who have the necessary technical knowledge of lead chemistry and access to such corporate records as exist about the historical minutiae of lead manufacture.

suggesting that its holding applies to all while lead carbonate claims. E.g., *id.* at 256 ("[T]he question presented is whether *Collins'* risk-contribution theory should be extended to white lead carbonate claims. We agree that it should."). And the Wisconsin Supreme Court's language in *Godoy* suggests that it considers *Thomas* to have determined WLC's fungibility as a matter of law: "In *Thomas*, we concluded that for the purposes of risk contribution, white lead carbonate pigment is fungible, and all manufacturers of white lead carbonate pigment could be held jointly and severally liable for injuries caused by the product." *Godoy*, 319 Wis.2d at 109.

I need not resolve the question. Even if the *Thomas* holding requires the trial court in each new WLC case to reassess whether WLC is fungible and risk contribution should apply, the existence of minute differences between grades and isotopes of lead does not make the challenge of manufacturer identification any less insurmountable for the plaintiffs before me than it was for the plaintiff in *Thomas*. For purpose of these cases, WLC is fungible and plaintiffs were entitled to proceed under risk contribution theory.


## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that DuPont's motion for joinder in Sherwin Williams motion for Judgment NOV based on Wisconsin public policy factors (ECF # 1662) is **GRANTED.**

**IT IS FURTHER ORDERED** that Sherwin Williams' motion for judgment NOV based on Wisconsin public policy factors (ECF # 1659) is **DENIED.**

**IT IS FURTHER ORDERED** that Armstrong Containers' motion to preclude liability based on public policy factors (ECF # 1664) is **DENIED.**

**IT IS FURTHER ORDERED** that Sherwin Williams' renewed motion for judgment as a matter of law (ECF # 1669) is **DENIED.**

This decision and order resolves all pending post-verdict motions in these cases. Accordingly, **IT IS ORDERED** that the clerk of court enter judgment consistent with the jury's verdict in each of the three cases captioned above.

Dated at Milwaukee, Wisconsin this 19th day of September, 2019.

s/Lynn Adelman
LYNN ADELMAN
U.S. District Judge
