# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLENN BURTON, JR,**
                 **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　　**Case No. 07-CV-0303**

**AMERICAN CYANAMID CO, et al.,**
                 **Defendants;**

---

**RAVON OWENS,**
                 **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　　**Case No. 07-CV-0441**

**AMERICAN CYANAMID CO, et al.,**
                 **Defendants;**

---

**CESAR SIFUENTES,**
                 **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　　**Case No. 10-CV-0075**

**AMERICAN CYANAMID CO, et al.,**
                 **Defendants.**

---

## DECISION AND ORDER

Glenn Burton, Ravon Owens, and Cesar Sifuentes brought negligence and strict liability claims against six former manufacturers of white lead carbonate pigment (WLC). The plaintiffs alleged that they suffered injuries when, as young children, they ingested WLC that had been applied to the walls of their homes as a component of paint. Because they could not identify the manufacturers of the specific WLC that harmed them, the plaintiffs proceeded under the risk contribution theory of liability, which was extended to WLC cases by the Wisconsin Supreme Court in *Thomas ex rel. Gramling v Mallett*, 285 Wis.2d 236 (2005).

I consolidated the three cases for trial. At the close of trial, the jury returned verdicts in favor of each of the plaintiffs and against three of the named defendants: Sherwin-

1

Williams, DuPont, and Armstrong Containers. The jury awarded each plaintiff two million dollars in damages, and the three liable defendants agreed to allocate this sum amongst themselves rather than litigate allocation in a second phase of trial. Sherwin-Williams and Armstrong both filed motions for judgment as a matter of law, which I have denied. Concurrently, Sherwin Williams, Armstrong Containers and DuPont each filed motions for a new trial under Fed. R. Civ. P. 59(a). This order resolves the defendants' several Rule 59(a) motions.

## I.    BACKGROUND

Before discussing the substance of the pending motions, it may be helpful to present a brief chronology of these cases. The cases required an unusually large number of rulings on trial management and evidentiary questions, many of which the defendants now challenge in their motions for a new trial. I'll therefore briefly narrate the legal and procedural circumstances giving rise to the challenged rulings; my intent is to present a kind of overview or road map to the issues defendants raise.

In 1999, Steven Thomas commenced a lawsuit in Milwaukee County Circuit Court seeking damages against several former manufacturers of WLC. Thomas' lawsuit alleged that, as an infant, he ingested WLC that was present in the paint in his home, and suffered brain damage as a result. The trial court dismissed the case because Thomas could not identify the specific manufacturer of the WLC that harmed him. Thomas appealed, and the Wisconsin Supreme Court held that he could proceed with his case under the risk contribution theory, which the court had previously adopted in a case in which a plaintiff

had been harmed by a dangerous fungible product but could not identify the specific manufacturer of the product. *Collins v. Eli Lilly Co.,* 116 Wis.2d 166 (1984).

Under risk contribution, the Wisconsin Supreme Court held, a plaintiff who brought a white lead carbonate pigment case did not bear the traditional burden of proving that a particular defendant made or sold the specific WLC that caused the plaintiff's injury. Instead, if a plaintiff could make a prima facie showing that a defendant made or sold WLC during the period of the plaintiff's house's existence, then the burden shifted to the defendant to exculpate itself by proving that it did not make or sell WLC in the geographical market where the house was located or at the time when the paint was applied, such that the defendant could not reasonably have been the source of the WLC that caused the plaintiff's injury.[1] *Thomas*, 285 Wis.2d at 320. The plaintiff retained the traditional burden of proof with respect to other elements of the product liability claims: e.g., duty, breach, causation (other than manufacturer identification) and injury for a negligence claim; defective and unreasonably dangerous product sold without expectation of substantial change for a strict liability claim. *Id.* at 320-21. The Supreme Court contemplated that this process would yield a "pool" of defendants which reasonably "could have caused the plaintiff's injuries." *Id.* at 322. The jury would then allocate whatever damages the plaintiff established among the defendants in the pool. *Id.*

The *Thomas* case was remanded for trial in Milwaukee County Circuit Court. Because the jury found that the plaintiff had failed to establish that lead exposure had caused his injuries, it resolved the case without applying the risk contribution analysis.

---

[1] In the course of this litigation, I ruled that a defendant might also exculpate itself by performing a chemical analysis of the paint in a plaintiff's home so as to demonstrate that paint containing WLC it made or sold was not present.

Meanwhile, after the Supreme Court rendered its decision in *Thomas*, approximately 170 so-called "lead paint" cases were filed in Milwaukee County. Subsequently, all or most of them were removed to this court based on diversity jurisdiction. Progress on the removed cases was held up for some four years because my late colleague, Judge Randa, who had been assigned one of the cases (the others were assigned to me and are waiting to be tried) held that the Wisconsin Supreme Court's decision in *Thomas* violated the pigment manufacturers' substantive due process rights and other federal constitutional rights. That decision was appealed, and the Seventh Circuit reversed. *Gibson v. American Cyanamid Co.*, 760 F.3d 600, 615 (7th Cir. 2014). It reasoned that state courts have broad latitude to develop their own common law, that the *Thomas* decision reflected the state court's reasonable balancing of the tortious conduct of those who distributed an unreasonably dangerous product against the possibility that a non-culpable plaintiff might be left without a sufficient remedy, and that risk contribution theory reasonably relaxed without eliminating the causation-in-fact standard, since the plaintiff was still required to prove that WLC as opposed to other sources of lead was the cause of the lead poisoning. *Id.* at 623-24.

That brings us generally to the *Burton, Owens*, and *Sifuentes* cases and the motions for new trial that are presently before me. Other than the *Thomas* case itself, these three cases were the first WLC cases to be tried under the risk contribution doctrine. The parties chose them as "bellwethers" from among the large group of cases removed to this court. *See* Case Management Order at ECF # 352. The cases are similar to *Thomas* in that, in each, the plaintiff alleged he was injured when, as a young child, he ingested WLC that had been applied to the walls of his home as a component of paint.

Each plaintiff proceeded under risk contribution theory because he could not identify the company or companies that made or sold the WLC that was present in his home.

Each plaintiff sued the five defendants who ultimately went to trial—American Cyanamid, Armstrong Containers, Atlantic Richfield, DuPont, and Sherwin-Williams—as well as certain other defendants who were dismissed for various reasons earlier in the litigation. Among these other defendants was NL Industries, formerly known as the National Lead Company. Plaintiffs and defendants alike understand National Lead to have been a leading manufacturer of WLC pigment with a significant presence in the Milwaukee market during the first half of the Twentieth Century. In 2014, NL reached an aggregate settlement agreement with all the plaintiffs with WLC risk contribution cases before this court. *See* ECF # 244. The settlement was pursuant to *Pierrenger v. Hoger,* 21 Wis.2d 83 (1962), which permits a plaintiff to settle with a defendant while reserving the right to pursue claims against other tortfeasors and agreeing to indemnify the settling defendant for any claims for contribution that the non-settling tortfeasors might bring. *Bruner Corp. c. R.A. Bruner Co.*, 133 F.3d 491, 494 (7th Cir. 1988). NL deposited a sum of money into a qualified settlement account, which was distributed to the plaintiffs according to an agreed-upon formula. The non-settling defendants did not object to the settlement.

The three bellwether cases proceeded through summary judgment, and I then elected to consolidate them for trial. Though I had previously denied motions by the plaintiffs to consolidate the cases, summary judgment revealed significant factual overlap between the cases and tremendous efficiencies to be achieved through consolidation. At least eighteen separate summary judgment motions were filed in the *Burton* case alone,

along with roughly 30 motions to exclude various expert witnesses or limit their testimony; however, many of these motions were identical or very nearly identical to motions filed simultaneously in the *Owens* and *Sifuentes* cases. It became clear that proof of the claims and defenses in these cases would rest largely on the same body of historical, medical and chemical background evidence, and further that the parties intended to rely on the same set of expert witnesses to form opinions specific to the individual plaintiffs on the basis of that broad background information.

I also indicated to the parties that I would bifurcate the trial. This was for two reasons. First, in *Thomas,* the Wisconsin Supreme Court described its intention that application of the risk contribution doctrine would yield a "pool" of defendants whose product might reasonably have contributed to the plaintiff's injury. *Thomas*, 285 Wis.2d at 322. Damages were then to be allocated among the defendants in the pool on the basis of certain equitable factors such as market share and the defendant's role in shaping the industry or the market for the product. *Collins*, 116 Wis. 2d at 200. Whether a defendant's product could reasonably have caused the plaintiff's harm is a different sort of question from whether a defendant whose product might have caused harm should bear more or less of the financial burden for the harm than other defendants whose products also might have caused harm. It seemed likely, however, that evidence relevant to only one inquiry might improperly inform the jury's assessment of the other.

Second, and relatedly, National Lead's unusual position as a settled defendant whose liability and proportional responsibility remained live issues presented significant legal and evidentiary challenges in the risk-contribution context. Evidence that National Lead controlled a significant share of the market in Milwaukee, while relevant to the

allocation of damages, was not relevant to the question whether other defendants were or were not present in the Milwaukee market; such evidence threatened to skew the jury's assessment of that fundamental liability question. While it would be appropriate for a liable defendant to limit its damages exposure by arguing that most of the damages should be assigned to National Lead which held the greatest market share, it would *not* be appropriate for a defendant to evade liability altogether by arguing that National Lead held the greatest market share. Under *Thomas*, a defendant might exculpate itself by affirmatively showing that it did not participate in the relevant geographical market; merely pointing the finger at another market player was not a proper means of exculpation.

For these reasons—to clarify the issues for the jury and to avoid improper use of the National Lead evidence—and after many careful readings of *Thomas* and after hearing extensive arguments by the parties—I determined the trial would be best conducted in two phases. The first phase would address the issues of (1) injury, (2) causation in the limited sense required under risk contribution—i.e., that the plaintiff had ingested WLC, that the WLC had caused his injury, and that one or more defendants had manufactured or sold WLC during the period of the house's existence, and (3) culpability of the non-settled defendants—i.e., that the defendant had breached a legally recognized duty to the plaintiff by making or selling WLC or that the defendant's WLC was defective and unreasonably dangerous when sold, and (4) the total value of the plaintiff's damages. The first phase would also address the non-settled defendants' exculpation defenses, and the contributory responsibility of non-parties such as landlords. I determined that if in Phase One a plaintiff could establish liability under risk contribution against a defendant and that defendant could not exculpate itself by showing that it could not have contributed

to plaintiff's injury, then we would proceed to the second phase of the trial. At Phase Two, the parties would then present evidence and argument on how to allocate the damages among National Lead and the liable non-settled defendants. I concluded that bifurcation of the trial in this manner was by far the most effective way of implementing what the Thomas court was seeking to accomplish.

The question arose whether the prima facie case of National Lead's liability should properly be made at Phase One or Phase Two. Under *Pierrenger*, National Lead would not appear on the verdict form unless such a prima facie case was made. It was defendants, and not plaintiffs, who had an interest in establishing National Lead's liability at trial so as to assign a measure of responsibility to National Lead and limit their own damages exposure if liability against them were found. Thus, it was defendants' burden to establish National Lead's liability, and at the outset of the trial I instructed that the defendants should make this case at Phase One so that it might be considered alongside the other liability arguments.

As the trial unfolded, however, it became clear that this approach was unworkable. Because the claims against National Lead were based on the same conduct as the claims against the non-settled defendants (i.e., the making and selling of WLC), for the non-settled defendants to make a case against National Lead would require them to present evidence and arguments adverse to their own litigation positions. For example, defendants would have to establish that WLC manufactured by NL was defective and unreasonably dangerous while at the same time defending against plaintiffs' claims by arguing that their own WLC was not defective or unreasonably dangerous. Once trial began, it also proved very difficult to admit the evidence needed for defendants to make

their prima facie case against National Lead while excluding evidence, such as market share evidence, that was relevant only to allocation and might be used to improperly bolster a non-settled defendant's exculpation defense. Thus, to clarify the issues and prevent prejudice to both sides, I ruled during Phase One that defendants would make their prima facie case against National Lead at Phase Two , and that evidence of National Lead's participation in the Milwaukee WLC market would largely be excluded from Phase One.

Another issue arose as I was resolving motions in limine in preparation for trial. DuPont filed a motion to exclude evidence that it purchased WLC from other manufacturers to incorporate into its paint products. ECF # 1147. It argued that it had been sued only as a manufacturer of WLC and could not be liable for purchasing WLC from others to integrate into its products. This was the first time that the question whether manufacturing WLC was the only conduct for which a defendant might be liable under *Thomas* had been presented to me. I looked to the Wisconsin Supreme Court's risk contribution cases for guidance on the question. *Thomas* itself stated that a defendant might be liable for "manufacturing or marketing" WLC, and selling WLC as a component of a paint product seemed clearly to be a manner of "marketing" WLC. A second Wisconsin Supreme Court case, *Godoy ex rel. Gramling v. E.I. du Pont de Nemours and Co.*, 319 Wis. 2d 91 (2009), had established that a plaintiff could not bring a risk contribution case on the theory that lead-containing paint had been defectively designed, since WLC and not paint was the fungible product to which the risk contribution theory had been extended. *Id.* at 682-83. But I found in *Godoy* no legal reason to disallow a risk contribution claim based on the marketing of WLC that had been integrated into paint. I

therefore denied DuPont's motion in limine. DuPont and Sherwin-Williams moved for reconsideration of this decision, and I denied the motion. See ECF # 1408 at 6-8. DuPont and Sherwin-Williams then asked for leave to take additional discovery regarding paint they had made that incorporated WLC made by other manufacturers, and I granted such leave.

Phase one of the trial began on May 6, 2019 and lasted more than three weeks. Some thirty-five witnesses testified. The three plaintiffs first presented their cases. Most of their witnesses were expert witnesses and the same experts testified regarding each of the plaintiffs. Then the defendants presented their case. Most of the defendants' witnesses were also experts. Some testified on behalf of individual defendants and some testified on behalf of the defendants collectively.

At the close of phase one of the trial, American Cyanamid filed a renewed motion to dismiss on grounds that the court lacked personal jurisdiction. I had previously deferred this issue for resolution at trial under rule 12(i) of the Federal Rules of Civil Procedure. I found that plaintiffs had not met their burden to establish jurisdiction over American Cyanamid, and granted Cyanamid's renewed motion. With the plaintiffs and the remaining defendants, I held a conference regarding the form of the special verdict and the jury instructions which lasted about one day.

The jury deliberated for slightly more than a day before returning verdicts in favor of each of the three plaintiffs and awarded each of them $2 million. The jury also found three of the four remaining defendants---Sherwin-Williams, DuPont and Armstrong Containers---liable. The jury determined that the fourth defendant, Atlantic Richfield, was not liable.

I then advised the jury that the trial would entail a second phase regarding the allocation of damages between the liable defendants. I had been very careful not to previously advise the jury that there might be a Phase Two because I did not want there to be any possibility that the jury's verdict in Phase One of the trial might be influenced by the jury's knowledge that the time that they were released from jury duty might depend on the verdict they reached in Phase One.

The jury reached its verdict on Friday morning, May 31. I released the jurors and directed them to return on Monday morning to begin with Phase Two. I advised them that the parties did not believe that phase two would last more than several days. After I released the jury, the defendants advised me that they were interested in mediating the allocation of damages between the liable defendants and the settling defendant, National Lead. So, I contacted a magistrate judge (only one was in the building on a Friday afternoon) and he was willing to mediate. Counsel for plaintiffs and the three liable defendants commenced mediation.

Several hours later, counsel returned to Court and announced that they had settled the Phase Two allocation issue. The settlement consisted of two parts. First, the parties agreed that National Lead was responsible for 12.5 percent of the damages sustained by plaintiffs. This meant that the amount owed by the non-settled defendants to each plaintiff would be $1.75 million dollars, instead of $2 million. Second, the three defendants agreed that they would be jointly and severally liable for the damages to plaintiffs. In other words, they would decide between themselves how much of the $1.75 million each defendant would pay to each plaintiff. We put that agreement on the record and proceeded to notify the jurors that their work was done.

Since the trial, the three liable defendants brought motions for judgment notwithstanding the verdict, for judgment as a matter of law, and the present motions for a new trial. I denied the motions for JNOV on September 19, 2019 (ECF # 1706) and those for judgment as a matter of law on February 27 and 28, 2020 (ECF ## 1775, 1776). I now address defendants' motions seeking a new trial. To some extent, the present motions overlap with the previous motions so I may repeat points that I made previously but will attempt to avoid being redundant.

## II. LEGAL STANDARD

Rule 59(a) provides that, after a jury trial, a court may grant a motion for a new trial for any reason recognized by federal law. Fed. R. Civ. P. 59(a)(1)(A); *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 602 (7th Cir. 2019). The most common reasons are that the trial was fundamentally unfair to the moving party, that the jury's verdict went against the manifest weight of the evidence, or that the damages awarded were excessive. *Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 440 (7th Cir. 2010); *Ruiz-Cortez*, 931 F.3d at 602. The defendants make arguments in all three categories.

## III. DISCUSSION

### A. Consolidation of Cases for Trial

Defendants first challenge my decision to consolidate the Burton, Owens and Sifuentes cases for trial. As I have explained, this decision was based on the shared historical, medical and chemical underpinnings of the cases and the parties' reliance on the same set of experts. The efficiencies to be yielded through consolidation were compelling, especially in light of the long list of WLC cases awaiting trial.

The defendants argue that my consolidation of the Burton, Owens and Sifuentes cases for trial was error because it risked jury confusion and unfair prejudice---specifically, that the jury would not be able to distinguish between the individual plaintiffs. The defendants' primary basis for the argument that the jury was confused is the award of identical damages to the three defendants. As I will explain below, the identical damage award is readily explained by the fact that plaintiffs' expert, Dr. James Besunder, testimony that each plaintiff sustained at least a ten-point drop in IQ due to lead exposure.[2] Further, the jury showed its ability to distinguish between parties because it found three defendants liable and one defendant, the Atlantic Richfield company, not liable. The parties were careful throughout trial to specify that certain evidence was offered only with respect to certain defendants and I reinforced the limited relevance of that evidence in my rulings throughout trial and my final instructions to the jury. Defendants have not demonstrated that consolidation of the cases prejudiced them or confused the jury.

### B. Bifurcation of Trial

Next, defendants argue that the trial was fundamentally unfair to them because I bifurcated it and ultimately excluded most evidence of National Lead's liability from the first phase of trial. I continue to think that bifurcation of the trial was and is the most clear and efficient means of achieving the *Thomas* court's directive that the jury first identify a pool of liable defendants and then allocate damages among those defendants based on equitable factors extraneous to the elements of the underlying product liability claims.

---

[22] The jury's identical verdicts do not account for Besunder's testimony that a measure of Mr. Burton's lead exposure came from sources not contemplated by this lawsuit. I will correct this error through an order of remittitur, as I will discuss in more detail below.

Defendants argue that excluding evidence of National Lead's participation in the Milwaukee market from the first phase of trial distorted the jury's view of the facts and impeded the defendants' ability to present their exculpation defenses. As I have explained many times, whether a defendant could reasonably have contributed to a plaintiff's harm is a binary, yes or no question to be answered based only on that defendant's conduct. See, e.g., ECF # 1408 at 16-18. Evidence that National Lead sold a lot of WLC in Milwaukee at a given time is of limited probative value for the assertion that the current defendants did not sell WLC in Milwaukee at that time, and I found in my discretion that such value was greatly outweighed by the risk that the jury would improperly rely on evidence of a defendant's limited market share as a basis for total exculpation. It is entirely plausible that, had the defendants proceeded to Phase Two of the trial rather than settling it amongst themselves, the jury might have allocated nearly all the damages to National Lead and a tiny percentage to the current defendants. That that outcome did not come about is not a reflection of an unfair trial structure but rather of defendants' decision not to see the process through to completion.

Defendants also argue that National Lead's conduct was relevant to their defense against the prima facie claim of negligence, because National Lead was a leader in the Lead Industries Association (LIA) and set standards of conduct for the lead industry. These arguments don't hold water. I instructed the jury that no defendant was responsible for the LIA's conduct, and that evidence of the LIA's activities was to be considered only as probative of the defendants' knowledge of risks associated with the use of WLC in paint. That National Lead was a leader of the LIA does not affect the probative value of the LIA evidence with respect to other defendants' knowledge of risk. And defendants

provide no legal basis for an argument that National Lead's conduct affected the duty of care owed by other defendants.

I acknowledge that my rulings regarding the admissibility of National Lead evidence at phase one did shift in the manner described in Armstrong Container's brief on this issue. *See* ECF # 1740 at 10-11. However, defendants do not explain how the change in rulings prejudiced them; I believe this is because it did not. At the outset of trial, the parties understood that defendants were to make a prima facie case of National Lead's liability at Phase One. Midway through Phase One, I ruled that defendants were to make that case against National Lead at Phase Two. As I explained at the time, an important purpose of this change was to avoid prejudice to both sides; in particular, given that National Lead's liability was premised on the same sorts of knowledge and conduct alleged against the defendants, I thought it important to allow defendants to focus on defending themselves at Phase One without simultaneously having to prove another entity liable for the same knowledge and conduct. See Tr. 4389. Absent any concrete explanation of how this change caused prejudice to the defendants, I find no reason to grant them a new trial.

## C. Liability for Selling WLC Made by Another Manufacturer

Defendants argue that I erred in allowing recovery on grounds that a defendant integrated WLC made by another company into paint and then sold that paint.

First, defendants argue that this ruling was an unjustified expansion of state law. I am not persuaded. First, *Thomas* established that a defendant might be liable for producing *or* marketing WLC. 185 Wis.2d at 320. Second, applicable Wisconsin strict product liability law applies to the entire chain of distribution, such that an assembler of

component parts into a final product can be liable for harm caused by a defective component part. See WIS JI-CIVIL 3260 Strict Liability: Duty of Manufacturer to End User (Comment)("[T]he maker of a component part, or assembler of component parts who markets the whole product as his, or anyone in the 'chain of distribution' may be liable under strict liability.")(citing 13 A.L.R.3d 1057, 1096-1100 (1967)). Third, defendants wrongly cite *Godoy* as standing for the principle that risk contribution theory did not apply to manufacturers of paint; *Godoy* established only that *Thomas* did not permit plaintiffs to bring a risk contribution claim naming paint as the defective product. *See* ECF No 1408 at 6-10. Finally, if the concern is that paint is a non-fungible product to which risk-contribution should not apply, it would not make sense to allow plaintiffs to recover from defendants who integrated their own WLC into paint products and sold those products— and yet defendants concede that risk contribution clearly allows recovery under such circumstances.

Defendants also argue that they were prejudiced by my ruling that plaintiffs could recover for a defendant's marketing of products containing WLC made by another manufacturer because plaintiffs waived that theory earlier in the litigation. Defendants point to arguments that the plaintiffs made in support of their motion to exclude testimony by DuPont's expert Dr. Lamb, and in opposition to DuPont's motion for summary judgment on the basis of chemical analysis of the paint samples from plaintiffs' homes. ECF # 1724 at 22. Plaintiffs argued that because DuPont had been sued as a WLC manufacturer (i.e., because the product at issue was WLC), the chemical composition of the paint on the walls was not relevant to any claims or defenses—a position I rejected when I allowed defendants to present exculpation defenses based on chemical analysis

of paint chip samples. As stated in the case law cited by the defendants, waiver occurs when a party "intentionally relinquishes or abandons a known right." *United States v. Seals*, 813 F.3d 1038, 1044-45 (7th Cir. 2016). Plaintiffs' argument that paint chemistry was not relevant to claims or defenses as they understood them at the time does not amount to an intentional relinquishment of a right of recovery based on a defendant's marketing of another manufacturer's WLC.

Defendants claim of prejudice is further undermined by the fact that I granted their motions to supplement their expert reports to address products they marketed that included WLC made by others. ECF # 1644 at 80-81.

### D. Evidentiary Rulings

Defendants argue that various of my evidentiary rulings were erroneous and warrant a new trial.

To begin, defendants argue that my decision to exclude evidence of plaintiffs' school attendance and behavioral records unfairly prevented them from presenting a causation defense. They argue that plaintiffs' absences from school and lack of effort in school provide an alternative explanation for the neuropsychological test scores that provide the evidentiary foundation for plaintiffs' claimed brain injuries. I excluded this evidence from trial because I was concerned that its probative value was outweighed by the significant risk that it would prejudice the jury. Defendants were not without opportunity to contest plaintiffs' injury and causation claims: they presented their own neuropsychologist expert who challenged plaintiffs' expert's interpretation of the test results. I am therefore not persuaded that my application of Rule 403 to exclude plaintiffs school records was unfair to the defendants.

Defendants also argue that I unfairly prevented them from challenging plaintiffs' estimate of their damages when I excluded evidence of plaintiffs' families' educational and career outcomes and barred defendants from obtaining discovery on parental or sibling IQ. Again, I found and still find that such evidence would be highly prejudicial to the plaintiffs. Further, the evidence is only marginally relevant to plaintiffs' damage claims. Plaintiffs damages claims were for pain and suffering—not loss of income or opportunity—to be estimated based on a *loss* of ten IQ points, and not on the absolute IQ at which they landed. By analogy, in a case involving a claim for a loss of ten dollars, the jury would not need to know the plaintiff's net worth following the loss in order to render a decision on compensatory damages.

Sherwin-Williams also argues that certain evidentiary rulings warrant a new trial because they allowed for admission of irrelevant evidence that caused "jury confusion." Sherwin-Williams provides no compelling authority for the principle that jury confusion warrants a new trial; it cites only a Fifth Circuit case from 1984 and an Eastern District Case from 1977. Further, I do not find that the evidence Sherwin-Williams complains about was either irrelevant or confusing.

First, Sherwin-Williams complains that I admitted historical advertisements from Milwaukee publications for Sherwin-Williams products that did not contain WLC. Sherwin-Williams argues that these advertisements are not probative of Sherwin-Williams' conduct with respect to WLC-containing products in Milwaukee. I disagree. Under risk contribution, it was Sherwin-Williams' burden to exculpate itself by showing that its making and selling of WLC could not reasonably have caused a plaintiff's harm; one way it might have done so was to prove by a preponderance of the evidence that it did not sell

WLC products in Milwaukee at the time(s) when WLC products were applied to that plaintiff's home. *See* ECF # 1074 at 13-15. Evidence that Sherwin-Williams advertised any of its products in Milwaukee at a given time is relevant to the question whether Sherwin-Williams products containing WLC were available for sale in Milwaukee at that time, because it shows that Sherwin-Williams had a market presence and distribution capacity in Milwaukee at that time.

Next, Sherwin-Williams complains that I admitted a 1937 Sherwin-Williams brochure containing instructions for interior use of its "ODP" brand white lead-in-oil (WLO). It argues that no evidence shows that ODP was distributed in Milwaukee at this time, and that therefore this brochure was irrelevant and its admission confused the jury. Again, I disagree. The brochure is highly relevant to plaintiffs' prima facie negligence and strict liability cases, since it shows that Sherwin-Williams was manufacturing and selling a WLC product for interior household use at that time. That plaintiffs did not present evidence of advertising of ODP in Milwaukee at the time doesn't affect this brochure's relevance to their prima facie case; under *Thomas*, the burden was on Sherwin-Williams to prove that it did not sell ODP in Milwaukee at the time.[3]

> ## E. Weight of Evidence
>
> ### 1. Sherwin-Williams

---

[3] A more compelling challenge to this brochure's relevance would arise if the evidence suggested that all WLC-containing paint had already been applied to a plaintiff's home before this brochure was published. In that case, the negligence evidenced by the brochure could not be a cause of the plaintiff's injury, and thus would not contribute to the plaintiff's prima facie case. See pages 2-4 above. However, Sherwin-Williams has not made this argument, and it is therefore waived.

Sherwin-Williams argues that the jury's verdict was against the weight of the evidence on various elements of plaintiffs' claims.

First, Sherwin-Williams argues that the jury's finding of negligence was against the weight of the evidence because plaintiffs did not identify a particular time period when WLC was applied to their houses. Sherwin-Williams' argues that it cannot be liable for negligently manufacturing or selling WLC *after* the last date when WLC was applied to a plaintiff's home, because that subsequent negligence can't be a cause-in-fact of plaintiff's harm; on the flip side, Sherwin Williams can't be liable for negligence if the WLC in a plaintiff's home was applied before Sherwin-Williams had knowledge about the foreseeable risks of WLC sufficient to give rise to a duty of care.

Sherwin-Williams' argument fails because it implies a standard of causation-in-fact higher than that required under *Thomas*. The elements of a negligence claim under *Thomas* are:

(1) That the plaintiff ingested white lead carbonate;

(2) That the white lead carbonate caused his injuries;

(3) That the defendant produced or marketed the type of white lead carbonate the plaintiff ingested; and

(4) That the defendant's conduct in producing or marketing the white lead carbonate breached a legally recognized duty to the plaintiff.

285 Wis.2d at 320. Further, where (as here) the plaintiff cannot prove the specific type of WLC he ingested, "he need only prove that [the defendant] produced or marketed white lead carbonate for use during the relevant time period: the duration of the house's existence." *Id.* To require a plaintiff to identify the time at which WLC was applied to his

home in order to show that a particular defendant was negligently making or selling WLC at that time would be to require evidence of manufacturer identity at a level of specificity explicitly disclaimed by risk contribution theory. *Thomas* provided that a defendant might exculpate itself by demonstrating that it did not make or sell WLC "at the relevant time," and I interpreted the relevant time for purposes of exculpation as meaning the time at which the WLC was applied to the plaintiff's home. If liability is to be avoided on the basis that a defendant did not *negligently* make or sell WLC at the time it was applied to a plaintiff's home, it is the defendant's burden as an extension of the exculpation defense to identify the time at which the WLC was applied to the home and demonstrate that its making and selling of WLC was not negligent.[4]

---

[4] Furthermore, trial evidence would support a jury finding of a temporal link between Sherwin-Williams' negligence and plaintiffs' exposure. The date when American medical experts first understood the risk of WLC in paint to children was at issue in this trial, but as I have discussed in a previous order, the jury heard evidence sufficient to support a finding that Sherwin-Williams knowledge of the risks to children associated with lead paint was sufficient to give rise to a duty to stop making and selling WLC for use in residential paint beginning in the nineteen-teens. See ECF # 1775 at 10-11. Sherwin Williams manufactured WLC between 1910 and 1947. Tr. 5075. It sold white lead in oil (WLO) between 1910 and 1969. It sold ready-mix paints that contained WLC between 1890 and 1969. Tr. 4955. The evidence permits a finding that Sherwin-Williams' conduct in making and selling WLC dating was culpable for a period dating from the nineteen-teens until 1969.

It's undisputed that Mr. Burton's home was built in 1902, Mr. Sifuentes' home in 1915, and Mr. Owens' two homes in 1899 and 1922. ECF # 1760 at 5, fn. 7. The houses built in 1915 and 1922 were built at or after the beginning of the time period when Sherwin-Williams' making and selling of WLC could reasonably be deemed negligent. Paint could not have been applied to those homes before they were built; the obvious inference, therefore, is that the paint containing WLC that was found in those homes was applied to those homes during the time period when Sherwin-Williams' making and selling of WLC was culpable. Because the WLC in plaintiff Owens' 1922 home satisfies the temporal causation issue raised by Sherwin-Williams, I needn't address the question of his 1899 home.

As for the Burton home built in 1902, trial evidence strongly supports the inference that at least some portion of the WLC found in that home was applied during the period of Sherwin Williams' culpability. Defendants' expert Christopher Palenik testified that he analyzed paint chip samples taken from plaintiffs' homes by identifying individual layers

Second, Sherwin-Williams argues that the strict liability verdict was against the weight of the evidence because plaintiffs did not present evidence that, if properly warned, consumers would have altered their behavior and the injury to plaintiffs have been avoided. In support, Sherwin-Williams cites a Wisconsin Court of Appeals case that addressed the requirements of a duty to warn claim in the context of negligence, not strict liability. ECF # 1727 at 14, *citing Kurer v. Parke, Davis & Co.*, 272 Wis. 2d 390, 409 (Wis. App. 2004). As I recently explained, under the applicable law it was not plaintiffs' burden to prove that appropriate warnings would have changed consumer behavior; plaintiffs' strict liability claim required them to show that the dangers posed by WLC were outside the contemplation of the ordinary consumer, at which point it became Sherwin-Williams' burden to demonstrate that the warnings it provided were sufficient to render safe its otherwise dangerously defective product. See my discussion at ECF # 1775 at 14-16. Because plaintiffs were not obligated to present evidence that warnings would have changed consumer behavior, the absence of such evidence does not affect the weight of the evidence supporting the verdict.

---

of paint within the chips and testing those individual layers for the presence of WLC. Tr. 4036-4038. Each layer of paint reflects a new application of paint to the surface—i.e., a repainting. Palenik identified WLC in many of the layers of paint in the chips, not just the earliest-applied layers. For example, in the 1902 home, Palenik tested chip 902-7B which was taken from a door casing. He found 33 layers. With "Layer 1" representing the outermost, last-applied layer of paint and "Layer 33" representing the innermost, first-applied layer of paint, Palenik determined that WLC was present at layers 32, 31, 29, 26, 25, 24, 22, 14, 13, 12, 11, 9, 8, and 7. Tr. Ex. 7093 at 78-110. Layer 7 was the 26th layer to be applied to the surface. Based on common experience, it is reasonable to infer an interval of a few years between repaintings. Therefore, it is reasonable to infer that Layer 7 was applied 26 or more years after the home was built in 1902. That places it well past the starting point of Sherwin-Williams' period of culpability. I conclude that a jury's finding that Sherwin-Williams' negligence was a substantial factor in causing plaintiffs' lead exposure would not be against the weight of the evidence.

Third, Sherwin-Williams argues that plaintiffs failed to prove that they ingested WLC. The basis of this argument is that the paint chip samples that were tested for purposes of this litigation and revealed the presence of WLC were taken from areas in the home where the paint was intact at the time the plaintiffs were exposed, and intact paint is not a lead hazard. This argument fails. Home inspections at the time of plaintiffs' lead exposure revealed areas of deteriorated paint that contained lead, which was subsequently remedied through mandatory abatement. Though the deteriorated paint was not tested at the time to determine whether it contained WLC or other lead compounds, the significant presence of WLC in the intact paint in each home supports that inference that the deteriorated paint in the homes at the time of the plaintiffs' exposure also contained a significant measure of WLC, which might readily have been ingested by the plaintiffs.

Fourth, Sherwin-Williams argues that plaintiffs failed to provide reliable evidence of injury caused by WLC. As I have discussed elsewhere, Dr. Idit Trope's testimony that neuropsychiatric testing revealed areas of functional deficit consistent with brain injury caused by lead poisoning is a sufficient basis for the jury's finding that each plaintiff had sustained an injury from his lead exposure. ECF # 1775 at 19. Sherwin-Williams also challenges the reliability of the testimony of plaintiffs' expert Dr. Besunder, who used epidemiological studies to reach the conclusion that each plaintiff had likely suffered at least 10 points of IQ loss due to his lead exposure. As I have explained, Dr. Besunder's testimony is addressed to the question of damages rather than causation, and his reliance on epidemiological evidence is reliable for that purpose. *Id.* at 20-21, fn. 4.

2. Armstrong Containers

Armstrong Containers also makes certain arguments that the verdict against it was against the weight of the evidence. I have addressed Armstrong's arguments in my order denying its motion for judgment as a matter of law. ECF # 1776, and I will not reconsider them here.

### F. Excessive or Inconsistent Damages

The defendants argue that the jury's award of two million dollars damages to each defendant was excessive and lacked evidentiary basis. Wisconsin case law provides that where the amount of damages cannot be proven with exact proof, a plaintiff must present "evidence with such certainty as the nature of a particular case may permit" to "lay a foundation which will enable the trier of fact to make a fair and reasonable estimate." *Cutler Cranberry Co., Inc. v. Oakdale Elec. Coop.*, 254 N.W.2d 234, 240-41 (Wis. 1977). Each plaintiff seeks compensatory damages for the pain and suffering he has experienced and will experience as a result of the brain injury caused by his WLC exposure. Under Wisconsin law, pain and suffering include worry, distress, embarrassment and humiliation. WIS JI-CIVIL 1767 – Personal Injuries: Future Pain, Suffering and Disability. In answering the damage question as to pain and suffering, a jury should consider "the extent plaintiff's injuries have impaired and will impair his ability to enjoy the normal activities, pleasures and benefits of life," along with other factors. *Id.* These factors are not easily quantified and require a subjective determination. Plaintiffs presented evidence that they had suffered injuries to their brains that impaired certain key cognitive functions. They also presented evidence that the scale of such injury might be estimated as at least 10 IQ points in each case. Further, the injuries were sustained when the plaintiffs were toddlers. Ten IQ points is a meaningful loss, which over the course of

an entire lifetime might give rise to many experiences of distress and embarrassment, and might significantly and repeatedly impair a person's ability to fully enjoy the normal activities, pleasures and benefits of life, particularly those pleasures and benefits associated with learning. A jury can value such experiences and impairments on the basis of common experience, without expert testimony. I find that "ten IQ points over a lifetime" gave the jury a sufficient evidentiary basis to make a fair and reasonable estimate of the damages in these cases, and I find that $2 million is not an unreasonable valuation of those damages.

However, defendants also argue that the award of identical damages to each of the three plaintiffs is not rationally connected to the evidence, because Dr. Besunder admitted at trial that of the minimum of 10 IQ points he estimated plaintiff Burton had lost due to cumulative lead exposure, six were lost to unspecified exposure dating from before Burton moved into the home that was the focus of this trial. Tr. 2818-19. I agree with Sherwin-Williams on this point. The jury's award of $ 2 million to each of the three plaintiffs is consistent with the testimony that each of the three plaintiffs suffered a loss of at least ten IQ points due to cumulative lead exposure, but fails to account for the evidence that a substantial measure of Burton's exposure was caused by lead for which no defendant was found or alleged to be responsible. A trial court may vacate a jury award where there is "no rational connection between the evidence on damages and the verdict," *Joan W. v. City of Chicago,* 771 F.2d 1020, 1023 (7th Cir. 1985), and I find that standard applicable to Mr. Burton's case. When a jury verdict meets this standard, Seventh Circuit law requires that I present the plaintiff with the option of a reduction of damages or a new trial. *Haluschak v. Dodge City of Wauwatosa*, 909 F.2d 254, 256 (7th Cir. 1990); *Adams v. City*

*of Chicago*, 798 F.3d 539, 541 (7th Cir. 2015). Because plaintiffs' expert's testimony indicates that only four of the 10 lost IQ points that form the basis of the jury's award can be causally attributed to the defendants, I will remit Mr. Burton's damage award to $800,000. If Mr. Burton chooses to reject this remittitur and instead seek a new trial on the question of damages, he shall so notify the court within fourteen days of the date of this order.

### G. First Amendment

Sherwin-Williams argues that I violated its First Amendment rights by allowing the jury to consider evidence of its truthful advertisements and membership in trade associations without limiting instructions. Sherwin-Williams argues that I should have instructed the jury that Sherwin-Williams could not be held liable for its advertisements or association memberships. However, the verdict forms and instructions made clear that the only conduct for which the jury might find liability is the making and selling of WLC. The verdict form asks whether each defendant was negligent in producing or marketing WLC, and the instructions specify that the word "marketing" means "offering a product for sale." I also instructed the jury that no defendant was responsible for any action or omission of the trade associations, and that the evidence concerning the trade associations was to be considered only with respect to the participating defendants' knowledge of the risks of lead and not as an independent ground for liability. Therefore, I am confident that the jury's verdict against Sherwin-Williams was not improperly premised on conduct protected by the First Amendment; I am also confident that I did not violate Sherwin-Williams' First Amendment rights by admitting the challenged evidence.

*H. Jury Selection*

Defendants argue that my handling of the jury selection process rendered the trial unfair to them. First, they object to my decision to allow three peremptory strikes to the defendants collectively, and three to the plaintiffs collectively. Second, they claim that I was inequitable in my handling of the two sides' challenges for cause.

To establish a right to relief from errors in the jury selection process, a party must show that a biased juror was seated. *Jiminez v. City of Chicago*, 732 F.3d 710, 716 (7th Cir. 2013). Defendants have not made such a showing. They argue that Juror 23 was biased, because she stated that "in the name of the almighty dollar sometimes companies . . . will not do all they should maybe to protect the public or make a safe product." ECF # 1740 at 23. This statement is not indicative of bias; it is an objectively true statement about behavior in which companies sometimes engage—the type of behavior recognized by product liability law. In other words, the statement defendants point to as indicative of bias is in actuality only a statement that this juror understood in broad strokes the legal theory on which this case was premised. Because defendants have not shown that a biased juror was seated, they are not entitled to a new trial on the basis of the jury selection process. *Jiminez*, 732 F.2d at 716 ("Without a showing that a biased juror was seated, any error in the jury selection process . . . could have been an error only in a technical sense.")(internal quotations omitted).

Further, I do not find that the defendants have identified any actual error or unfairness in my handling of the jury selection process. Under 28 U.S.C. § 1870, multiple defendants may be "considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised

separately or jointly." 28 U.S.C. § 1870; *Tideman v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 725 (7th Cir. 2000). In multidefendant cases, courts look to whether the defendants have different or adverse interests in deciding whether to treat them as a single party or allow more than the statutory minimum of three challenges. *See, e.g., Long John Trucking, Inc. v. Greear*, 421 F.2d 125, 128 (10th Cir. 1970). Here, I determined that the defendants' interests were closely aligned and did not warrant a departure from the norm of three strikes per side. The claims against the defendants were all based on the making and selling of WLC. Defendants argue that there were certain factual differences between them---e.g., when they manufactured WLC or the forms in which they sold it. But defendants do not show how these factual nuances give rise to adverse interests between them that would be material to jury selection.

Defendants' claims of unfairness in my handling of the two sides challenges for cause are also overblown. The two jurors cited in Armstrong's brief whom I struck for cause on plaintiffs' motion had both made hard statements that people who sue companies are looking for an easy way to get paid, suggesting prejudice about the parties and pre-existing conclusions about the proper outcome of the lawsuit. ECF # 1740 at 20-21(Juror No. 7 had "strongly held beliefs that people who sue companies are looking for an easy way to get paid"; Juror No. 11 "believes that corporations get sued because they have deep pockets[,] . . . .and that verdict amounts should be limited right off the bat, without hearing any further evidence."). In contrast, the three jurors Armstrong cites regarding whom I denied defendants' motions to strike made no such statements suggesting they had already formed conclusions about the proper outcome of this lawsuit. As described above, Juror 23 made an objectively true statement about behavior in which

companies might engage, but did not indicate that she already assumed that the companies in this case had engaged in such behavior. Juror 18 stated that she knew lead paint was harmful, a fact that defendants have conceded many times over.[5] She also stated that she had attended the same high school as one of the plaintiffs and that if she recognized one of the teachers from that school it might "have an effect" on her, but she did not state what that effect might be. Finally, Juror 19 made no statements suggesting that he had preconceptions about the outcome of the trial; defendants' grounds for striking him were that he had been a plaintiff in a tort action, but he unequivocally stated that that experience would not affect his assessment of these cases. In short, defendants' argument that I was unfair in my handling of the two sides' strikes for cause is based on false equivalencies and therefore not persuasive.

### I. *Verdict Form Treatment of Causation*

Defendants argue that the verdict form misstated Wisconsin law because it did not require the jury to find a causal link between a specific defendant's negligent conduct and plaintiff's harm. For the reasons discussed in section III.E.1, *supra,* under risk contribution the jury was not required to find causation in the manner the defendants suggest.

### J. *Other Arguments.*

The defendants make various other arguments for a new trial. Some of these arguments revisit issues I have already addressed at length, and I will rest on my previous

---

[5] See, e.g., ECF # 1070 at 15, holding that defendants had no duty to warn plaintiffs or their caregivers about risks associated with lead paint, because federal, state and local governments had been warning the public of risks of lead paint since the 1970s.

treatments of them.[6] Other arguments are addressed to individual evidentiary rulings, lines of questioning I allowed counsel to pursue at specific points in the proceedings, and nuances in the language of the verdict form. I have considered these arguments, and I do not find that defendants have identified any fundamental unfairness that warrants a new trial, particularly in the context of this long and complex litigation.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that DuPont's Motion for Joinder in Armstrong Containers' and Sherwin-Williams' motions for new trial (ECF # 1742) is **GRANTED.**

**IT IS FURTHER ORDERED** that DuPont's Motion for New Trial (ECF # 1723) is **DENIED.**

**IT IS FURTHER ORDERED** that Sherwin-Williams' Motion for New Trial (ECF # 1726) is **GRANTED** to the extent that the damages award to Glenn Burton shall be remitted to $800,000.00, and **DENIED** in all other respects**.**

**IT IS FURTHER ORDERED** that Armstrong Containers' Motion for New Trial (ECF # 1739) is **DENIED.**


Dated at Milwaukee, Wisconsin this 10th day of April, 2020.

s/Lynn Adelman____
LYNN ADELMAN
U.S. District Judge

_____

[6] For my treatment of the fungibility question, see ECF # 1706 at 16-27. For my treatment of the question of superseding, intervening cause, see *id.* at 5-9. Regarding the sophisticated user doctrine, see ECF # 1775 at 17.